WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Teamsters Local 617 Pension )    No. 2:06-CV-2674-PHX-RCB
and Welfare Funds, on behalf )
of itself and all other      )         **O R D E R**
similarly situated,          )
                             )
          Plaintiff,         )
                             )
     vs.                     )
                             )
                             )
Apollo Group, Inc.; John G.  )
Sperling; Todd S. Nelson;    )
Kenda B. Gonzales; Daniel E. )
Bachus; John Blair; John R.  )
Norton III; Hedy Govenar;    )
Brian E. Mueller; Dino J.    )
DeConcini; Peter Sperling; and)
Laura Palmer Noone,          )
                             )
          Defendants.        )
_____

### *Introduction*

Since the publication of a series of *Wall Street Journal* articles in March 2006, "reporting academic research suggesting that various companies were suspiciously lucky in selecting their option grant dates[,]" In re MIPS Technologies, Inc., 2008 WL 3823726, at *2 (N.D.Cal. Aug. 13, 2008), countless lawsuits have been filed across the country alleging backdating of stock options.

1  This is one such lawsuit.

2       Lead plaintiff, Pension Trust Fund for Operating Engineers

3  ("plaintiff"), "a $3.17 billion pension fund[,]" First Amended

4  Complaint ("FAC") (doc. 71) at ¶ 16, brings this lawsuit against

5  Apollo Group, Inc. ("Apollo"), "the largest accredited post

6  secondary education institution in the United States[.]"  Farrell

7  Decl'n (doc. 80), exh. 2 thereto at 9.  Also named as defendants

8  are various individuals who were Apollo officers and directors

9  between November 28, 2001, and October 18, 2006 ("the Class

10 Period").

11                              ***Background***

12 ***I.  Overview of Claims***

13      Basically, plaintiff alleges that defendants "intentionally

14 manipulated stock option grants to [Apollo's] officers, directors

15 and employees . . . to provide the[m] . . . with a more profitable

16 exercise price and to under-report [Apollo's] expenses and thereby

17 overstate [Apollo's] earnings."  FAC (doc. 71) at ¶ 2.  That

18 allegedly fraudulent backdating occurred in three ways.  First,

19 defendants "violate[d] the terms of [Apollo's] stock option

20 plan[.]"  Id. at ¶ 5(a).  Second, they "misrepresent[ed] how the

21 options [we]re priced[.]"  Id. at ¶ 5(b).  Third, defendants

22 "fail[ed] to properly record expenses associated with these option

23 grants under GAAP [Generally Accepted Accounting Principles]."  Id.

24 at ¶ 5(c).

25      As a result of this alleged backdating "scheme, Apollo [was]

26 forced to restate its previously filed financial statements for

27 fiscal years 2001 through the second quarter of 2006 by over $59

28 million[.]"  Id. at ¶ 2.  That "scheme" likewise purportedly

"caused" Apollo to issue "materially false and misleading"
financial statements during the Class Period, "resulting in an
artificial inflation of [Apollo's] stock price, the disclosure of
which caused investors to lose hundreds of millions of dollars."
Id.   Through this "scheme," defendants also supposedly "concealed
that Apollo was not recording material compensation expenses and
was materially overstating its net income and earnings per share,
in violation of . . . [GAAP]." Id.  During the Class Period
plaintiff purchased Apollo stock which, in light of the foregoing,
it alleges was purchased at artificially inflated prices.

Plaintiff alleges violations of §§ 10(b) and Rule 10b-5,
20(A)(a), and 20(a) of the Securities and Exchange Act of 1934
("Exchange Act"), as amended by the Private Securities Litigation
Reform Act of 1995 ("the PSLRA"), against all defendants.  It
further alleges that all defendants violated a host of fiduciary
duties under Arizona state common law "and/or aided and abetted" in
the violation of those duties.  Id. at 94.  Lastly, plaintiff
alleges that defendants Nelson, Blair, Norton, Gonzales, Bachus and
Mueller engaged in a "civil conspiracy to commit fraud[.]" Id. at
95.

Currently pending before the court is Apollo's motion to
dismiss pursuant to Fed. R. Civ. P. 12(b)(6) (doc. 81), and the
individual defendants'[1] motions to dismiss on that same basis (doc.
82).  Additionally, Apollo and the individual defendants have each
filed a "Request for Judicial Notice" ("RJN")(docs. 79 and 83),

---

[1]      Apollo and the individual defendants will be referred to collectively
throughout as "the defendants," unless necessary to distinguish among them.

1  which plaintiff does not oppose.[2]

2  ***II.  Overview of Allegations***

3      As the court in In re New Century, 2008 WL 5147991 (C.D.Cal.

4  2008), astutely observed, "in the securities class action context,

5  the stringent pleading requirements appear to invite both parties

6  to throw everything and the kitchen sink into their respective

7  pleadings and motions to dismiss."  Id. at *9.  This case is no

8  different.  In an effort to separate the wheat from the chaff, at

9  the outset the court will summarize plaintiff's allegations.  It

10  will then go on to consider each of defendants' numerous dismissal

11  arguments.

12      The following facts, which the court must "accept[] as true" on

13  these motions to dismiss, are derived from the FAC.  See South

14  Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 782 (9th Cir. 2008)

15  (citation omitted).  Additionally, as explained below, these facts

16  are also derived from various documents which the FAC either

17  incorporates by reference or of which the court may properly take

18  judicial notice.  From these documents, the following general

19  picture emerges of Apollo's stock option grant process during the

20  Class Period.  More details will be provided herein as necessary to

21  resolve these motions to dismiss.

22      Defendants vigorously deny that they engaged in fraudulent

23  backdating of stock options.  Rather, as Apollo depicts it, the

24  Company merely "failed . . . to dot all 'i's and cross all 't's

25

26      [2]    Given the parties' comprehensive memoranda of law, including
27  supplemental memoranda ordered by the court, and other submissions, the court
   denies the parties' respective requests for oral argument, finding that it will not
   aid the court in its decisional process.  See Mahon v. Credit Bureau of Placer
28  County, Inc., 171 F.3d 1197, 1200 (9th Cir. 1999).

when completing the paperwork necessary to grant stock options."
Mot. (doc. 81) at 7.  The individual defendants similarly maintain
that at most "innocent accounting errors[]" were made.  Mot. (doc.
82) at 13.  Given these widely divergent views of Apollo's stock
option grant practices, before turning to the specific allegations
in the FAC, an overview of stock option grants in general is
warranted.

### A.  The Rudiments of Stock Option Backdating

In re CNET Networks, Inc., 483 F.Supp.2d 947 (N.D.Cal. 2007),
provides a succinct description of "the mechanics of stock-options
backdating[,]" from which this court will heavily borrow.  See id.
at 949.  When a company grants a stock option to an employee, that
employee has "the right to purchase the stock at the exercise price
at a later date after the option vests."  Id. at 949.  The
"exercise price" is simply a pre-determined or designated price at
which the underlying security may be purchased.  See FAC (doc. 71)
at 1, ¶ 3.  Due to that later vesting date, "[i]f the stock price
rises, the employee stands to make a profit."  CNET Networks, 483
F.Supp.2d at 949.  Conversely, "[i]f the stock price falls below
the exercise price, the option is worthless to the employee."  Id.
So-called "at-the-money" options are those "where the exercise
price is at the market price as of the date of the grant[.]"  Id.
On the other hand, "in-the-money" options, which the FAC alleges
were the type granted here, are those "where the exercise price is
lower than the market prices as of the grant date[.]"  Id.  The
distinction between these two types of options is significant for
financial reporting purposes.  Companies must "record compensation
costs for granting in-the-money options because the company

effectively receives a lower price than it could get for the shares on the open market[.]" Id. Not recording such options, as the FAC alleges, results in overstating a company's net income. See FAC (doc. 71) at 4, ¶ 8. On the other hand, there is no need to record compensation costs "for at-the-money options because the exercise price is the same as the market price." CNET Networks, 483 F.Supp.2d at 949. Consequently, "[t]he company is not foregoing any revenue." Id. "Backdating occurs when the option's grant date is altered to an earlier date with a lower, more favorable price to the recipient." Id. at 950. This "[b]ackdating is done to avoid compensation expenses." Id. at 956.

### B. Apollo Stock Option Grants

Like many publicly held companies, as part of its compensation plan, Apollo granted stock options to its executives and employees. Plaintiff alleges that Apollo engaged in impermissible stock option backdating under two separate compensation plans whereby it awarded "Management Grants" – the Long Term Incentive Plan ("LTIP") and the 2000 Stock Incentive Plan. See FAC (doc. 71) at ¶ 41. Under the LTIP, between June 1994 to March 24, 2000, "Apollo issued stock option grants to Section 16 officers[.]" Id. at ¶ 42. The LTIP expressly required that the exercise price of "Incentive Stock Option[s] [("ISO)]" thereunder could "not be less than the Fair Market Value of a share of [s]tock on the date of [the] grant[.]" Id. at ¶ 42 (internal quotation marks and citation omitted). That limitation on the exercise price pertained only to ISOs, however. As to other stock options, the LTIP allowed the Compensation Committee to determine the exercise price, with no mention of fair market value. Id., exh. B thereto at ¶ 7.1(a). The LTIP also

required that both members of that Committee, defendants Norton and Blair, approve all grants made thereunder.  Id. at ¶¶ 42; 22 and 23.

   "After March 24, 2000, . . . Management Grants" were awarded pursuant to the 2000 Plan.  Id. at ¶ 43.  That Plan required grant approval by the two member Compensation Committee, i.e. defendants Blair and Norton, "or by both the President and CEO[,]" which during the relevant time frame was the same person, defendant Nelson.  Id.  The FAC further alleges that "both Nelson and the Compensation Committee" approved backdated grants "during the relevant period."  Id. (emphasis added).  Defendant Nelson had the "authority to approve" option grants under the 2000 Plan for not only other employees, but also for himself.  Id.

   The 2000 Plan differed somewhat from the LTIP in terms of the exercise price.  Like the LTIP, the exercise price for any ISO could "not be less than the Fair market Value as of the date of the grant."  Id., exh. C thereto at ¶ 7.2(a).  As for certain other options, however, the Compensation Committee could grant options "with an exercise price of less than Fair Market Value on the date of grant."  Id., exh. C thereto at ¶ 7.1(a).

   Quoting directly from the Restatement, the FAC alleges that the process of granting stock options at Apollo "followed a similar pattern each year[,]" with the initial development of a "list of grantees."  Id. at 63, ¶ 106.  In the ensuing weeks, adjustments would be made as to names, shares and "underlying vesting goals . . . developed."  Id. at 64, ¶ 106.  At times during this process there was insufficient documentation as to when, for example, certain grants were actually finalized.  See generally id. at 63-

67, ¶ 106.  As defendants characterize it, these "documentation errors led Apollo to recognize additional compensation expenses of $52.9 million before tax for the years 1994 to 2005."  Mot. (Doc. 82) at 9 (citing FAC at 63).

Despite defendants' depiction of the grant process at Apollo, plaintiff alleges that on June 28, 2006, "the truth beg[a]n to emerge" regarding Apollo's alleged backdating scheme.  FAC (doc. 71) at 56, VII.  On that date, a Lehman Brothers analyst "published a report titled, 'Did Apollo Backdate Options?'[.]" Id. at ¶ 89. Based upon an indication in that Report that "***Apollo['s] . . . option grant history looks highly questionable***[,]" the FAC alleges, "Apollo's stock price fell 2.7%" from the preceding day.  Id. at ¶ 89 (internal quotation marks omitted) (emphasis added in FAC).

Apollo responded by issuing a news release stating, among other things, that after an internal review of its stock option practices "Management believes that it has complied with all applicable laws, . . . in granting options to officers and it has not backdated options."  Farrell Decl'n (doc. 80), exh. 3 thereto  at 3; see also FAC (doc. 71) at ¶ 91.  Apollo further signaled its intent "to hire an outside firm to review and confirm [Apollo's] conclusions."  Id.

Several weeks later, on June 19, 2006, Apollo "disclosed that it had received a subpoena from the U.S. Attorney for the Southern District of New York requesting documents relating to [its] stock option grants."  FAC (doc. 71) at 58, ¶ 92.  Shortly thereafter, on June 28, 2006, defendant John Sperling, at the time Apollo's Acting Executive Chairman, and defendant Peter Sperling, Apollo's Senior Vice President, "appointed a [S]pecial [C]ommittee . . . of the Board to oversee a review of" Apollo's stock option grant

1   practices.  Id. at  ¶ 93.  Defendant Hedy Govenar was one of two

2   Apollo Board members appointed to that Special Committee.  Id.  The

3   Special Committee "retain[ed] independent legal counsel, who in

4   turn, retained forensic accountants, to assist them in conducting

5   an independent review of [Apollo's] historical practices related to

6   stock option grants[.]" Morrison Decl'n (doc. 83), exh. 1 thereto

7   at 5.  Soon after the formation of the Special Committee, Apollo

8   "received a letter from the SEC [Securities Exchange Commission]

9   announcing an informal investigation and requesting documents."

10  FAC (doc. 71) at ¶ 94 (footnote omitted).

11      Due to that "ongoing investigation[,]" on July 13, 2006,

12  "Apollo announced that . . . it was unable to timely file with the

13  SEC its [fourth quarter] Form 10-Q[.]" Id. at ¶ 95 (internal

14  quotation marks omitted).  Plaintiff alleges that Apollo's stock

15  dropped "23.5% from a close of $55.47 on June 8, 2006, to a close

16  of $43.51 on August 8, 2006, in significant part due to the[se]

17  disclosures of backdating."  Id. at ¶ 96.

18      On October 18, 2006, Apollo "issued a news release and

19  disappointing earnings announcement[.]"  Id. at ¶ 98.  The alleged

20  import of those statements is that "for the first time, and in

21  contrast to Apollo's previous denials, . . . '***various deficiencies***

22  ***in the process of granting and documenting stock options have been***

23  ***identified to date.***  The accounting impact of these matters has not

24  been quantified.  ***There can be no assurances that the results of***

25  ***the investigation will not require a possible restatement of the***

26  ***Company's financial statements*** when the potential errors are

27  quantified and assessed.'" Id. (emphasis added in FAC).  Following

28  that announcement, Apollo's stock price fell "22.0% in one day to a

4-year low of $37.55[.]" Id.

    **C.  Special Committee Results**

    On November 3, 2006, Apollo "announced the [Special
Committee's] interim factual findings[.]"  Id. at ¶ 99.  Those
findings "identified various deficiencies" in terms of "the process
of granting and documenting stock options."  Id.  Among those
deficiencies were Apollo's failure to "correctly apply the
requirements of Accounting Principles Board . . . Opinion No. 25
[("APB 25")][;]" its misapplication of the Internal Revenue Service
("IRS") Code "with respect to the contemporaneous tax treatment of
certain stock options[;]" and "inaccurate documentation concerning
the date that grant award lists were completed and approved."  Id.
Despite those deficiencies, at that juncture the Special Committee
"found no direct evidence that the grant date for any of the large
management grants was selected with the benefit of hindsight."
Morrison Decl'n (doc. 83), exh. 3 thereto at 3.  Acknowledging the
"possibility" in "two instances" that "the grant date was
retroactively selected," nonetheless, Apollo stated that there was
"insufficient evidence at th[at] time to reach such a conclusion."
Id.  On that same date, Apollo announced that its Chief Financial
Officer and Treasurer, defendant Gonzales, had resigned two days
earlier, on November 1, 2006.  FAC (doc. 71) at ¶ 99.  Following
the Special Committee's announcement, the FAC alleges that
"Apollo's stock price dropped another 2.72%[.]" FAC (doc. 71) at
¶ 100.

    A few days later, on November 9, 2006, Apollo announced another
resignation -- the November 5, 2006 resignation of defendant
Bachus, Apollo's Chief Accounting Officer and Controller.  Id. at

1   ¶ 102.  Allegedly, "Bachus resigned as a result of his involvement
2   in the backdating at Apollo[.]" Id. (citation omitted). During this
3   roughly one week period in early November 2006, plaintiff claims
4   that Apollo's "stock price declined 6.2%" – a decline which it
5   specifically alleges was "not due to market or industry-specific
6   events." Id. at ¶ 103.

7       On December 8, 2006, the Special Committee "presented their
8   final factual findings" to Apollo's Board, findings which "were
9   largely consistent" with the interim findings outlined above.
10  Morrison Decl'n (doc. 83), exh. 4 thereto at 3.  Additionally, the
11  Special Committee "reported . . . that certain former officers took
12  steps that may have been intended to mask failures in the grant
13  approval process with respect to [Apollo's] financial reporting and
14  payment of taxes." Id. The Special Committee further advised the
15  Board that it had "recently discovered additional evidence that
16  raise[d] questions whether another grant date" besides the two
17  mentioned earlier, "may have been retroactively selected by a
18  day[,]" but the Committee stated that there was "insufficient
19  evidence to reach such a conclusion." Id.   Nonetheless, at that
20  time Apollo determined that it had "understated its allowance for
21  doubtful accounts" and had an "associated bad debt expense of
22  approximately $34 million." Id., exh. 4 thereto at 4.  The next
23  trading day, after this information was filed with the SEC, the FAC
24  alleges that Apollo's stock price "declined by 3.59%[.]" FAC (doc.
25  71) at ¶ 105.

26  ***D.  Restatement***

27      Roughly six months after the Special Committee released its
28  final findings, on May 22, 2007, Apollo filed with the SEC "its

belated Form 10-K containing restated financial results [("the Restatement")]. Id. at ¶ 106. The FAC contains large block quotes from the Restatement making it difficult to ascertain exactly what parts thereof plaintiff deems pertinent to its claims. Suffice it to say for now that the Restatement indicates that Apollo "used incorrect measurement dates for accounting purposes[]" for 57 of the 100 total grants made during this time period[,]" Id. at 62, ¶ 106. "As a result, revised measurement dates were selected for many grants and resulted in exercise prices that were less than the fair market value of the stock on the most likely measurement dates[,]" and Apollo "restated [its] financial results] to record additional share based compensation expense." Id. at 63, ¶ 106; and at 69, ¶ 106. Overall, the "Impact of the Restatement[,]" was that Apollo's "retained earnings as of September 1, 2003," were "adjusted" downward from $765.2 million to $702.7 million. Morrison Decl'n (doc. 83), exh. 1 thereto at 15.

On July 3, 2007, Apollo announced that the SEC had "completed its investigation and . . . [it] d[id] not intend to recommend any enforcement action[.]" Farrell Decl'n (doc. 802), exh. 1 thereto at 2; see also FAC (doc. 71) at ¶ 94 n. 4. Several months after the filing of the Restatement, but prior to the completion of that SEC investigation, on November 2, 2006, this action was commenced. Approximately one year later, following the appointment of lead plaintiff and lead counsel, on November 23, 2007, the complaint which is the subject of these dismissal motions was filed.

. . .

1          *Discussion*

2   *I.  Scope of Documents Considered*

3         *A.  Defendants' Requests*

4         Preliminarily, the court will address defendants' requests for

5   consideration of documents beyond the complaint.  The court will

6   proceed in this way because "as a general rule, a district court

7   may not consider materials not originally included in the pleadings

8   in deciding a Rule 12 motion."  U.S. v. 14.02 Acres of Land More or

9   Less, 530 F.3d 883, 894 (9th Cir. 2008) (internal quotation marks

10  and citation omitted).  "When ruling on a Rule 12(b)(6) motion to

11  dismiss, if a district court considers evidence outside the

12  pleadings, it must normally convert the 12(b)(6) motion into a Rule

13  56 motion for summary judgment, and it must give the nonmoving

14  party an opportunity to respond."  U.S. v. Ritchie, 342 F.3d 903,

15  907 (9th Cir. 2003) (citations omitted).  There are two exceptions

16  to these general rules.  The first is the incorporation by

17  reference doctrine; and the second is the doctrine of judicial

18  notice.  Under either of those doctrines, a court may consider

19  certain matters beyond the complaint, without converting a motion

20  to dismiss into a summary judgment motion.  See id. at 908

21  (citations omitted).  Here, the defendants are relying upon both

22  doctrines, which the court will address in turn.

23        *1.  Incorporation by Reference*

24        It is well settled that, "a court may consider material which

25  is properly submitted as part of the complaint on a motion to

26  dismiss without converting th[at] motion . . . into a motion for

27  summary judgment."  Lee v. City of Los Angeles, 250 F.3d 668, 688-

28  89 (9th Cir. 2001) (internal quotation marks and citation omitted);

1  see also Fed. R. Civ. P. 10(c) ("A copy of a written instrument

2  that is an exhibit to a pleading is a part of the pleading for all

3  purposes.") The incorporation by reference doctrine allows a court

4  to also "take into account documents whose contents are alleged in

5  a complaint and whose authenticity no party questions, but which

6  are not physically attached to the [plaintiff's] pleading."

7  Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005) (internal

8  quotation marks and citations omitted).  Taking a relatively

9  expansive view of that doctrine, the Ninth Circuit has recognized

10  that "[e]ven if a document is not attached to a complaint, it may

11  be incorporated by reference into a complaint if the plaintiff

12  refers extensively to the document or the document forms the basis

13  of the plaintiff's claim."  Ritchie, 342 F.3d at 908 (citations

14  omitted).  Under those circumstances, "the district court may treat

15  such a document as part of the complaint, and thus may assume that

16  its contents are true for purposes of a motion to dismiss under

17  Rule 12(b)(6)."  Marder v. Lopez, 450 F.3d 445, 448 (9th Cir. 2006)

18  (internal quotation marks and citation omitted).

19      Significantly, in In re Silicon Graphics Secs. Litig., 183 F.3d

20  970 (9th Cir. 1999), the Ninth Circuit held that on a motion to

21  dismiss the district court properly invoked the incorporation by

22  reference doctrine to consider a company's SEC filings where the

23  plaintiff alleged the contents of those filings in her complaint

24  and relied on them as a basis for her allegations.  Id. at 986; see

25  also Fecht v. Price Co., 70 F.3d 1078, 1080 n.1 (9th Cir. 1078)

26  (affirming district court's consideration on motion to dismiss of

27  "full text of the Company's corporate disclosure documents and

28  . . . securities analysts' reports quoted in the Complaint[]").

1    In this action, the FAC is 103 pages, with attached exhibits

2   totaling 79 pages.  It references 11 of the 13 documents which

3   Apollo requests the court to consider, and 8 of the 12 documents

4   which the individual defendants request the court to consider.

5   Defendants' requests overlap somewhat.

6    Given that plaintiff is not opposing these defense requests,

7   obviously, there are no authenticity challenges.  Thus, under the

8   incorporation by reference doctrine, the court will consider the

9   following documents, as necessary, to resolve these motions to

10  dismiss:

11          (1)  the July 3, 2007, news release entitled "Apollo
            Group, Inc. Announces Completion of SEC Investigation[;]"
12
            (2) a June 8, 2006, Lehman Brothers Equity Research
13          Company Update ("the Lehman Report");

14          (3) Apollo's Form 8-Ks filed with the SEC on October 18,
            2006; November 6, 2006; and December 15, 2006;
15
            (4) excerpts from Apollo's Form 8-Ks filed with the SEC on
16          June 12, 2006, and June 20, 2006;

17          (5) excerpts from Apollo's Form 10-K filed with the SEC on
            May 22, 2007;
18
            (6) a Yahoo! Finance print out, documenting the market
19          price of Apollo's common stock from December 1998, April
            1999, and May 14, 2007 until present;
20
            (7) excerpts from the November 17, 2006, deposition
21          transcript of John Sperling in In re Apollo Group, Inc.
            Securities Litigation, CV 04-2147-PHX-JAT;
22
            (8) a September 19, 2006, letter from the SEC's Chief
23          Accountant; and

24          (9) Apollo "stock trading price information for the
            periods January 1, 1998 through December 31, 2001 and
25          January 1, 2006 through December 31, 2007 downloaded from
            Google Finance . . . [.]"
26

27  RJN (doc. 79) at ¶¶ 1-10; and RJN (doc. 83).

28  . . .

### *2. Judicial Notice*

Pursuant to Fed. R. Evid. 201, a court may "take judicial notice of matters of public record and consider them without converting a Rule 12 motion into one for summary judgment." 14.02 Acres of Land, 530 F.3d at 894 (internal quotation marks and citation omitted).  That Rule "governs only judicial notice of adjudicative facts." Fed. R. Evid. 201(a).  The notes following that Rule define "adjudicative facts" as "simply the facts of the particular case." Fed. R. Evid. 201 advisory committee's note. The court may take judicial notice of such facts "as long as the facts noticed are not subject to reasonable dispute." Intri-Plex Technologies, Inc. v. Crest Group, Inc., 499 F.3d 1048, 1052 (9th Cir. 2007) (internal quotation marks and citation omitted). Rule 201 therefore provides an alternative means by which the court can consider Apollo's SEC filings, reported stock price history, and the other publicly available financial documents listed above. See Metzler Inv. GmbH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1064, n.7 (9th Cir. 2008) (citation omitted) ("proper" for district court to take judicial notice of "reported stock price history and other publicly available financial documents, including . . . SEC filings[]" on motion to dismiss).

The complaint does not reference the remaining four documents of which the individual defendants request the court to take judicial notice.  Three of those documents also are SEC filings: (1)  Apollo's Form 8-Ks filed on March 15, 2007, and on May 4, 2007; (2)  Apollo's Articles of Incorporation, filed on August 1, 2000; and (3) the Articles of Amendment thereto, filed in Apollo's Form 8-K filed on July 27, 2007.  As just explained, the court may

1  properly take judicial notice of these various SEC filings.  That

2  is because such filings "are 'capable of accurate and ready

3  determination by resort to sources whose accuracy cannot be

4  reasonably questioned.'"  In re White Electronic Designs Corp. Secs.

5  Litig., 416 F.Supp.2d 754, 760 (D.Ariz. 2006) (quoting In re

6  Network Assoc., Inc. II Secs. Litig., 2003 WL 24051280, at *1 n. 3

7  (N.D.Cal. Mar. 25, 2003)) (other citations omitted).  The court

8  stresses that it only is taking judicial notice of "the content" of

9  these various SEC filings, "and the fact that they were filed with

10 the agency."  See Patel v. Parnes, 2008 WL 2803076, at *14

11 (C.D.Cal. May 19, 2008).  "The truth of the content, and the

12 inferences properly drawn from them, however, is not a proper

13 subject of judicial notice under Rule 201."  Id. (citations

14 omitted).  Accordingly, as in Patel, the court will take judicial

15 notice of these SEC filings, but only to the extent the individual

16 defendants are seeking judicial notice of the content of those

17 documents and the fact of their filing.  See id.

18     The last document of which the individual defendants seek to

19 have this court take judicial notice is a December 4, 2006, court

20 order in Alaska Electrical Pension Fund, Derivatively on Behalf of

21 Apollo Group, Inc. v. Sperling, CV-06-2124-PHX-ROS.  Curiously,

22 despite this explicit request, these defendants do not mention that

23 order either in their motion or in their reply.  Nor does their RJN

24 offer any insight as to why judicial notice of that order is

25 necessary.  The individual defendants merely state that the court

26 may take judicial notice of the Alaska Electrical order "because it

27 is an order of another court."  RJN (doc. 83) at 4 (citing U.S. ex

28 rel. Robinson Rancheria Citizens Council v. Borneo, Inc., 971 F.2d

1   244, 248 (9th Cir. 1992)).  The court declines to speculate as to

2   the supposed import of the <u>Alaska Electrical</u> order on this action.

3   Accordingly, it denies the individual defendants' request to take

4   judicial notice of that order.  <u>See</u> <u>White Electronic</u>, 416 F.Supp.2d

5   at 761 (refusing to take judicial notice where defendants did "not

6   explain[] why they . . . requested judicial notice").

7        Like the individual defendants, Apollo also is requesting that

8   the court take judicial notice of documents which the FAC does not

9   reference.  The first is a news article.  On the theory that it is

10  a "matter of public record and not subject to dispute[,]" RJN (doc.

11  79) at ¶ 7, Apollo is seeking to have the court judicially notice

12  "an October 18, 2006 news article entitled 'Apollo Group Says

13  Fourth-Quarter Net Income Declines 12 Percent.'" Farrell Decl'n

14  (doc. 80) at ¶ 8; and exh. 7 thereto.  The second document is "[a]

15  March 8, 2007 NERA Economic Consulting report entitled 'Options

16  Backdating: The Statistics of Luck,' available at

17  http://www.nera.com/image/PUB Backdating Part  III  Sep2007-

18  FINAL.pdf[.]" <u>Id.</u> at 3; and exh. 12 thereto.  As part of the

19  "Background" for their motion, the individual defendants included a

20  section entitled **"Stock Options and 'Backdating'" A Primer**[.]**"**

21  Apollo Mot. (doc. 81) at 4 and 15.  (Emphasis omitted)  Based

22  generally upon that NERA report, Apollo notes in passing that "one

23  might reasonably expect companies lawfully to grant options at

24  times when their stock prices are relatively low, without any

25  'backdating.'" <u>Id.</u> at 6, n. 5 (citation omitted).

26  "It is appropriate for the court to take judicial notice of news

27  articles regarding defendants' stock or corporate activities[,]"

28  such as the October 18, 2006, news article identified above, and it

1  will.  See Patel, 2008 WL 2803076, at 817 (citations omitted).

2  This is so even though the complaint does not mention this

3  particular article.   See Helitrope General, Inc. v. Ford Motor Co.,

4  189 F.3d at 981 and n.18.   The court will therefore take judicial

5  notice of the October 18, 2006 news article.   On the other hand, it

6  will not take judicial notice of the NERA report because although

7  Apollo is referenced generally in a table thereto, neither the

8  report itself nor that table include adjudicative facts properly

9  subject to judicial notice under Rule 201.

10     **_B.  Plaintiff's Exhibits_**

11     In opposing these motions, plaintiff also is relying upon

12  documents not attached to the complaint.   Those documents are

13  exhibits to the declaration of attorney Wood who is associated with

14  the law firm appointed as lead counsel.   In contrast to the

15  defendants, though, plaintiff did not specifically request that the

16  court take judicial notice of any of those exhibits.   Nonetheless,

17  the court could, _sua sponte_, take judicial notice of those

18  exhibits.   See Fed. R. Evid. 201(c).   For that reason, and because

19  those exhibits are part of plaintiff's opposition, the court must

20  decide whether to consider any of those exhibits on these Rule 12

21  motions.

22          **_1.  CFRA Educational Report_**

23     In its factual recitation, plaintiff includes a relatively

24  lengthy quote by an analyst at the Center for Financial Research

25  and Analysis ("CFRA").   That quote is taken from an "Educational

26  Report" entitled "Options Backdating - Which Companies are at

27  Risk[:] A Survey of the Top 100 Users of Stock Options 1997 -

28  2002[.]" Wood Decl'n (doc. 95), exh. A thereto at 1. Plaintiff

1  relies upon an excerpt from that report to summarize "the risks for

2  companies found to have backdated stock options[.]" Resp. (doc. 94)

3  at 15.

4      Pursuant to Fed. R. Evid. 201(c), the court in its discretion

5  may *sua sponte* take judicial notice of an ajudicative fact.  The

6  court declines to do so with respect to this CFRA report however.

7  The primary reason for not taking judicial notice is that, as

8  Apollo accurately points out, "although th[at] report identifies 32

9  companies as having the highest risk of having backdated options,

10  the report does not mention Apollo at all."  Reply (doc. 97) at 15.

11  Clearly then this CFRA report does not contain an adjudicative

12  fact, *i.e.* "the facts of the particular case[,]" of which this

13  court may properly take judicial notice.  <u>See</u> Fed. R. Evid. 201

14  advisory committee's note.  The court observes that while it is not

15  refusing to take judicial notice on this basis, somewhat tellingly,

16  every page of that report includes the qualifying language that it

17  is "[f]or the exclusive use [of] Lerach Coughlin Stoia & Robbins,

18  LLP."  Wood Decl'n (doc. 95), exh. A thereto at 10-26.  The

19  inclusion of that qualifying language calls into question the

20  objectivity of this CFRA report.

21          **2.  "The Arizona Republic" Article**

22      Exhibit B to the Wood declaration is a January 17, 2008,

23  article from "The Arizona Republic" entitled "Apollo Guilty of

24  Securities Fraud[.]" Wood Decl'n (doc. 95), exh. B thereto at 1.

25  If for no other reason, the court will not take judicial notice of

26  this article because the jury verdict discussed therein was

27  subsequently set aside by Judge Teilborg.  <u>See</u> <u>In re Apollo Group,</u>

28  <u>Inc. Sec. Litig.</u>, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008).  Thus,

1   even if this "Arizona Republic" article was relevant to the present

2   case at some point, it no longer is.

3           *3.  Verdict Form*

4       Likewise, the court also will not take judicial notice of, or

5   otherwise consider exhibit C to the Wood declaration, the jury

6   verdict form in the Apollo Group case  – the same verdict which

7   Judge Teilborg set aside.

8           *4.  Apollo Stock Chart*

9       The fourth exhibit to the Wood declaration is an untitled one

10  page document.  Neither the source of that document nor its

11  significance appear on the face thereof.  Attorney Wood describes

12  the columns of numbers contained thereon as an "Apollo

13  stock chart showing the 50 dates when the highest volume of Apollo

14  Group, Inc. Stock was traded from February 2, 1995 to March 20,

15  2008, retrieved from Yahoo! Finance (http;//finance.yahoo.com) and

16  sorted by volume with Microsoft Excel."  Wood Decl'n (doc. 95) at

17  2, ¶ 2.  Plaintiff is relying upon that chart to show that "[m]ore

18  shares of Apollo stock changed hands on October 18, 2006 than ever

19  before in Apollo's history."  Resp. (doc. 94) at 28.

20      Largely because the source of that chart is not apparent from

21  its face, and because the method of its creation uncertain, the

22  court will not take judicial notice of it.  See White Electronics,

23  416 F.Supp.2d at 761 (refusing to take judicial notice, in

24  securities fraud case, of exhibit "purport[ing] to be a chart

25  showing [defendant's] stock prices" where "source not apparent from

26  the document itself and not all of the share prices on th[e] chart

27  compared with share prices for specific dates listed in the

28  Complaint[]").

- 21 -

1  ***II.  Motions to Dismiss***

2     ***A.  Rule 12(b)(6) Standards***

3     It is axiomatic that Rule 12(b)(6) motions "test[] the legal

4  sufficiency of the claims asserted in the complaint[.]" <u>Ileto v.</u>

5  <u>Glock, Inc.</u>, 349 F.3d 1191, 1199-1200 (9th Cir. 2003).  "A Rule

6  12(b)(6) dismissal may be based on either a lack of a cognizable

7  legal theory or the absence of sufficient facts alleged under a

8  cognizable legal theory."  <u>Johnson v. Riverside Healthcare System,</u>

9  <u>LP</u>, 534 F.3d 1116, 1121-1122 (9th Cir. 2008) (internal quotation

10  marks and citation omitted).  It is the latter theory of dismissal

11  which forms the basis for defendants' attacks on the FAC in this

12  case.

13     When considering a motion to dismiss for failure to state a

14  claim under Rule 12(b)(6), the court must "accept the plaintiffs'

15  allegations as true and construe them in the light most favorable

16  to plaintiffs."  <u>In re Gilead Sciences Sec. Litig.</u>, 536 F.3d 1049,

17  1055 (9th Cir. 2008) (internal quotation marks and citation

18  omitted), <u>petition for cert filed</u>, ( _____ U.S. _____ Feb. 6,

19  2009)(no. 08-1121).  At the same time though, the court is not

20  "required to accept as true allegations that are merely conclusory,

21  unwarranted deductions of fact, or unreasonable inferences.'" <u>Id.</u>

22  (internal quotation marks and citations omitted). As the Supreme

23  Court explained in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544,

24  127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), "While a complaint attacked

25  by a Rule 12(b)(6) motion to dismiss does not need detailed factual

26  allegations, . . . , a plaintiff's obligation to provide the

27  grounds of his entitle[ment] to relief requires more than labels

28  and conclusions, and a formulaic recitation of the elements of a

- 22 -

cause of action will not do[.]" Id. at ___, 127 S.Ct. 1964-1965
(internal quotation marks and citations omitted).  "Factual
allegations must be enough to raise a right to relief above the
speculative level, . . . , on the assumption that all the
allegations in the complaint are true (even if doubtful in
fact)[.]" Id. at 1965 (citations and footnote omitted).  Similarly,
"[l]egal conclusions need not be taken as true merely because they
are cast in the form of factual allegations."  Lee Myles Associates
Corp. v. Paul Rubke Enterprises, Inc., 557 F.Supp.2d 1134, 1137
(S.D.Cal. 2008) (citations omitted).

    At the end of the day, "[t]he complaint is properly dismissed
if it fails to plead enough facts to state a claim to relief that
is plausible on its face."  Gilead, 536 F.3d at 1055 (internal
quotation marks and citations omitted).  On the other hand, as the
Supreme Court stressed in Twombly, "a well-pleaded complaint may
proceed even if it strikes a savvy judge that actual proof of those
facts is improbable, and that recovery is very remote and
unlikely."  Twombly, 550 U.S. at ____, 127 S.Ct. at 1965 (internal
quotation marks and citation omitted).  "Indeed, it may appear on
the face of the pleading that recovery is very remote and unlikely
but that is not the test."  Johnson, 534 F.3d at 1123-24 (internal
quotation marks and citations omitted).

### B.  Statute of Limitations

    Although not the first dismissal argument which Apollo raises,
because it can potentially narrow the scope of plaintiff's claims,
the court will address Apollo's statute of limitations argument
first.

    Preliminarily, there is no merit to plaintiff's suggestion that

1   this statute of limitations argument is not properly before the

2   court on this Rule 12 dismissal motion.  "If the expiration of the

3   applicable statute of limitations is apparent from the face of the

4   complaint," it is well settled that "the defendant may raise [that]

5   defense in a Rule 12(b)(6) motion to dismiss."  See  In re Juniper

6   Networks, Inc. Sec. Litig., 542 F.Supp.2d 1037, 1050 (N.D.Cal.

7   2008) (citing Jablon v. Dean Witter & Co., 614 F.2d 677, 682 (9th

8   Cir. 1980)).  Despite plaintiff's contrary suggestion, "[t]his is

9   true even though expiration of the limitations period is an

10  affirmative defense because Federal Rule of Civil Procedure Rule

11  9(f) makes averments of time and place material for the purpose of

12  testing the sufficiency of a complaint."  Id. (internal quotation

13  marks and citation omitted).  Consistent with the foregoing, "[i]f

14  a claim is barred by [the] applicable statute of limitations,

15  dismissal pursuant to Rule 12(b)(6) is appropriate."  Guerrero-

16  Melchor v. Arulaid, 2008 WL 539054, at *2 (W.D.Wash. Feb. 22, 2008)

17  (citation omitted).

18      At the same time, though, the court is keenly aware that a

19  complaint cannot be dismissed as untimely under Rule 12(b)(6)

20  "unless it appears beyond doubt that the plaintiff can prove no set

21  of facts that would establish the timeliness of the claim." Pesnell

22  v. Arsenault, 531 F.3d 993, 997 (9th Cir. 2008) (internal quotation

23  marks and citation omitted).  In making this inquiry, the court

24  must "[a]ccept[] as true the allegations in the complaint," and it

25  "must determine whether the running of the statute is apparent on

26  the face of the complaint."  Huynh v. Chase Manhattan Bank, 465

27  F.3d 992, 979 (9th Cir. 2006) (internal quotation marks and

28  citations omitted).  "[I]f the factual and legal issues are not

1  sufficiently clear to permit a determination with certainty whether

2  the action was timely[,]" then the court "must" deny a motion to

3  dismiss based on the running of the statute of limitations.  Lee

4  Myles, 557 F.Supp.2d at 1137 (citing Supermail Cargo, Inc. v.

5  United States, 68 F.3d 1204, 1207 (9th Cir. 1995)).

6      Finding no merit to plaintiff's procedural argument, the court

7  is free to turn to the merits of Apollo's statute of limitations

8  argument.  As Apollo construes the FAC, plaintiff is proceeding

9  under two related fraud theories.  The first is an alleged

10  "fraudulent scheme" of "backdating . . . stock option grants[.]"

11  FAC (doc. 71) at ¶¶ 2 and 6.  The second theory, which Apollo terms

12  "an accounting fraud claim[,]" is that due to that alleged

13  "backdating," Apollo issued financial statements which were

14  purportedly "materially false and misleading, resulting in an

15  artificial inflation of [Apollo's] stock price[.]"  Id. at ¶ 2.

16      As to the first theory, Apollo contends that those backdating

17  claims are barred under 28 U.S.C. § 1658(b).  That statute reads as

18  follows:

19              [A] private right of action that involves
            a claim of fraud, deceit, manipulation, or
20          contrivance in contravention of a regulatory
            requirement concerning the securities laws, . . .
21          may be brought not later than the earlier of –

22              (1) 2 years after the discovery of the facts
                    constituting the violation; or
23

24              (2) 5 years after such violation.

25  28 U.S.C. § 1658(b) (West 2006).  Apollo argues that to the extent

26  the FAC alleges a fraudulent option backdating scheme, it is barred

27  under section 1658(b)'s five year statute of repose.  A statute of

28  repose, as distinguished from a statute of limitations, is "not

1   subject to equitable tolling." Munoz v. Ashcroft, 339 F.3d 950,

2   957 (9th Cir. 2003) (citations omitted).  Rather, "[a] statute of

3   repose is a fixed, statutory cutoff date, usually independent of

4   any variable, such as claimant's awareness of a violation." Id.

5   (citations omitted).

6       "A claim under § 10(b) that is based on the backdating itself

7   accrues on the date the option grant was made."[3]  In re Affiliated

8   Computer Servs. Deri. Litig., 540 F.Supp.2d 695, 701 (N.D.Tex.

9   2007) (citation omitted); see also In re Comverse Tech., Inc. Sec.

10  Litig., 543 F.Supp.2d 134, 155 (E.D.N.Y. 2008) (citation omitted)

11  ("[T]o the extent that [plaintiffs'] claims are based directly on a

12  backdated grant of options, the 5-year period begins to run on the

13  date the options were granted.") The five option grants which the

14  FAC identifies, i.e., December 18, 1998; April 19, 1999; January

15  12, 2000; December 15, 2000; and September 21, 2001, all occurred

16  more than five years prior to the filing of this action.

17  Therefore, the court agrees with Apollo that dismissal of those

18  claims is mandated because this lawsuit was not filed until

19

20          [3]    Plaintiff challenges Apollo's reliance upon three backdating cases
21  because they were derivative, where "the actual granting of a stock option, not the
    resulting false financial statements," was at issue.  Resp. (doc. 94) at   51
22  (footnote and citations omitted). Regardless of that asserted factual distinction,
    this court will not consider any of those cases because in each the court
23  unequivocally stated: "This disposition is not designated for publication and may
    not be cited." In re Apple Computer Inc., Derivative Litig., 2007 WL 4170566, at
24  *1 n.1 (N.D.Cal. Nov. 19, 2007) (emphasis added); In re Atmel Corp. Derivative
    Litig., 2007 WL 2070299, at *1, n.1 (N.D.Cal. July 16, 2007) (emphasis added); and
25  In re Ditech Networks, Inc. Derivative Litig., 2007 WL 2070300, at *1, n. 1
    (N.D.Cal. July 16, 2007) (emphasis added).  United States District Court Judge
26  Fogel could not have been more clear.  This court will abide by the court's express
    intention in those cases; none of them will factor into the court's analysis
    herein.
27          Apollo was not alone in improperly relying upon cases such as the foregoing.
    All of the parties had a distressing penchant for relying upon cases where courts,
28  in one way or another, had severely limited the precedential value of their
    decisions.

1  November 2, 2006  -- "five years and forty-six days after the last
2  of the five grant dates (September 21, 2001)[.]"  Mot. (doc. 81) at
3  11.

4      Plaintiff buries its response to this argument in a footnote,
5  indicating that the general rule that a backdating claim accrues on
6  the date the option was granted "is not directly at issue in this
7  case[.]" Resp. (doc. 94) at 52, n.26.  Even assuming the
8  applicability of that rule, plaintiff reasons that a backdating
9  claim based upon "[t]he last grant that [it] specifically alleges
10 was backdated[,]" *i.e.* September 21, 2001, would survive this
11 dismissal motion in any event.  <u>Id.</u>  That particular backdating
12 claim is not time-barred, plaintiff hypothesizes, if the September
13 21, 2001, grants were "backdated by over forty-six days[.]"  <u>Id.</u>
14 Countering that Apollo has not met its burden of proof on such a
15 claim because it has not shown that that "grant was actually
16 granted before November 2, 2006," plaintiff contends that this
17 particular backdating claim is timely.  <u>See id.</u>

18     Plaintiff misconceives the parties' respective burdens at this
19 juncture.  Absent any allegations in the complaint, the court
20 declines to speculate, as plaintiff urges, as to whether the
21 September 21st grants were "backdated by over forty-six days," so
22 as to bring them within the five year statute of repose.  <u>See id.</u>
23 As part of the alleged fraudulent scheme to backdate stock options,
24 the FAC alleges that "[w]hile some of these grants were not
25 publicly reported, several grants reported in Apollo's Forms 10-K
26 had purported grant dates so improbable that backdating is the only
27 plausible explanation."  <u>Id.</u> at 17, ¶ 48.  Among those are grants
28 made "on September 21, 2001[.]"  <u>Id.</u> at 21, ¶ 52.  To the extent

1  plaintiff is asserting a claim for the backdating itself in

2  conjunction with those September 21st grants, as set forth above,

3  such a claim accrues the date those option grants were made.  See

4  Affiliated Computer, 540 F.Supp.2d at 701 (citation omitted); see

5  also Comverse Technology, 543 F.Supp.2d at 155 (citation omitted).

6  Because the present action was not commenced until November 2,

7  2006, any claims based directly on backdating allegedly occurring

8  on September 21, 2001, are time barred.  Accordingly, the court

9  grants Apollo's motion to dismiss as untimely any claims based upon

10 backdating itself with respect to the five option grants set forth

11 earlier.

12     Turning to what it concedes is the "[t]he gravamen of" the FAC,

13 "the reporting of false and misleading financial results[,]"

14 plaintiff contends that because it is alleging a "series of

15 fraudulent misrepresentations[,]" the five year repose period began

16 to run "no earlier than 2006[.]" Resp. (doc. 94) at 50 and 51.  In

17 essence, plaintiff is urging this court to adopt a theory of

18 continuing wrong so that it can circumvent the five year repose

19 period.  Based upon that theory, plaintiff contends that all of its

20 false misrepresentation claims are timely.

21     Primarily because it would run afoul of the general proposition

22 that "the five-year statute of limitations period begins to run on

23 the date of the false representation[,]" the court declines to

24 adopt a continuing wrong or continuing violation theory here.  See

25 Juniper Networks, 542 F.Supp.2d at 1051 (citations omitted).  As in

26 In re Zoran Corp. Deriv. Litig., 511 F.Supp.2d 986 (N.D.Cal. 2007),

27 the court finds that the statute of limitations accrues for these

28 false representation claims "when the violation itself occurs, not

1  when the last violation in a series of alleged violations occur."

2  Id. at 1014.  Accordingly, plaintiff's false representation claims

3  are timely to the extent such misstatements were made during the

4  five-year period of repose.  Claims based on misrepresentation

5  statements outside the statute of repose (i.e., prior to November

6  2, 2001) are not timely, however, and the court grants Apollo's

7  motion to dismiss in that regard.[4]  See Juniper Networks, 542

8  F.Supp.2d at 1051 (citation omitted) ("any part of Plaintiffs'

9  § 10(b) claim based on pre-repose period representations is barred

10 even if the injury did not occur until after period began[]").

11    ***C. Section 10(b) & Rule 10b-5 Claims***[5]

12     The court will next turn to the core issue of these dismissal

13 motions --"whether plaintiff[] [has] adequately pled a claim of

14 securities fraud - something that is much harder now than in days

15 gone by." Berson v. Applied Signal Technology, Inc., 527 F.3d 982,

16 983 (9th Cir. 2008).  Indeed, fairly recently the Ninth Circuit

17 observed that "[d]ue in large part to the enactment of the . . .

18 PSLRA, . . plaintiffs in private securities fraud class actions

19 face formidable pleading requirements to properly state a claim and

20 avoid dismissal under Fed.R.Civ.P. 12(b)(6)." Metzler Inv., 540

21 F.3d at 1055 (citation omitted).  Although "formidable," those

22 _____

23    [4]    Having found that the five specifically alleged backdated stock option grants are time-barred, there is no need to address Apollo's alternate argument that those claims also fail because the FAC does not include a "legitimate statistical analysis" to support backdating as to those grants.  Mot. (doc. 81) at 18.  Similarly, there is no need to delve into Apollo's argument that the FAC is deficient because it "does not plead any of the mandatory specifics" as to the roughly 100 unidentified grants therein.  See id.  No analysis of this issue is necessary because the court assumes by plaintiff's silence that it is abandoning any claims as to fraud based on alleged backdating of grants other than the five which the FAC specifically identifies.

24

25

26

27

28    [5]    Hereinafter section 10(b) shall be read to include Rule 10b-5 as well.

1 standards are not insurmountable.

2    "In a typical § 10(b) private action a plaintiff must prove

3 (1) a material misrepresentation or omission by the defendant;

4 (2) scienter; (3) a connection between the misrepresentation or

5 omission and the purchase or sale of a security (4) reliance upon

6 the misrepresentation or omission; (5) economic loss; and (6) loss

7 causation."  Stoneridge Inv. Partners, LLC v. Scientific-Atlanta,

8 ___ U.S. ___, 128 S.Ct. 761, 768, 169 L.Ed.2d 627 (2008).

9 Defendants contend that they are entitled to dismissal of

10 plaintiff's 10b-5 claims because plaintiff has not adequately pled

11 three of those elements.  More specifically, Apollo maintains that

12 "plaintiff has failed to adequately plead that *any* grants were

13 'backdated[.]'"  Mot. (doc. 81) at 12 (emphasis in original).  In a

14 similar vein, all defendants argue that plaintiff's misstatement

15 and omissions claims are not pled with the requisite particularity.

16 Next, Apollo challenges the sufficiency of plaintiff's loss

17 causation allegations,[6] whereas the primary thrust of the

18 individual defendants' motion is that the FAC does not adequately

19 plead scienter.[7]

20 _____

21    [6]    Originally failure to adequately plead loss causation was not a basis
for the individual defendants' dismissal motion.  In their Supplemental Brief,
22 however, those defendants specifically "incorporate by reference . . .the loss
causation aspect of the recent Ninth Circuit decisions . . . addressed in Apollo's
[supplemental] brief[.]" Supp. Br. (doc. 100) at 5, n.1.  Thus, the court deems the
23 individual defendants to be seeking dismissal for failure to adequately plead loss
causation as well.

24
    [7]    "The Ninth Circuit has rejected the concept of collective scienter in
25 attributing scienter to a corporation."  In re International Rectifier Corp. Sec.
Litig., 2008 WL 4555794, at *21 (C.D.Cal. May 23, 2008) (internal quotation marks
26 and citation omitted).  Accordingly, "'[a] defendant corporation is deemed to have
the requisite scienter for fraud *only if* the individual corporate officer making
27 the statement has the requisite level of scienter, i.e., knows that the statement
is false, or is at least deliberately reckless as to its falsity, at the time that
28 he or she makes the statement.'"  Id. (quoting Nordstrom, Inc. v. Chubb & Son,
Inc., 54 F.3d 1424, 1435-36 (9th Cir. 1995)) (emphasis added).  In light of the

1        ***1.  Particularity***

2          ***a. Pleading Standards***

3            ***i.  Rule 9***

4      Rule 9(b) requires that "[i]n all averments of fraud or

5  mistake, the circumstances constituting fraud or mistake shall be

6  stated with particularity."  Fed. R. Civ. P. 9(b).  "In order to

7  allege fraud with particularity, the complaint must both identify

8  the allegedly fraudulent statement and explain why it was false

9  when made."  <u>In re Metropolitan Sec. Litig.</u>, 532 F.Supp.2d 1260,

10  1279 (E.D.Wash. 200) (citation omitted).  A complaint which

11  "specif[ies] such facts as the times, dates, places, and benefits

12  received, and other benefits of the alleged fraudulent activity[]"

13  provides the notice which Rule 9(b) requires.  <u>See</u> <u>id.</u> at 672

14  (citations omitted).  "Further, a pleader must identify the

15  individual who made the alleged representation and the content of

16  the alleged representation."   <u>In re Hansen Natural Corp. Sec.</u>

17  <u>Litig.</u>, 527 F.Supp.2d 1142, 1151 (C.D.Cal. 2007) (internal

18  quotation marks and citation omitted). The purpose of Rule 9(b)'s

19  heightened pleading requirements is "to give defendants notice of

20  the particular misconduct which is alleged to constitute the fraud

21  charged so that they can defend against the charge and not just

22  deny that they have done anything wrong."  <u>Neubronner v. Milken</u>, 6

23  F.3d 666, 671 (9th Cir. 1991) (internal quotations and citation

24  omitted).

25      A complaint which "relies on 'shotgun' or 'puzzle' pleading[]"

26

27  foregoing, it is understandable that Apollo did not focus heavily upon this element
    of securities fraud and instead basically adopts the individual defendants'
    arguments on the issue of scienter.   <u>See</u> Mot. (doc. 81) at 25; and Supp. Memo.
28  (doc. 102) at 10.

1  does not meet Rule 9(b)'s particularity requirement.  <u>Metropolitan</u>

2  <u>Sec.</u>, 532 F.Supp.2d at 1279 (citation omitted).  "Shotgun pleadings

3  are those that incorporate every antecedent allegation by reference

4  to each subsequent claim for relief or affirmative defense."  <u>Id.</u>

5  (internal quotation marks and citation omitted).  Puzzle pleadings,

6  which "[c]ourts in this [C]ircuit have repeatedly lamented[,]"

7  <u>Defazio v. Hollister, Inc.</u>, 2008 WL 958185, at *3 n.3 (E.D.Cal.

8  April 8, 2008) (citing cases), including this one,[8] "are those that

9  require the defendant and the court to match the statements up with

10 the reasons they are false or misleading."  <u>Metropolitan Sec.</u>, 532

11 F.Supp.2d at 1279 (internal quotation marks and citations omitted).

12         ***ii.  PSLRA***

13        In addition to satisfying Rule 9(b), a securities fraud

14 plaintiff must meet the PSLRA's "exacting pleading requirements."

15 <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 127

16 S.Ct. 2499, 2054, 168 L.Ed.2d 179 (2007).  "The PSLRA requires a

17 heightened pleading standard for allegations regarding misleading

18 statements and omissions that is similar to the heightened pleading

19 standard required by Rule 9(b)."  <u>Hansen</u>, 527 F.Supp.2d at 1151.

20 More specifically, that Act requires plaintiffs alleging securities

21 fraud "to specify each statement alleged to have been misleading,

22 the reason or reasons why the statement is misleading, and if an

23 allegation regarding the statement or omission is made on

24 information and belief, the complaint shall state with

25 particularity all facts on which that belief is formed."  15 U.S.C.

26

27        8    <u>Chan v. Orthologic Corp.</u>, 1998 WL 1018624, at *4 n.11 (D.Ariz. Feb. 5,
   1998) ("This tactic not only makes it difficult to ascertain whether any of the
28 allegations have more merit than others, it also makes the complaint dreadfully
   oversized . . . [and] make[s] a mockery of Rule 9(b).")

§ 78u-4(b)(1) (West 1997).  "The purpose of this heightened

pleading requirement was generally to eliminate abusive securities

litigation and particularly to put an end to the practice of

pleading fraud by hindsight."  In re Vantive Corp. Sec. Litig., 283

F.3d 1079, 1084-85 (9th Cir. 2002) (internal quotation marks and

citation omitted).  Indeed, the detail which § 78u-4(b)(1) demands

"is the PSLRA's single most important weapon against pleading fraud

by hindsight because it forces plaintiffs to reveal whether they

base their allegations on an inference of earlier knowledge drawn

from later disclosures or from contemporaneous documents or other

facts."  Hansen, 527 F.Supp.2d at 1152 (citation omitted).  "By

requiring specificity, § 78u-4(b)(1) prevents a plaintiff from

skirting dismissal by filing a complaint laden with vague

allegations of deception unaccompanied by a particularized

explanation stating _why_ the defendant's alleged statements or

omissions are deceitful."  Metzler Inv., 540 F.3d at 1061 (citation

omitted).

    By Apollo's count, the FAC identifies 26 allegedly false and

misleading statements which defendants issued during the class

period.  See FAC (doc. 71) at ¶¶ 53-87.  Plaintiff alleges that

those statements were false and misleading as they pertained to:

(1) Apollo's "financial results;" (2) "the terms and value of the

options granted to [Apollo] officers, directors, and employees;"

(3) "the internal controls relating to stock option grants and

related financial reporting;" and (4) Apollo's "application" of

certain accounting principles and standards pertaining to

"accounting for stock option grants."  Id. at ¶ 53.  The FAC goes

on to allege, broadly stated, that in each of the years 2002-2006

1   Apollo issued a series of press releases providing quarterly fiscal

2   results.  Although the FAC does not allege that those press

3   releases contained "false financial results[,]" given plaintiff's

4   manner of pleading, that is the obvious inference.  See, e.g., id.

5   at ¶ 54 ("On March 26, 2002, Apollo issued a press release entitled

6   'Apollo Group Inc. Reports Fiscal 2002 Second Quarter Results.'

7   These false financial results were reported in Apollo's Form 10-Q,

8   which was filed with the SEC on April 12, 2002.") The FAC also

9   alleges that those purportedly false results were in turn

10  "repeated" in Apollo's Form 10-Qs and 10-Ks, which it filed with

11  the SEC.  See, e.g., id. at ¶¶ 54; 57; 72; and 76.

12      After enumerating the supposedly false and misleading

13  statements for each of the years from 2002-2006, plaintiff sets

14  forth what it deems to be '[t]he true facts known at the time[.]"

15  Id. at ¶¶ 59(a)-(f); 65(a)-(f); 74(a)-(g); 81(a)-(f); and 87(a)-

16  (g).  With a few minor exceptions, those "true facts" are identical

17  for each of the class period years and are set forth in full below:

18          (a) Apollo's 2000, 2001, and 2002 financial
            results, including its net income, earnings per share,
19          and profit and gross margins, were all materially
            overstated due to *contrivances and manipulations* in
20          the administration of Apollo's stock options, including
            backdating and failing to properly record or account for
21          the actual amount and tax consequences of compensation
            expenses of its executives;
22
23          (b) Apollo's financial and operating results
            reported during the Class Period were not entirely due
24          to the skill and business acumen of its top executives,
            their successful management of its business or the
            outstanding performance of its business units, as
25          represented; in fact, a significant part was due to
            falsification of Apollo's financial statements by not
26          properly accounting for (and thus understating) the true
            compensation expenses of its executive and management
27          team;

28          (c) Apollo's top executives and directors were

1
2
3
4

        manipulating the Company's stock option plans to provide
themselves with millions of dollars in undisclosed income
by backdating stock option grants to a much lower exercise
price thus giving them an instant, riskless profit, while
exposing the Company to the risk of regulatory
investigations, tax penalties and even criminal
proceedings;

5
6
7
8

        (d) Apollo's internal financial and accounting
controls were *materially deficient* and *not effective
in providing the necessary and required degrees of
assurance that Apollo's financial results and reports
were fairly and accurately presented and free from
fraud;*

9
10
11

        (e) Senior management's salaries and option grants
had not been determined as a result of arm's-length
negotiation with Apollo's Compensation Committee,
but rather were the product of cronyism and undisclosed
conflicts of interest; and

12
13

        (f) Because Apollo's historical and current financial
results were overstated, defendants' forecasts of Apollo's
future financial performance were false and could not be
achieved.

14
15
16

Id. at ¶¶ 59(a)-(f) (emphasis added); see also FAC at ¶¶65(a)-(f);
¶¶ 74(a)-(d) and ¶¶ 74(f)-(g); ¶¶ 81(a)-(f); and ¶¶ 87(a)-(f).

17
18
19
20

    An additional "true fact" in 2004 was that purportedly "Apollo
had not taken the required compensation expenses for its conversion
of University of Phoenix Online common stock."  Id. at ¶74(e).
Likewise, in 2006 the FAC alleges two other "true facts[:]" (1)
"Apollo's June 9, 2006 denial of stock option backdating was false

21
22
23
24

and misleading as discussed *infra*[;]" and (2) Apollo's January 11,
2006 press release regarding the resignation of Nelson omitted
material facts regarding the circumstances of [his] resignation."
Id. at ¶¶ 87(g)-(h).

25
26
27
28

    To illustrate its view that plaintiff has not pled fraud with
the requisite degree of particularity, Apollo points out that the
FAC alleges that an April 12, 2002, SEC filing contained "false

1    financial results[.]" Id. at ¶54.  Yet, when the FAC later alleges

2    that such financial results were "due to contrivances and

3    manipulations in the administration of Apollo's stock options," id.

4    At ¶59(a), it fails to "connect-the-dots" in terms of explaining

5    what is meant by "contrivances and manipulations[,]" and how such

6    actions relate to the earlier allegations of false financials.  See

7    In re PetSmart, Inc. Sec. Litig., 61 F.Supp.2d 982, 991 (D.Ariz.

8    1999) (footnote omitted) ("The court should not have to play

9    connect-the-dots in order to identify the facts and trends upon

10   which plaintiffs base their claim.") Apollo further challenges the

11   sufficiency of plaintiff's fraud allegations for failing to specify

12   the supposedly backdated stock options as they relate to particular

13   "false financial results."  Apollo adds that given the overly broad

14   and vague nature of the FAC, it is impossible to ascertain, among

15   other things, whether plaintiff is relying upon time-barred

16   backdated stock options.

17       The individual defendants, as does Apollo, take plaintiff to

18   task for essentially cutting and pasting and "simply parrot[ing]

19   lengthy . . . quotes from Apollo's public filings" without

20   identifying the specific statement therein which supposedly is

21   false.  Mot. (doc. 82) at 23. The individual defendants also

22   challenge the sufficiency of plaintiff's fraud allegations because

23   of the lack of detail as to "why the unidentified misleading

24   statements are purportedly false."  Id.

25       Essentially plaintiff counters that it has complied with the

26   heightened pleading requirements for fraud in that it is alleged

27   "*where* and *when*" each false and misleading statement was made; "*who*

28   made" it; "and a fraudulent course of conduct demonstrating *why*

1  each statement was false and misleading." Resp. (doc. 94) at 29

2  (emphasis in original). Apollo's May 22, 2007, Restatement is the

3  primary basis for plaintiff's claims that the 26 identified

4  statements were all false and misleading.

5  　　The court agrees with defendants that the FAC does not satisfy

6  the heightened pleading standards for fraud under either Rule 9(b)

7  or the PSLRA. In its current form the FAC is a puzzle-like

8  pleading which the court cannot countenance. The cut and paste

9  nature of the FAC is troubling. Perhaps the most troubling aspect

10 of the FAC as currently pled is that the "vague allegations of

11 deception" are "unaccompanied by a particularized explanation

12 stating *why* the defendant's alleged statements or omissions are

13 deceitful." See Metzler Inv., 540 F.3d at 1061 (citation omitted).

14 Further, as in Metropolitan Sec., "it is difficult and laborious to

15 determine which portions" of the quoted press releases and SEC

16 filings "are allegedly false and which false statements are

17 attributed to any particular defendant." See Metropolitan Sec.,

18 532 F.Supp.2d at 1279. The FAC "'often rambles through long

19 stretches of material quoted from defendants' public statements

20 . . . unpunctuated by any specific reasons for falsity.'" See id.

21 (quoting In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1547-48 (9th

22 Cir. 1994)) (other citation omitted).

23 　　The court will not take the "drastic step of dismissal based on

24 the form of the pleading[,]" however. See In re Cornerstone

25 Propane Partners, L.P., Sec. Litig., 355 F.Supp.2d 1069, 1081

26 (N.D.Cal. 2005) (citation omitted). Rather, in accordance with

27 "the Ninth Circuit['s] recommend[ation][,]" the court will

28 "require[] . . . plaintiff to 'streamline and reorganize the

complaint before allowing it to serve as the document controlling discovery.'" <u>See</u> <u>Metropolitan Sec.</u>, 532 F.Supp.2d at 1280 (quoting <u>GlenFed</u>, 42 F.3d at 1554) (other citation omitted); <u>see also</u> <u>Eminence Capital, LLC v. Aspeon, Inc.</u>, 316 F.3d 1048, 1053 (9th Cir. 2003) (abuse of discretion to dismiss FAC with prejudice for failure to provide the detail which PSLRA requires where, *inter alia*, plaintiff alleged with requisite detail who, what, when and by whom false statements were made, but did not "'plead sufficiently how and why the financial statements were false'"). In so doing, plaintiff must be "clear and concise in identifying the false statements and articulating the factual allegations supporting an inference that the statement is false or misleading." <u>See</u> <u>Patel v. Parnes</u>, 253 F.R.D. 531, 554 (C.D.Cal. 2008) (internal quotation marks and citation omitted). The FAC in its current form makes it difficult, if not impossible, to evaluate and determine whether the PSLRA's particularity requirements are met. This task may be both "challenging and burdensome," but as the court astutely observed in <u>Metropolitan Sec.</u>, 532 F.Supp.2d at 1278, "the American legal system places this [pleading] burden on the party seeking relief, rather than the party responding to a claim." <u>See</u> <u>id.</u> "Nor is it appropriate for a trial court to effectively involve itself in the drafting process by puzzling out the details of a plaintiff's claims." <u>Id.</u>

Assuming that plaintiff can successfully amend its complaint to comply with the dictates of the PSLRA in terms of pleading false and misleading statements or omissions, the court will next address defendants' scienter and loss causation allegations. . . .

1    **_2.  Scienter_**

2       **_a.  Pleading Standards_**

3       The PSLRA also has a heightened pleading standard for scienter.

4    "[P]laintiffs proceeding under the PSLRA can no longer aver intent

5    in general terms of mere motive and opportunity or recklessness,

6    but rather, must state specific facts indicating no less than a

7    degree of recklessness that strongly suggests actual intent."

8    Metzler Inv., 540 F.3d at 1066 (internal quotation marks and

9    citation omitted).  "The requisite recklessness must be an extreme

10   departure from the standards of ordinary care, and . . . present []

11   a danger of misleading buyers that is either known to the defendant

12   or so obvious that the actor must have been aware of it."  Patel,

13   253 F.R.D. at 555 (internal quotation marks and citations omitted).

14   In other words, "reckless conduct" can meet the PSRLA, but only "to

15   the extent that it reflects some degree of intentional or conscious

16   misconduct, or what [the Ninth Circuit] has called deliberate

17   recklessness."  South Ferry, supra, 542 F.3d at 782 (internal

18   quotation marks and citation omitted).  This pleading requirement

19   is met when the complaint "contain[s] allegations of specific

20   contemporaneous statements or conditions that demonstrate the

21   intentional or the deliberately reckless false or misleading nature

22   of the statement when made."  Metzler Inv., 540 F.3d at 1066

23   (internal quotation marks and citation omitted).

24      The PSLRA "place[s] an additional gloss on the scienter

25   requirement[.]"  Id.  Pursuant to the PSLRA, a plaintiff must "state

26   with particularity facts giving rise to a strong inference that the

27   defendant acted with the required state of mind."  15 U.S.C. § 78u-

28   4(b)(2) (West 1997).  Congress did not define "strong inference,"

1  resulting in divergent views as to what constitutes a "strong

2  inference."  Setting out "to prescribe a workable construction" of

3  the "strong inference standard," the Supreme Court in Tellabs

4  adopted a holistic approach, *i.e.* "whether *all* of the facts

5  alleged, taken collectively, give rise to a strong inference of

6  scienter, not whether any individual allegation, scrutinized in

7  isolation, meets that standard."  551 U.S. at ___, 127 S.Ct. at

8  2509 (citations omitted).  "[A]ssess[ing] all [of] the allegations

9  holistically[]" is necessary, the Tellabs Court explained, because

10  "[t]he strength of an inference cannot be decided in a vacuum."

11  Id. at ___, 127 S.Ct. at 2511 and 2510.  While acknowledging that

12  the PSLRA "unequivocally raised the bar for pleading scienter[,]"

13  the Tellabs Court held that pleading facts suggesting a "plausible"

14  inference of scienter does not satisfy that statute.  Id. at ___,

15  127 S.Ct. at 2509 (internal quotation marks and citation omitted).

16  Instead, a "strong inference" of scienter can only be shown by

17  "plead[ing] with particularity facts that give rise to a . . .

18  powerful or cogent. . . inference" of scienter.  Id. at ___, 127

19  S.Ct. at 2510 (citations omitted).

20      In determining the strength of any given inference, "[t]he

21  inquiry is inherently comparative: How likely is it that one

22  conclusion, as compared to others, follows from the underlying

23  facts?"  Id.  When undertaking such a comparison, "a court must

24  consider plausible nonculpable explanations for the defendant's

25  conduct, as well as inferences favoring the plaintiff."  Id.

26  Clarifying, the Tellabs Court stated that "the inference that the

27  defendant acted with scienter need not be irrefutable, *i.e.*, of the

28  smoking gun genre, or even the most plausible of competing

1  inferences[.]" <u>Id.</u> (internal quotation marks and citation omitted).

2  Likewise, although defendants herein suggest to the contrary, "to

3  carry their burden on scienter, Plaintiffs . . . do not need to

4  invalidate the inferences which Defendants raise."   <u>See</u> <u>McGuire v.</u>

5  <u>Dendreon Corp.</u>, 2008 WL 5130042, at *7 (W.D.Wash. Dec. 5, 2008).

6      "Yet the inference of scienter must be more than merely

7  'reasonable' or 'permissible' – it must be cogent and compelling,

8  thus strong in light of other explanations."   <u>Tellabs</u>, 551 U.S. at

9  ___, 127 S.Ct. at 2510.   As the Ninth Circuit recently put it, "[a]

10  court must compare the malicious and innocent inferences cognizable

11  from the facts pled in the complaint, and only allow the complaint

12  to survive a motion to dismiss if the malicious inference is at

13  least as compelling as any opposing innocent inference."   <u>Zucco</u>

14  <u>Partners, LLC v. Digimarc Corp.</u>, 552 F.3d 981, 991 (9th Cir. 2009`)

15  (citing <u>Tellabs</u>, 551 U.S. at ___, 127 S.Ct. at 2510; and <u>Metzler</u>

16  <u>Inv.</u>, 540 F.3d at 1066).   Thus, after <u>Tellabs</u> "[a] complaint will

17  survive [a motion to dismiss]. . . only if a reasonable person

18  would deem the inference of scienter cogent and at least as

19  compelling as an opposing inference one could draw from the facts

20  alleged."   <u>Tellabs</u>, 551 U.S. at ___, 127 S.Ct. at 2510 (footnote

21  omitted).

22      In the present case, arguing that plaintiff has not adequately

23  pled scienter, Apollo stresses that the standard for pleading

24  scienter in the Ninth Circuit is "more stringent" than in other

25  Circuits, Mot. (doc. 81) at 26 (citing <u>No. 84 Employer-Teamster v.</u>

26  <u>America West Holding</u>, 320 F.3d 920, 931 n. 8 (9th Cir. 2003)) - a

27  point which is implicit in the individual defendants' argument.

28  Until fairly recently, that was an accurate description of the

1  scienter pleading standards in this Circuit.

2       The Ninth Circuit in South Ferry, however, revisited the issue
3  of the "level of detail required under the PSLRA[]" when pleading
4  scienter.  South Ferry, 542 F.3d at 784.  As one commentator
5  describes it, South Ferry "represents a seismic shift in the
6  [Ninth] Circuit's analysis of securities fraud complaints and
7  significantly lowers the bar for pleading scienter[.]"  14 No. 11
8  Andrews Sec. Litig. & Reg. Rep. 2 (Oct. 7, 2008) (footnote
9  omitted).  That commentator further described South Ferry as a 'sea
10 change in scienter pleading standard by the [Ninth] Circuit[.]" Id.
11 That "seismic shift" or "sea change" is due to the Ninth Circuit's
12 explicit repudiation in South Ferry of its prior securities fraud
13 pleading standards as set forth in In re Read-Rite Corp. Sec.
14 Litiq., 335 F.3d 843 (9th Cir. 2003); Vantive, supra, 283 F.3d 1079;
15 and Silicon Graphics, supra, 183 F.3d 970.  Cognizant that
16 "perhaps" it had been "too demanding and focused too narrowly in
17 dismissing vague, ambiguous, or general allegations [of scienter]
18 outright" in that trilogy of pre-Tellabs cases, the Ninth Circuit
19 found that "Tellabs permits a series of less precise allegations to
20 be read together to meet the PSLRA requirements, th[os]e prior
21 holdings . . . notwithstanding."  South Ferry, 542 F.3d at 784.  In
22 conformity with Tellabs, and retreating from its prior holdings,
23 the Ninth Circuit further found that "[v]ague or ambiguous
24 allegations are now properly considered as part of a holistic
25 review when considering whether the complaint raises a strong
26 inference of scienter."  Id. (citation omitted).

27      Recognizing that while "Tellabs suggests that . . . a high
28 level of detail is required under the PSLRA," the South Ferry Court

- 42 -

1 stressed that "a court should look to the complaint as a whole, *not*

2 to each individual scienter allegation as Silicon Graphics

3 suggests." Id. (emphasis added).   Thus, the Ninth Circuit

4 explicitly instructed courts "to consider the totality of the

5 circumstances, rather than to develop separately rules of thumb for

6 each type of scienter allegation." Id.   Taking the "holistic[]"

7 approach which Tellabs mandates, the South Ferry Court opined that

8 "federal courts certainly need not close their eyes to

9 circumstances that are probative of scienter viewed with a

10 practical and common-sense perspective." Id.

11      ***b.  Argument Summary***

12      Plaintiff points to a number of allegations which from its

13 standpoint give rise to "a strong inference of scienter with

14 respect to [Apollo's] false financial reporting resulting from

15 undisclosed stock option backdating, and its failure to properly

16 account for such backdating." Pl. Supp. Br. (doc. 101) at 2.

17 First, plaintiff relies upon allegations of backdating stock

18 options to show "that it is 'at least as likely' that defendants

19 possessed the requisite scienter" as to "their statements regarding

20 stock options granting and accounting[.]" Resp. (doc. 94) at 23-24.

21 Another way plaintiff believes it has sufficiently alleged scienter

22 is based upon circumstances which when taken together show

23 deliberate recklessness "with respect to Apollo's stock option

24 granting practices." Id. at 25.   Basically those circumstances

25 are: (1) the Restatement (2) "false SOX [Sarbanes-Oxley]

26 certifications"[;]" (3) resignations of Apollo executives and

27

28

1  directors; and (4) defendants' financial gain.[9]  Id. at 36; and 39.

2  Invoking Tellabs' competing inferences analytical framework,

3  plaintiff maintains that not only has it raised a cogent and

4  compelling inference of scienter, but defendants have not "raise[d]

5  a single reasonable competing inference that could counter [these]

6  allegations."  Id. at 58.

7      As the individual defendants construe the FAC, in addition to

8  the foregoing, plaintiff is endeavoring to allege scienter by

9  relying upon defendant Mueller's assurance of no backdating.  As

10  more fully explained below, the individual defendants strongly

11  contend that each of plaintiff's allegations "fall woefully

12  short[]" of the standard necessary to adequately plead scienter.

13  Mot. (doc. 82) at 13.

14      Similarly, Apollo maintains that plaintiff has "utterly failed"

15  to adequately plead scienter.  Mot. (doc. 81) at 26.  Essentially

16  adopting the individual defendants' scienter arguments,[10]  Apollo

17  ─────────────────

18      [9]    Plaintiff is also attempting to rely upon the jury verdict in In re
    Apollo Group, Ins. Sec. Litig., CV 04-2147 (D.Ariz.), finding Apollo, and
19  defendants Nelson and Gonzales liable for securities fraud.  As noted earlier,
    however, Judge Teilborg set aside that verdict.  See In re Apollo Group, Inc. Sec.
20  Litig., 2008 WL 3072731 (D.Ariz. Aug. 4, 2008).  Thus, assuming that verdict
    otherwise had any bearing on the present action, plainly it no longer does.
21  Consequently, the court will not take into account that verdict in evaluating the
    sufficiency of plaintiff's scienter allegations herein.

22      [10]    Apollo's tack is understandable given that ordinarily as a corporation,
    Apollo can be "'deemed to have the requisite scienter for fraud only if the
23  individual corporate officer making the statement has the requisite level of
    scienter.'"  Mot. (doc. 81) at 25 (quoting In re Apple Computer, Inc., Sec. Litig.,
24  243 F.Supp.2d 1012, 1023 (N.D.Cal. 2002) (citing, in turn, Nordstrom, Inc. v. Chubb
    & Son, Inc., 54 F.3d 1424, 1435-36 (9th Cir. 1995)).  As the Ninth Circuit recently
25  made clear though, it has not completely foreclosed the possibility of "collective
    scienter," Glazer Capital Management, LP v. Magistri, 549 F.3d 736, 744 (9th Cir.
26  2008), i.e. where "[t]he knowledge necessary to adversely affect the corporation
    does not have to be possessed by a single corporate agent; the cumulative knowledge
    of several agents can be imputed to the corporation."  Nordstrom, 54 F.3d at 1435
27  (internal quotation marks and citation omitted).
        In the present case, to the extent plaintiff may be urging application of the
28  collective scienter doctrine, the court declines to do so.  That doctrine does not
    come into play here because the FAC's scienter allegations are not akin to

1  highlights that the Restatement alone is an insufficient basis for

2  inferring scienter.  Apollo adds that plaintiff cannot rely upon

3  the corporate titles and responsibilities of the individual

4  defendants to plead scienter because that is tantamount to

5  impermissible "group pleading."  Id. Lastly, Apollo notes that the

6  individual defendants' stock sales during the Class Period also do

7  not provide a sufficient basis for pleading scienter.

8      The dominant theme of defendants' scienter argument is that

9  each of the actions complained of, standing alone, is insufficient

10  to create a strong inference of such.  Hence, the court should

11  dismiss the FAC for failure to adequately plead scienter.

12  Painstakingly deconstructing each of the FAC's scienter allegations

13  and the competing inferences which can be drawn therefrom, and

14  insisting on viewing each such allegation in isolation, was

15  problematic even after Tellabs.  See Metzler Inv., 540 F.3d at 1069

16  (observing, based upon Tellabs, that "a defendant cannot gain

17  dismissal by de-contextualizing every statement in a complaint that

18  goes to scienter[]").  That approach is even more problematic now

19  given evolving Ninth Circuit standards for pleading scienter.  In

20  Zucco, the Ninth Circuit recently acknowledged that it had "yet to

21  fully explain how the [Supreme] Court's Tellabs decision relates to

22  much of [its] [prior] analysis" of scienter pleading standards

23  under the PSLRA.  Zucco, 552 F.3d at 987.  Clarifying, the Ninth

24  Circuit now views "'Tellabs [as] permit[ting] a series of less

25

26  "circumstances in which a company's public statements were so important and so
27  dramatically false," such as the hypothetical example mentioned in Glazer Capital
   where "General Motors announced that it had sold one million SUVs in 2006, and the
   actual number was zero[,]" so as to justify allowing this method of pleading
28  scienter.   See id. at 743 (citation omitted).

1  precise allegations to be read together to meet the PSLRA

2  requirement.'" Zucco, 552 F.3d at 1006 (quoting South Ferry, 542

3  F.3d at 784).  It also recognizes that "'[v]ague or ambiguous

4  allegations are now properly considered as part of a holistic

5  review when considering whether the complaint raises a strong

6  inference of scienter.'" Id. (quoting South Ferry, 542 F.3d at

7  782).

8     "[R]ecognizing that Tellabs calls into question a methodology

9  that relies exclusively on a segmented analysis of scienter[,]" the

10  Zucco Court further explained that it now "read[s] Tellabs to mean

11  that [its] prior, segmented approach is not sufficient to dismiss

12  an allegation of scienter." Id. at 991.  Indeed, in Rubke v.

13  Capitol Bancorp LTD, 551 F.3d 1156 (9th Cir. 2009), the Ninth

14  Circuit explicitly recognized that it "can no longer summarily

15  dismiss a complaint whose individual allegations are insufficient

16  under the PSLRA." Id. at 1165.  Instead, a court must "conduct a

17  dual inquiry." Zucco, 552 F.3d at 992.  "First, [it] will

18  determine whether any of . . . plaintiff's allegations, standing

19  alone, are sufficient to create a strong inference of scienter[.]"

20  Id. "Second, if no individual allegations are sufficient, [the

21  court] will conduct a 'holistic' review of the same allegations to

22  determine whether the insufficient allegations combine to create a

23  strong inference of intentional conduct or deliberate

24  recklessness." Id.  So, while holding that "Tellabs does not

25  materially alter the particularity requirements for scienter claims

26  established in [its] previous decisions[,]" at the same time the

27  Zucco Court held that Tellabs "adds an additional 'holistic'

28  approach to those requirements[.]" Id. at 987.

1    Consistent with that recently espoused view, a court must
2  "determine whether the complaint contains an inference of scienter
3  that is greater than the sum of its parts." Rubke, 551 F.3d at
4  1165 (citations omitted); see also Glazer Capital, 549 F.3d at 745
5  (internal quotation marks and citation omitted) ("To determine
6  whether [plaintiff] has met the PSLRA pleading requirements, [the
7  Court] must determine whether these five events [which plaintiff
8  claimed supported an inference of scienter], even though
9  individually lacking, are sufficient to create a strong inference
10  of scienter."). In accordance with the dual inquiry approach
11  adopted by the Ninth Circuit in Zucco, first the court will
12  individually examine each of plaintiff's scienter allegations,
13  standing alone, to determine whether they are sufficient to create
14  a strong inference of scienter. If necessary, i.e., "if no
15  individual allegations are sufficient," the court will then conduct
16  a holistic review of those same allegations. See Zucco, 552 F.3d
17  at 992.

18         ***c.  Individual Scienter Allegations***

19              ***i. Stock Option Backdating***

20    The principle means by which plaintiff is attempting to show
21  scienter is through allegations of stock option backdating.
22  Defendants construe the FAC as alleging that Apollo has "'admitted'
23  to backdating[]'" – an admission and an allegation which they
24  vehemently deny. Mot. (doc. 82) at 13 (citing FAC at ¶ 2.) Thus,
25  defendants reason, plaintiff cannot rely upon that supposed
26  admission to establish that they had the requisite scienter. The
27  parties spill much ink over whether defendants have admitted
28  backdating, which is the underpinning of plaintiff's accounting

1  fraud claims.  At this juncture, there is no need to become mired

2  down in whether defendants have "admitted" to backdating because

3  the FAC sufficiently *alleges* that they engaged in such conduct

4  regardless of any purported "admission."  At this pleading stage,

5  nothing more is required.  See Edmonds v. Getty, 524 F.Supp.2d

6  1267, 1274 (W.D.Wash. 2007) (citation omitted) ("[A]t the pleading

7  stage, the plaintiff need not prove that backdating occurred but

8  rather must only allege circumstances from which it may be

9  reasonably inferred that backdating as opposed to an innocent

10 bookkeeping error occurred.")

11      The FAC alleges that "several grants . . . had purported

12 grant dates so improbable that backdating is the only plausible

13 explanation."  FAC (doc. 71) at ¶48.  From defendants' viewpoint,

14 this is nothing more than a "self-serving conclusion"  which does

15 not plead scienter.  Mot. (doc. 82) at 15.   Rather than alleging a

16 scheme to fraudulently backdate stock options, the individual

17 defendants construe the FAC as alleging nothing more than "simple

18 accounting errors and sloppy recordkeeping" – allegations which

19 cannot support a finding of scienter.  See Supp. Br. (doc. 100) at

20 3.  Similarly, Apollo charges plaintiff with improperly "lump[ing]

21 Apollo's innocuous accounting mistakes with nefarious retroactive

22 pricing[,]" in an effort to plead scienter. Reply (doc. 97) at 7.

23      Although it is a close call, when read together, a number of

24 allegations support a finding that the inference of backdating is

25 "at least as compelling as any opposing inference" of innocent

26 bookkeeping error.  See Tellabs, 551 U.S. at ___, 127 S.Ct. at 2510

27 (footnote omitted).  Tellabs and its progeny require nothing more.

28 In fact, as one court within this district has astutely observed,

"[t]he Supreme Court [in <u>Tellabs</u>] has now made clear, . . . that a
tie goes to the Plaintiff[]" in terms of competing inferences as to
scienter.   <u>Communications Workers of America Plan for Employees'
Pensions and Death Benefits v. CKS Auto Corp.</u>, 525 F.Supp.2d 1116,
1120 (D.Ariz. 2007).   At this relatively early stage in the
litigation, the court endorses this tie-breaking approach.

In the present action, the FAC alleges that in conducting their
own "investigation" Apollo explicitly acknowledged that it
"prepared and maintained inaccurate documentation concerning the
date that grant award lists were completed and approved."   FAC
(doc. 71) at ¶ 115(a) (internal quotation marks omitted).   This
allegation is akin to the "admission" in <u>Middlesex</u> which the court
found, along with other allegations, "lean[ed] heavily toward a
finding of scienter."   <u>Middlesex</u>, 527 F.Supp.2d at 1181.   The
<u>Middlesex</u> complaint alleged that defendant "admitted that
accounting measurement dates for most of the stock option grants to
employees from July 1998 and May 2002 differed from the recorded
grant dates."   <u>Id.</u> (internal quotation marks and citation omitted).
In a similar vein, here the FAC alleges that "'Apollo has admitted
in its Form 10-K for the year ending August 31, 2006 that 57 of the
100 total grants made during this time period used incorrect
measurement dates for accounting purposes.'" FAC (doc. 71) at ¶ 47.

Further, other allegations detailed below, much like those in
<u>Middlesex</u>, amount to "extremely fortunate [grant] dates [which]
give rise to a strong inference that backdating has occurred and
that it was done intentionally."   See <u>Middlesex</u>, 527 F.Supp.2d at
1182.   More specifically, the FAC alleges that on December 18,
1998, "[d]efendants dated certain of Apollo's 1998 option grants

1   . . . at $11.39 per share[,]" which "was nearly the low for the
2   month of December when Apollo's stock traded between $10.22 and
3   $15.06 per share."  FAC (doc. 71) at ¶ 49.  On that date the
4   Sperling defendants, as well as defendants Nelson, Gonzales, and
5   Noone, allegedly made a 10 day return on those options totaling
6   $2,396,520.00.  Id.

7        The FAC further alleges that on April 19, 1999, Apollo dated
8   option grants at "the low of the month[,]" with defendant Gonzales
9   receiving 20,000 options at that price.  Id. at ¶ 50.  Allegedly,
10  that particular option grant resulted in a five day return to Ms.
11  Gonzales of $35,000.00.  Id.  The FAC also alleges that
12  "[d]efendants dated many of Apollo's 2000 grants as of January 12,
13  2000 at $8.39 per share (split adjusted)- **not only the low of the**
14  **month but also the low of the year.**"  Id. at ¶ 51 (emphasis in
15  original).  The FAC continues, alleging that during 2000 Apollo's
16  "stock traded as high as $11.33 per share in January and as high as
17  $22.14 per share[.]" Id.

18       Later in 2000, the FAC alleges that Apollo dated "many of [its]
19  grants as of December 15, 2000 at $14.84 per share (split
20  adjusted)[.]" Id. (emphasis in original).  Allegedly that share
21  price was "**not only the low of the month but also the low for the**
22  **fourth quarter of 2000**."  Id. (emphasis in original) Plaintiff
23  asserts that this particular stock grant "involved suspicious
24  timing" in that "two days later Apollo issued better than expected
25  results which caused a dramatic and immediate climb in the
26  Company's stock."  Id.  According to the FAC, "[b]y December 20,
27  2000 - a day after the earnings release - Apollo's stock closed at
28  $20.89 per share." Id.  Then, the stock purportedly "hit its high

1  for the year of $22.14 per share a few days later on December 28,

2  2000 – *a 49% increase in eight trading days*." Id. (emphasis in

3  original).  The Sperling defendants and defendants Nelson, Gonzales

4  and Noone allegedly were granted a total of 270,000 options on

5  December 15, 2000, with a total five day return of $3,877,200.00

6  Id.

7      Finally, the FAC alleges that on September 21, 2001,

8  "[d]efendants dated Apollo's . . . option grants . . . at $23.22

9  per share – *not only the low of the month but also the low for the*

10 *second half of 2001*." Id. at ¶ 52 (emphasis in original).  To

11 support that assertion, the FAC further alleges that Apollo's

12 "stock traded as high as $28.02 per share in September [2001] and

13 as high as $32.03 per share in the second half of th[a]t year."

14 Id.  Again the FAC alleges that the Sperling defendants, as well as

15 defendants Nelson, Gonzales, and Noone and, this time, defendant

16 Bachus, received stock options with high returns.  More

17 specifically, allegedly those defendants received a total of

18 385,000 options on September 21, 2001, with a five day return

19 totaling $2,705,550.00.  Id.

20     These dates, with one exception, appear to reflect at a

21 minimum the lowest price of the month, and in one instance the

22 lowest price for the year.  Additionally, as to the December 15,

23 2000 date, allegedly the grant price immediately preceded a 49%

24 increase in the price of Apollo's stock – a significant price

25 increase by any measure.  See id. at ¶ 51.  Not only that, like the

26 Middlesex court, this court cannot ignore "[t]he fact that none of

27 the option grant dates resulted in less-than-favorable results for

28 Defendants[,]" which "also gives rise to a strong suggestion that

1  the improper dating of options was intentional." <u>See</u> <u>Middlesex</u>,

2  527 F.Supp.2d at 1182.   Bolstering the inference of intentional

3  backdating here are the charts in the FAC showing Apollo's stock

4  price history.   Also as in <u>Middlesex</u>, those charts, when "overlaid

5  with demarcations reflecting the date of the option grants at issue

6  (as has been done in Plaintiff's FAC)," strengthen the inference of

7  backdating. <u>See</u> <u>id.</u>

8      The FAC does not include a statistical analysis as part of its

9  backdating allegations.   Initially the court found this omission

10 somewhat troubling given defendants' position that such an analysis

11 is a necessary predicate to pleading backdating.   A careful reading

12 of the cases to which defendants cite, however, reveals that while

13 a statistical analysis may be preferable, and certainly would

14 strengthen the backdating allegations herein, at this point the

15 lack of such an analysis is not fatal.

16     To illustrate, <u>In re Computer Sciences Corp. Deriv. Litig.</u>,

17 2007 WL 1321715 (C.D.Cal. 2007), the court recognized that "the

18 detailed statistical that the plaintiffs employed in" another case

19 was "not necessary to making particularized allegations of

20 backdating." <u>Id.</u> at *14.   Likewise, in <u>CNET Networks</u>, <u>supra</u>, 483

21 F.Supp.2d 947, the court did fault plaintiffs for alleging that

22 they had "employ[ed] a widely accepted analytical model for

23 detecting backdated options," when all they had done was to "merely

24 look[] at the stock price movement." <u>Id.</u> at 957.   Significantly,

25 however, the court was quick to point out that it "would not

26 necessarily require plaintiffs to perform a complex financial

27 analysis at the pleading stage." <u>Id.</u> at 958-957.   In fact, the

28 court expressly stated that "[s]ound analytical methods are *one way*

1  that plaintiffs could have eliminated the possibility that the

2  returns from the grants were the product of dumb luck."  <u>Id.</u>  at

3  958 (emphasis added).  Although the court in <u>CNET</u> reasoned that

4  "[w]ithout such models, that inference is more difficult to

5  support[,]" it did not require such models.  <u>Id.</u> In fact, even

6  without a "sound analytical method," after scrutinizing the eight

7  alleged grants at issue therein, the <u>CNET</u> court found that

8  plaintiff had sufficiently pled facts supporting an inference that

9  three of the eight grants at issue therein were backdated.

10      That is not to say that at some point in this litigation

11  plaintiff's backdating allegations cannot be defeated due to the

12  lack of a sound financial analysis, but not now.  The court is all

13  the more reluctant to require a complex, detailed statistical

14  analysis at this particular juncture given the Ninth Circuit's

15  explicit recognition even "vague or ambiguous" scienter allegations

16  may survive a motion to dismiss, as well as a "series of less

17  precise allegations[,] [when] read together[.]" <u>South Ferry</u>, 542

18  F.3d at 784 (citation omitted).

19          **ii. Deliberately Reckless**

20      Having found plaintiff sufficiently pled backdating, "the

21  question . . . becomes whether Plaintiff has adequately pled that

22  Defendants either knew of the backdating, or were deliberately

23  reckless in not knowing of the backdating."  <u>See</u> <u>Middlesex</u>, 527

24  F.Supp.2d at 1182.  Plaintiff relies upon a series of

25  circumstances, the totality of which it believes show deliberate

26  recklessness in terms of Apollo's stock option granting practices.

27  As noted earlier, those circumstances are: (1) the Restatement

28  (2) "false SOX certifications"[;]" (3) the "mass exodus" of Apollo

1  executives and directors; and (4) defendants' financial gain.
2  Resp. (doc. 94) at 36 and 39.

3              *(a)  Restatement/GAAP Violation*

4       The parties offer diametrically opposing views as to the impact
5  of the Restatement on the court's scienter analysis.  Plaintiff
6  contends it "supports a strong inference of scienter[,]" Resp.
7  (doc. 94) at 30, whereas defendants retort that the Restatement
8  actually "shows the absence of scienter[.]" Mot. (doc. 82) at 13.
9  Although not without its weaknesses, plaintiff's argument is the
10  stronger one, at least at this juncture.

11      A strong inference of scienter can be drawn from the
12  Restatement, according to plaintiff because it confirms that "[i]n
13  the accounting of certain stock option grants, [Apollo] did not
14  correctly apply the requirements of APB 25[,] [i]n certain
15  instances" using an improper measurement date for option awards.
16  FAC (doc. 71) at 62, ¶ 106 (internal quotation marks omitted).
17  Additionally, plaintiff stresses that the Restatement also confirms
18  that Apollo "prepared and maintained inaccurate documentation
19  concerning the date that grant award lists were completed and
20  approved."  Id.  Lastly, plaintiff hones in on the Special
21  Committee's "report[] to [Apollo's] Board that certain former
22  officers took steps that may have been intended to mask failures in
23  the grant approval process with respect to [Apollo's] financial
24  reporting and payment of taxes[,]" as the Restatement recites.  Id.
25  (internal quotation marks omitted).

26      The court is well aware that "mere publication of a restatement
27  is not enough to create a strong inference of scienter." Zucco,
28  552 F.3d at 1000; see also In re Marvell Technology Group Ltd. Sec.

Litig., 2008 WL 4544439, at *6 (N.D.Cal. Sept. 29, 2008) (citation omitted) ("To the extent . . . Plaintiffs seek to rely solely on the restatement of financials, plaintiffs cannot show scienter solely by pointing to the fact that Marvell restated its financial statements.").  The court is equally well aware that "'[t]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter.'"  Rudolph v. UTStarcom, 2008 WL 4002855, at *5 (N.D.Cal. Aug. 21, 2008) ("UTStarcom II") (quoting, inter alia, DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 390 (9th Cir. 2002) (other quotation marks and citations omitted) (emphasis added); see also Cornerstone, supra, 355 F.Supp.2d at 1091 ("The majority of circuits have clearly held that standing alone, allegation of GAAP or SEC regulations do not establish scienter.") This is so even if the GAAP violations are "significant" or "requir[e] large or multiple restatements[.]" Rectifier, supra, 2008 WL 4555794, at *13 (footnote and citations omitted); but see Batwin v. Occam Networks, Inc., 2008 WL 2676364, at *13 (C.D.Cal. July 1, 2008) (footnote omitted) ("[S]ignificant violations of GAAP [alleged overstatement of revenues by over 30 and 40%], taking place over an extended period of time [nearly every quarter for roughly three years], g[a]ve rise to a strong inference of scienter.")

     Rather, to create a strong inference of scienter based upon a restatement or alleged GAAP violations, those allegations "must be augmented by other specific allegations that defendants possessed the requisite mental state." Rectifier, 2008 WL 4555794, at *13 (collecting cases).  Courts have variously described these additional allegations, requiring "specific allegations that the

1  defendant had actual knowledge of relevant facts from which

2  scienter could be inferred[,]" In re U.S. Aggregates, Inc. Sec.

3  Litig., 235 F.Supp.2d 1063, 1073 (N.D.Cal. 2002), or similarly

4  requiring that allegations of GAAP violations "be underpinned by

5  other particularized allegations that defendants possessed the

6  requisite mental state."   Cornerstone, 355 F.Supp.2d at 1091.

7       Apart from defendants Nelson, Norton and Blair, missing from

8  the FAC are any "specific or particularized" allegations that the

9  other individual defendants had the requisite mental state *vis-a-*

10 *vis* the Restatement.   Therefore, the Restatement standing alone

11 does not support a strong inference of scienter as to those

12 defendants.   Plaintiff's bald assertion that "failure to adhere to

13 APB 25 and properly record compensation expense for millions of

14 dollars worth of stock options[]" was "part and parcel" of

15 defendants' alleged fraudulent scheme, Resp. (doc. 94) at 31, is

16 not the type of specific or particularized allegation which can

17 form the basis for a strong inference of scienter.   See Wojtunik v.

18 Kealy, 394 F.Supp.2d 1149, 1167 (D.Ariz. 2005) (in considering GAAP

19 violations, allegations of scienter insufficient as to defendants

20 "given the lack of specific allegations about those defendants'

21 personal involvement[]").   Similarly unavailing is plaintiff's

22 contention that scienter can be shown due to the "nature" of the

23 Restatement in that "the earlier false financial results were only

24 achieved by violating Apollo's own stated accounting polices and

25 stock option plans."   Id. (citing FAC at ¶ 46).   Plainly this

26 allegation also lacks the necessary detail from which an inference

27 can be drawn that unspecified defendants had the requisite state of

28 mind.

On the other hand, based directly on the Restatement, the FAC "details the[] extensive involvement" of defendant Nelson, Apollo's former CEO, and defendant Norton, the Chairman of the Compensation Committee, and defendant Blair, a member of that Committee, "in the options granting process[,]" and hence their access to information as to that process.  See Resp. (doc. 94) at 35.  Plaintiff highlights a number of allegations, including the following, in that regard:

> *    Apollo's Board or Compensation Committee [*i.e.* Messrs. Blair and Norton] was primarily responsible for selecting the grant dates.  See FAC (doc. 71) at ¶ 115(b).
>
> *    "Management Grants . . . required approval by both members of the Compensation Committee."  Id. at ¶ 115(c).
>
> *    Apollo's internal investigation revealed "Approval Memoranda signed by the Compensation Committee for grants to [Nelson]."  Id. at ¶ 115(d).
>
> *    "In many instances, the [Grant] Approval Memorandum was signed by only the Chairman of the Compensation Committee [Norton] and we lack evidence as to whether all of the grants issued, were, in fact, approved by a majority of the members of th[at] . . . Committee." Id. at ¶ 115(e).
>
> *    Nelson typically attended Compensation Committee meetings where option grants were discussed and approved.  See id. at ¶ 117(e).
>
> *    Beginning in August, 2001 either Nelson or the Compensation Committee signed the memoranda approving grants to all employees.  See id. at ¶ 117(c).

Undertaking the "comparative" inquiry which Tellabs elucidates, there is a strong inference of scienter as to defendants Norton, Nelson and Blair in light of their extensive involvement with the grant process as the Restatement indicates.  These allegations

- 57 -

1    permit a strong inference of scienter to be drawn as to defendants
2    Nelson, Norton and Blair with respect to the falsity of their
3    statements regarding Apollo's stock option granting practices,
4    especially when read in conjunction with other scienter
5    allegations.

6        Despite the foregoing, defendants insist that the Restatement
7    actually "shows the absence of scienter[,]" partly because it
8    states that "'[t]he Special Committee has found no direct evidence
9    that the grant date for any of the large Management Grants was
10   selected with the benefit of hindsight.'"  Mot. (doc. 82) at 13
11   (quoting FAC at 62, ¶ 106).  They also point to the fact that
12   following its investigation, the SEC did not recommend any
13   enforcement action.  Morris Decl'n. (doc. 83), exh. 10 thereto.
14   Thus, from defendants' perspective the Restatement is nothing more
15   than a "simple statement that Apollo misapplied certain complicated
16   accounting rules."  Id. at 14 (footnote omitted).  Hence, it does
17   not support a strong inference of scienter as to any of the
18   defendants.

19       Neither of these arguments are persuasive.  The Special
20   Committee's "no direct evidence" finding does not alter the court's
21   conclusion that at least as to defendants Nelson, Norton and Blair,
22   the Restatement squarely contributes to a finding of scienter.
23   Moreover, despite what defendants imply, the SEC's decision not to
24   take any enforcement action does not undercut a finding of
25   scienter.  The SEC's determination is irrelevant to this court's
26   scienter analysis because, in the first instance, as the FAC
27   accurately states, "the SEC's decision not to take action can 'in
28   no way be construed as indicating that the party has been

1  exonerated' and any 'attempted use . . . as a purported defense in

2  any action . . . would be clearly inappropriate and improper[.]'"

3  FAC (doc. 71) at 58, n. 4 (quoting *SEC Procedures Relating to the*

4  *Commencement of Enforcement Proceedings and Termination of Staff*

5  *Investigations*. 1082 SEC LEXIS 238 at *7).  Secondly, like the

6  Batwin defendants, defendants herein do not cite to any authority

7  for the proposition that the SEC's discretionary decision not to

8  institute enforcement proceedings should be taken into

9  consideration in determining whether a plaintiff's allegations as

10  to scienter pass muster under the PSLRA."  Batwin, 2008 WL 2676364,

11  at *13 n.7.  Therefore, the court abides by its ruling that the

12  Restatement provides at least some basis for finding that

13  defendants Nelson, Norton and Blair had the requisite scienter,

14  especially when considering the FAC as a whole.

15              *(b)  SOX Certifications*

16       The FAC further specifically alleges that defendant Nelson

17  "signed false and misleading SOX certifications which falsely

18  attested to the adequacy of [Apollo's] internal controls, and the

19  accuracy of [Apollo's] reported financial statements."  FAC (doc.

20  71) at ¶ 120. The FAC does not expressly allege that defendant

21  Gonzales also signed false and misleading SOX certifications.

22  However, it does allege that she was "at least deliberately

23  reckless with respect to her administration of [Apollo's] option

24  granting process and her oversight of [Apollo's] accounting." Id.

25  at ¶ 122.  That is so, the FAC alleges because "contrary to the SOX

26  certifications [which Gonzales signed] which each year affirmed the

27  adequacy of [Apollo's] internal controls and the accuracy of

28  [Apollo's] financial results, Gonzales wholly failed to monitor the

1  granting of stock options, or account for the backdated stock

2  options at Apollo." Id. at ¶ 125. These purportedly false SOX

3  certifications, from plaintiff's viewpoint, "support a strong

4  inference of scienter." Resp. (doc. 94) at 36.  Two recent Ninth

5  Circuit decisions substantially erode this argument, however.

6      Fairly recently, for the first time the Ninth Circuit addressed

7  "the precise interplay between the reporting requirements of [SOX]

8  and the scienter pleading requirements of the PSLRA." Glazer

9  Capitol, 549 F.3d at 747.  Agreeing "with the reasoning of the

10  Eleventh and Fifth Circuits[,]" the Court held that "[b]ecause

11  Congress expressed no intent to alter the pleading requirement of

12  the PSRLA, [SOX] certification is only probative of scienter if the

13  person signing the certification is severely reckless in certifying

14  the accuracy of the financial statements." Id. (internal quotation

15  marks and citation omitted).  In Glazer Capitol, the plaintiff

16  relied upon standard SOX certification language as to disclosure

17  controls and procedures – the precise language upon which the

18  plaintiff in this action also relies.  However, because the

19  plaintiff in Glazer Capitol did not plead any "facts to th[e]

20  effect" that defendants were "severely reckless," the Court held

21  that "without more," the SOX certifications "[we]re not sufficient

22  . . . to raise a strong inference of scienter[.]" Id.

23      As in Glazer Capitol, plaintiff does not allege any facts

24  showing that either Nelson or Gonzales was "severely reckless in

25  certifying the accuracy of the financial statements." See id.

26  Moreover, as in Zucco, plaintiff is relying upon nothing more than

27  "boilerplate language" in Apollo's 10-K forms and statutorily

28  required SOX certifications to establish scienter. Zucco, 552

1   F.3d, at 1003.  In fact, in all significant respects, the SOX

2   certification allegations herein are identical to those under

3   scrutiny in _Zucco_ – allegations which the Ninth Circuit found

4   "add[ed] nothing substantial to the scienter calculus."  _Id._ at

5   1004.  In light of the foregoing, standing alone the purported

6   false SOX certification allegations do not support a strong

7   inference of scienter as to defendants Nelson and Gonzales, and

8   certainly not to any of the other defendants.

9           _(c)  **Resignations**_

10      Plaintiff believes that "[t]he mass exodus of Apollo executives

11  and directors around the time that the allegations of backdating

12  were revealed also supports an inference of scienter."  Resp. (doc.

13  94) at 39.   Plaintiff recognizes that such allegations are "not

14  dispositive alone[]" of scienter.  _Id._  Plaintiff reasons though

15  that the "large number of resignations and firings," which it

16  attributes to "Apollo's stock option misconduct and subsequent

17  investigation," along with the "connections" of the departing

18  individuals to "wrongdoing at Apollo," "collectively[] support a

19  strong inference of scienter."  _Id._ at 43.

20      Consistent with their prior proposition, Defendants assert that

21  standing alone such allegations do not raise a strong inference of

22  scienter, adding that resignations are an expected byproduct of a

23  restatement.  To further undercut plaintiff's scienter argument on

24  this point, defendants explain that the circumstances under which

25  certain defendants left Apollo militate against a finding of

26  scienter.

27      In _Zucco_, the Ninth Circuit also recently considered how

28  resignations impact the scienter equation, indicating that "in some

1  circumstances" they "may be indicative of scienter[.]" <u>Zucco</u>, 552

2  F.3d at 1002.   However, "[w]here a resignation occurs slightly

3  before or after the defendant corporation issues a restatement, a

4  plaintiff must plead facts refuting the reasonable assumption that

5  the resignation occurred as a result of restatement's issuance

6  itself in order for a resignation to be strongly indicative of

7  scienter."   <u>Id.</u> (citation omitted).   The mere allegation that the

8  company's independent accounting firm resigned one month after

9  issuance of the restatement did not satisfy that pleading burden,

10 the Court held in <u>Zucco</u>.   That resignation was "not surprising[,]"

11 in the Ninth Circuit's estimation, because that firm "had just been

12 partially responsible for the corporation's failure to adequately

13 control its accounting procedures."   <u>Id.</u>   That, the Ninth Circuit

14 held, "is not enough to support a strong inference of scienter."

15 <u>Id.</u>

16      "For other resignations occurring during the relevant period,"

17 but not necessarily in close proximity to the restatement, the

18 Court in <u>Zucco</u> explained that "a plaintiff must allege sufficient

19 information to differentiate between a suspicious change in

20 personnel and a benign one."   <u>Id.</u> "Mere conclusory allegations that

21 a financial manager resigns or retires during the class period or

22 shortly before the corporation issues its restatement, without

23 more, cannot support a strong inference of scienter."   <u>Id.</u>

24 (citations omitted).   In that context, additional allegations that

25 "the resignation at issue was uncharacteristic when compared with

26 defendant's typical hiring and termination patterns or was

27 accompanied by suspicious circumstances[]" are necessary.   <u>Id.</u>

28 Without such allegations, the Ninth Circuit held that "the

inference that the defendant corporation forced certain employees
to resign because of its knowledge of the employee's role in the
fraudulent representations will *never* be as cogent or as compelling
as the inference that the employees resigned or were terminated for
unrelated personal or business reasons." Id. (emphasis added).

Applying those principles to the record before it, the Zucco
Court held that "the bare fact" that the defendant's chief
financial officer ("CFO") retired "just prior to the disclosure of
[defendant's] improper accounting and lack of financial controls
during his tenure[]" did not support plaintiff's allegations of
scienter where the complaint did not "indicate whether [that CFO]
was nearing retirement age, whether he left to pursue other
opportunities, or even the length of his tenure." Id. Likewise,
allegations that two controllers resigned during the class period
were insufficient "absent particular facts about [defendant's]
hiring and firing of controllers during the class period, to create
a compelling inference of scienter." Id. Plaintiff's claim that
the controllers "left because they believed management was
unethical[]" were "based on vague hearsay allegations[,]" the Ninth
Circuit found, and hence were "not specific enough to extract a
strong inference of scienter from otherwise mundane turnover in the
corporation's financial department." Id.

Here, plaintiff alleges that two of the individual defendants,
Mr. Blair, who wore several Apollo hats, serving as an Apollo
director, a Compensation Committee member, and Chairman of the
Audit Committee, as well as Ms. Govenar, another Apollo director,
resigned in close proximity to the issuance of the Restatement. On
May 2, 2007, they advised Apollo of their resignations, Morrison

1   Decl'n (doc. 83), exh. 6 thereto at 3, and the Restatement was

2   issued on May 22, 2007.  As Zucco makes clear though, a strong

3   inference of scienter requires more than close proximity between a

4   restatement and a resignation.

5       As to defendant Blair, in its opposition plaintiff points to

6   the allegation that he, along with defendant Norton "had the

7   closest working relationship with Nelson at Apollo."  Resp. (doc.

8   94) at 42 (internal quotation marks and citation omitted).  That

9   "working relationship" purportedly "consisted of massive systemic

10  stock option misconduct at Apollo."  Id. (internal quotation marks

11  and citation omitted).  These resignation allegations alone do not

12  suffice to raise a strong inference of scienter as to Blair though

13  because, as in Zucco, these facts are insufficient to "refut[e] the

14  reasonable assumption that [his] resignation occurred as a result

15  of [the] restatement's issuance itself[.]"  See Zucco, 552 F.3d at

16  1002.

17      Further, because the resignations of Blair and Govenar "were

18  not accompanied by any public statement by [Apollo] that [they]

19  participated in or were involved in the fraud[,]" their

20  resignations are "minimal evidence of scienter[.]"  See Rectifier,

21  2008 WL 4555794, at *16.  Not only that, but after resigning,

22  defendant Blair continued to serve on the Board of Western

23  International University, a wholly-owned subsidiary of Apollo,

24  Morrison Decl'n (doc. 83), exh. 6 thereto at 3.  That continued

25  service further undermines a strong inference of scienter as to

26  him.  See In re Cyberonics Inc. Sec. Litig., 523 F.Supp.2d 547,

27  553-54 (S.D.Tex. 2007) (retention of CFO by company after

28  supposedly "forced resignation," among other reasons, did not

support strong inference of scienter), aff'd on other grounds without pub'd opinion, 292 Fed.Appx. 311 (5th Cir. 2008).  By the same token though, as discussed herein, because the FAC contains additional allegations of Blair's "wrongdoing[,]" his resignation lends credence to a finding of scienter here.  See Rectifier, 2008 WL 4555794, at *16 (citations omitted) ("A resignation or termination provides evidence of scienter only when it is accompanied by additional evidence of the defendant's wrongdoing.")

     The FAC also does not include additional allegations as to defendant Govenar so as to support a strong inference of scienter based upon her resignation.  Besides the fact of her resignation, plaintiff alleges only that Ms. Govenar was "removed from the Special Committee due to" an unspecified "conflict[] of interest[.]" Resp. (doc. 94) at 43 (citing FAC at ¶ 93).  That generic allegation, simply is not enough to create a strong inference of scienter based upon Ms. Govenar's resignation.  The FAC does not include allegations which would transform Ms. Govenar's resignation from a "benign" to a "suspicious" one.

     Plaintiff also relies upon the resignations of four other defendants, Messrs. Nelson, Norton and Bachus, and Ms. Gonazles, to raise a strong inference of scienter.  In contrast to defendants Blair and Govenar, none of these resignations were in close proximity to the Restatement – a fact plaintiff overlooks.  "Apollo announced that [defendant] Nelson[,]" its Chairman, CEO and President, "unexpectedly 'resigned'" in January 2006 – nearly a year and a half prior to issuance of the Restatement.  FAC (doc. 71) at  ¶ 19.  The court will not turn a blind eye to the fact, however, that the Special Committee was formed that same month, on

1  January 28, 2006.  Nonetheless, without more, that timing does not

2  raise a strong inference of scienter in terms of Nelson's

3  resignation.

4      Plaintiff believes that the following allegation is "powerful

5  evidence" of Nelson's scienter as it relates to his resignation:

> John Sperling, . . . , stated that he personally
> recommended that the Board terminate Nelson because
> 'he was preoccupied primarily with the stock price
> and not with the function of the company.'

9  FAC (doc. 71) at ¶ 19.  Nowhere in the FAC, however, are there

10 allegations as to Apollo's "typical hiring and termination

11 patterns[,]" as Zucco demands.  See Zucco, 552 F.3d at 1002.  Nor

12 does this allegation amount to a "suspicious circumstance[ ]" so as

13 to support a strong inference of scienter.  See id.  Rather John

14 Sperling's purported statement falls into the category of a "vague

15 hearsay" allegation which, as in Zucco is "not specific enough to

16 extract a strong inference of scienter[.]" See id.  Clearly then,

17 Nelson's resignation standing alone is insufficient to create a

18 strong inference of scienter.  Taking the mandatory holistic

19 approach, however, as will soon become evident, the totality of the

20 allegations as to defendant Nelson shows that plaintiff has

21 sufficiently plead scienter as to him.

22     The FAC alleges that defendant Gonzales, Apollo's CFO,

23 Secretary and Treasurer, was "forced to resign in November 2006

24 because of her involvement in the stock option backdating at

25 Apollo."  FAC (doc. 71) at ¶ 20.  The FAC further alleges that as

26 part of its "[c]ontinuing . . . attempts to conceal . . .

27 backdating[,]" defendant Mueller "stated . . . that Gonzales

28 resigned to spend more time with her family."  Id. at ¶ 99

(internal quotation marks omitted).  Again, because her resignation was not in close proximity to the Restatement, and because there are no allegations as to Apollo's typical hiring and termination patterns or allegations of "suspicious circumstances[,]" in accordance with Zucco, the lone inference that Apollo "forced" Gonzales "to resign because of its knowledge of [her] role in the fraudulent representations will *never* be as cogent or as compelling as the inference that [she] resigned . . . for unrelated personal or business reasons."  See Zucco, 552 F.3d at 1002 (emphasis added).

Plaintiff attempts to show that Gonzales' resignation is highly probative of her state of mind based on allegations that the Special Committee "determined that [she] was unaware of APB 25, and therefore, administered an option plan that did not meet [certain IRS standards[,]" and she thus "[h]elped to cause" the financials to be restated, and necessitated IRS refunds because the options were not in compliance with APB 25.  See FAC (doc. 71) at ¶ 125 (internal quotation marks and citation omitted).  Plaintiff's reliance upon those determinations is misplaced because it is just as plausible to infer from Ms. Gonzales' supposed "unaware[ness] of APB 25" that she was "either negligent or grossly negligent – neither of which are sufficient under the PSLRA and Ninth Circuit precedent."  See Middlesex, 527 F.Supp.2d at 1187.  Consequently, like defendant Nelson, Gonzales' resignation without more does not establish the requisite strong inference of scienter.  Also as with defendant Nelson, however, as will be more fully explained below, collectively viewing the allegations against Ms. Gonzales creates a strong inference of scienter so as to defeat dismissal.

1    Plaintiff barely mentions Bachus in its discussion of
2  resignations, noting simply that he left at the same time as
3  Gonzales - in November 2006.  See Resp. (doc. 94) at 41 (citing FAC
4  at ¶¶ 20-21).  Such a conclusory allegation falls woefully short of
5  the allegations necessary to support a strong inference of scienter
6  based upon a resignation, especially given that Bachus' resignation
7  preceded the Restatement by almost a year and a half.  An
8  independent perusal of the FAC reveals additional allegations as to
9  Bachus' resignation, however.  Allegedly "he was forced to resign
10 because of his involvement in the stock option backdating at
11 Apollo."  FAC (doc. 71) at ¶ 21. Furthermore, Bachus purportedly
12 resigned before John "Sperling had a chance to ask for [his]
13 resignation."  Id. at ¶ 102.  At the risk of repetition, the FAC
14 does not include any allegations as to Apollo's typical hiring and
15 termination practices.  Although Bachus did resign during the
16 Special Committee's investigation, that does not rise to the level
17 of a "suspicious" circumstance.  Absent such allegations, "the
18 inference that [Apollo] forced certain employees[,]" such as
19 Bachus, its former CAO and Controller, "to resign because of [its]
20 knowledge of [his] role in the fraudulent representations will
21 never be as cogent or compelling as the inference that [he]
22 resigned . . . for unrelated personal or business reasons."  See
23 Zucco, 552 F.3d at 1002.  Thus, Bachus' resignation on its own is
24 insufficient to establish a strong inference of scienter as to him.
25    The FAC is similarly flawed with respect to the allegations
26 surrounding defendant Norton's resignation.  The only allegation in
27 the prolix FAC directly pertaining to his resignation alleges that
28 he along with other defendants "'retired' during or shortly after

the Special Committee's investigation regarding options backdating and the issuance of [Apollo's] Restatement."   FAC (doc. 71) at ¶ 137.   The press release announcing his resignation as Compensation Committee Chair, effective December 8, 2006 (well before the Restatement), indicates that Mr. Norton's "intention [was] not to stand for reelection at [Apollo's] Annual Meeting[,]" which "generally occurs in January, 2007."   Morrison Decl'n (doc. 83), exh. 4 thereto.   But, "[i]n light of the fact that the meeting has not been scheduled, Mr. Norton preferred not to continue his term into 2007."   Id.   Based upon the foregoing, undoubtedly, the FAC does not include sufficient additional information so as to render defendant Norton's resignation suspicious as opposed to benign.   Accordingly, without more, his resignation does not support a finding of scienter.   As with several of the other defendants, however, as will be seen, viewing the totality of the scienter allegations as to Mr. Norton shows that the FAC does adequately allege scienter as to him.

### (d)  Financial Gain

Next, plaintiff claims that the individual defendants' "personal enrichment through lucrative stock option grants and insider trading" is another possible means of establishing scienter.   FAC (doc. 71) at 79(C); see also id. at ¶ 113(c) ("Additional facts provide actual and strong circumstantial evidence of defendants' scienter including . . . [their] desire to personally obtain greater compensation without public scrutiny[.]").   Essentially defendants assert that the FAC does not include any of the details which are necessary to support an inference of scienter predicated upon financial gain.

1     In this Circuit "unusual or suspicious stock sales by corporate
2  insiders *may* constitute circumstantial evidence of scienter[.]"
3  Zucco, 552 F.3d at 1005 (internal quotation marks and citations
4  omitted) (emphasis added).  "[I]nsider trading is suspicious[,]"
5  however, "only when it is dramatically out of line with prior
6  trading practices at times calculated to maximize the personal
7  benefit from undisclosed inside information."  Id. (internal
8  quotation marks and citations omitted).  There are three factors
9  that a court "must . . . consider[] to determine whether stock
10 sales raise a strong inference of deliberate recklessness[.]" Id.
11 Those factors are: "(1) the amount and percentage of shares sold by
12 insiders; (2) the timing of the sales; and (3) whether the sales
13 were consistent with the insider's prior trading history."  Id.
14 (internal quotation marks and citation omitted).  An examination of
15 the FAC in light of these factors shows that due to the inadequacy
16 of plaintiff's allegations of insider trading, even in combination,
17 these three sub-factors are insufficient, standing alone, to
18 establish an inference of scienter.

19              *(i)  Amount and Percentage*

20     "Typically, courts consider the percentage of shares sold to
21 determine whether insiders are taking advantage of insider
22 knowledge regarding a scheme that will artificially inflate the
23 company's price."  Middlesex, 527 F.Supp.2d at 1185 (citation
24 omitted).  In the context of an alleged scheme to improperly
25 backdate stock options, however, the court in Middlesex found that
26 plaintiff's failure to plead what percentage of each defendant's
27 stock was sold to be "without consequence."  Id. at 1186. In
28 contrast to the "prototypical" insider trading scenario, the

1  alleged backdating scheme in _Middlesex_ "took place over several
2  years[.]" _Id._ at 1185.  Thus the court explained that "there was no
3  reason for Defendants to quickly sell large percentages of their
4  shares." _Id._  The court further contrasted "insiders . . . who
5  know that the then-inside information will eventually be disclosed
6  to the public, resulting in a drop in the stock price, . . . thus,
7  requiring them to sell large portions of stock to maximize their
8  profit," with backdating where it is "not inevitable that the
9  improperly-dated stock options w[ill] be revealed." _Id._   Given
10 that distinction, the _Middlesex_ court found that "the requirement
11 that percentages be pled is only relevant when the insider is aware
12 of the time that the inside information will be disclosed and there
13 will be a resulting effect on the stock price." _Id._  Accordingly,
14 "[b]ecause Plaintiff . . . pled the amount of stock sales with the
15 appropriate degree of specificity, and the amount [wa]s substantial
16 enough to justify an inference of motive," the _Middlesex_ court held
17 that this sub-factor "lean[ed] in favor of finding ths stock sales
18 'suspicious.'" _Id._ at 1186.

19      Here, the FAC, and especially exhibit G thereto, provide the
20 dates, number of shares, price and proceeds for each of defendants'
21 stock sales, but no allegations as to what percentage of each
22 defendant's shares were sold.  Nonetheless, in the context of the
23 backdating scheme alleged herein, this court finds convincing the
24 _Middlesex_ rationale set forth above.  Hence, it agrees that
25 plaintiff's failure to plead percentages of stock sold is
26 inconsequential at this time.  That is so because the FAC includes
27 the necessary specificity as to defendants' stock sales, and the
28 amount of those sales is substantial, viewed strictly in terms of

1  amounts, in that allegedly proceeds ranged from $1,715,237 to

2  $472,463,500.  See FAC (doc. 71), exh. G thereto.

3      Unlike the court in Middlesex, however, this court is unwilling

4  to take the next step and find that the foregoing "is substantial

5  enough to justify an inference of motive[,]" and in turn a finding

6  that defendants' stock sales were "suspicious."  See Middlesex, 527

7  F.Supp.2d at 1186.  The court is unwilling to find that the stock

8  sales at issue herein are suspicious based only on the proceeds

9  because plaintiff has "selected an unusually long class period of

10 over [250] weeks."  See Brodsky v. Yahoo! Inc., 2008 WL 4531815, at

11 *11 (N.D.Cal. Oct. 7, 2008) (citing Vantive, 283 F.3d at 1092

12 ("plaintiffs have selected an unusually long class period of [63]

13 weeks")).  "Just as in Vantive, 'lengthening the class period has

14 allowed plaintiff[] to sweep as many stock sales into their totals

15 as possible, thereby making the stock sales appear more suspicious

16 than they would be with a shorter class period.'"  Id. (quoting

17 Vantive, 283 F.3d at 1092).  "Thus, 'by themselves, large numbers do

18 not necessarily create a strong inference of fraud.'"  Id. (quoting

19 Vantive, 283 F.3d at 1093).  In sum, although the lack of percentage

20 allegations is not critical, the court cannot ignore the "unusually

21 long class period" here in terms of the amounts sold and the

22 proceeds.  Thus, the court finds that the first sub-factor regarding

23 insider trading does not weigh in favor of a finding that

24 defendants' stock sales were suspicious.

25          *(ii)  Timing*

26     The FAC includes details as to when certain defendants received

27 allegedly backdated Apollo stock options.  See FAC (doc. 71) at

28 ¶¶ 49-52.  However, as the individual defendants stress, the FAC

- 72 -

1   does not allege, nor have plaintiffs "attempt[ed] to demonstrate

2   that the **timing** of any Defendant's sales was suspicious."  Supp. Br.

3   (doc. 100) at 5 (emphasis in original).  This omission is readily

4   explainable from defendants' standpoint because the alleged stock

5   sales, even the most recent one of December 30, 2005, occurred

6   "before backdating was even an issue in corporate America[,]" and

7   "before Apollo disclosed that it may have to restate its financial

8   results."  Mot. (doc. 82) at 21.  Given the lack of temporal

9   proximity both in terms of the timing of the stock sales themselves

10  and in relation to the alleged misconduct, the individual defendants

11  maintain that these sales were "not suspicious at all."  Id. at 20.

12      "Traditionally," the timing factor "is not only concerned with

13  the date on which the insider's shares were sold, but rather when

14  the shares were sold in relation to the revelation of the inside-

15  information."  Middlesex, 527 F.Supp.2d at 1186 (citation omitted).

16  In a backdating situation though, where there is "no preordained

17  date on which the allegations of [such] w[ill] be revealed with [a]

18  resulting drop in stock price[,]" the court again concurs with the

19  Middlesex court – "[t]he facts . . . do not lend themselves to

20  analysis under this factor[.]"  See id.  In the first place, unlike

21  the prototypical insider scenario, "here defendants were not aware

22  of the date on which [Apollo's] backdating practice would be

23  revealed."  See id.  Plainly then, their "stock sales will not

24  [necessarily] reflect large sales prior to disclosure."  See id.

25  Second, a backdating scheme, in contrast to the prototypical insider

26  scenario, "does not depend on timing; regardless of when the stock

27  is sold, the fact that the stock was granted at such a relatively

28  low price virtually guarantees Defendants will reap significant

1  profits." Id.

2      Further, reasoned the Middlesex court, the nature of backdating
3  places defendants in a classic "catch-22[]" in that selling shortly
4  after reports of backdating "cause[s] a strong appearance of
5  impropriety[,]" whereas waiting to sell until after disclosure
6  forces defendant to sell after the decline in stock prices. Id.
7  For these reasons, in Middlesex the court found that plaintiff's
8  failure to plead facts as to the timing of defendants' stock sales
9  was "of little significance[.]" Id. Consistent with that view, the
10 court further held that that timing sub-factor "neither weigh[ed]
11 for nor against a finding of suspicious stock sales." Id.

12     The Middlesex rationale applies with equal force to the alleged
13 backdating scheme at Apollo. Accordingly, this court, too, finds
14 that although the FAC does not include allegations as to the timing
15 of defendants' stock sales, that sub-factor does not figure in the
16 court's final determination as to whether plaintiff's insider
17 trading allegations are sufficient to support a finding of scienter.

18                    *(iii)  Prior Trading History*

19     In Zucco, the Ninth Circuit repeated that "[f]or individual
20 defendants' stock sales to raise an inference of scienter, plaintiff
21 must provide a meaningful trading history for purposes of comparison
22 to the stock sales within the class period." Zucco, 552 F.3d at
23 1005 (internal quotation marks and citation omitted). The Court in
24 Zucco did not equivocate as to the necessity of such a comparison,
25 stating that "[e]ven if the defendants' trading history is simply
26 not available, for reasons beyond a plaintiff's control, the
27 plaintiff is not excused from pleading the relevant history." Id.
28 (citations omitted). Thus, in Zucco the Ninth Circuit held that

1  although the stock sales of two defendant officers were

2  "significant," because the complaint did not include any allegations

3  that their stock sales were "inconsistent" with their "usual trading

4  patterns, no inference of scienter c[ould] be gleaned from

5  [plaintiff's] stock sale assertions." <u>Id.</u> At 1006.

6      The same is true here.  Missing from the FAC are any allegations

7  as to the trading history of the ten individual defendants whom

8  allegedly engaged in insider trading.[11]  Plaintiff seeks to

9  circumvent this requirement by noting, as the FAC alleges, that

10  "'[s]ince this fraudulent scheme had commenced by at least 1998, no

11  meaningful comparison of prior trading patterns can be performed.'"

12  Resp. (doc. 94) at 46 (quoting FAC at ¶ 134).  Therefore,

13  allegations of defendants' trading history are not necessary.

14      To support that argument, plaintiff relies upon <u>Middlesex</u>, where

15  the court found "persuasive" plaintiff's argument "that because

16  Defendants were backdating options during the *entire* pre-Class

17  Period, the fact that Plaintiff ha[d] not demonstrated that the

18  sales were consistent with Defendants' prior trading history [wa]s

19  effectively meaningless as there [wa]s no trading period without the

20  influence of backdated options with which to compare the sales."

21  <u>Middlesex</u>, 527 F.Supp.2d at 1187 (emphasis in original).  What

22  plaintiff overlooks, however, is that in the end, given the lack of

23  trading history, the <u>Middlesex</u> court found that factor "neither

24  weighs for nor against a finding of suspicious stock sales."  <u>See</u>

25  <u>id.</u>  Moreover, this court is not at liberty to disregard the Ninth

26  Circuit's clear-cut directive in <u>Zucco</u> quoted earlier: "Even if the

27  ―――――――――――――――――

28      [11]    There are no allegations that the eleventh individual defendant, Brian
    Mueller, engaged in insider trading.

1  defendants' trading history is simply not available, for reasons

2  beyond a plaintiff's control, the plaintiff is *not* excused from

3  pleading the relevant history." <u>Zucco</u>, 552 F.3d at 1005 (citation

4  omitted) (emphasis added).  Thus, as with the amount of shares sold,

5  the lack of allegations as to defendants' trading history weighs

6  against finding that their stock sales were suspicious.  In sum,

7  because two of the three stock sales sub-factors weigh against a

8  finding that those sales were suspicious, and the third, timing,

9  does not come into play here, the court finds that even in

10 combination, these three factors are insufficient, standing alone,

11 to create a strong inference of scienter based upon alleged insider

12 trading.

13          ***(e)  Motive***

14     Closely related to plaintiff's insider trader allegations are

15 its allegations that defendants had financial motives to backdate

16 stock options, which plaintiff also believes is indicative of

17 scienter.  Succinctly put, the FAC alleges that "[d]efendants were

18 motivated to commit the fraudulent scheme [of backdating] to reap

19 significant personal profits."  FAC (doc. 71) at ¶¶ 133 and

20 ¶ 113(c).  That motivation allegedly derived from "the fact that the

21 vast majority of [defendants'] overall compensation was through

22 stock option grants."  <u>Id.</u> at ¶ 134.  Additionally, supposedly

23 defendants were motivated "to falsify [Apollo's] financial statement

24 by failing to record the additional compensation expenses in order

25 to meet their projected earnings goals and receive lucrative

26 bonus[es][.]"  <u>Id.</u>

27     Interestingly, plaintiff did not directly respond to defendants'

28 valid argument that "motive and opportunity" alone, and likewise

1  "the desire to maintain profitability"[12] alone, do not show

2  scienter. See, e.g., Cornerstone, 355 F.Supp.2d at 1091 (and cases

3  cited therein) ("The Ninth Circuit has clearly held that incentives

4  to enhance business prospects and executive compensation incentives

5  are insufficient allegations of scienter.") In accordance with this

6  well-settled precedent, the court easily finds that the scant motive

7  allegations are insufficient alone to carry plaintiff's burden of

8  alleging scienter.

9      As should be evident by now, when viewed individually,

10 plaintiff's scienter allegations are lacking.  Therefore, in

11 accordance with Zucco, the court "will conduct a 'holistic' review

12 of the[se] same allegations to determine whether the[y] combine to

13 create a strong inference of intentional conduct or deliberate

14 recklessness."  See Zucco, 552 F.3d at 992.

15          ***d.  Holistic View of Scienter Allegations***

16      Defendants took the first step in the Zucco dual inquiry by

17 viewing each scienter allegation in isolation, and then concluding

18 those allegations do not sufficiently allege scienter.  Defendants

19 did not take the second and, as it turns out, critical step under

20 Zucco - a holistic consideration of those individual allegations.

21 When the court does that, although it finds that even when read

22 together the allegations in the FAC do not create a strong inference

23 of scienter as to some of the defendants, the FAC does sufficiently

24 allege scienter as to others.

25      Even collectively, the allegations do not create a strong

26 inference of scienter as to defendants Bachus and or Govenar.  The

27

28       [12]    Mot. (doc. 82) at 22.

1  allegations as to defendant Bachus are relatively minimal.  He was

2  Apollo's Chief Accounting Officer and Controller from August 2000

3  until his resignation in November 2006, which allegedly was "forced"

4  due to his "involvement in . . . backdating[.]"  FAC (doc. 71) at

5  ¶¶ 11; 21; and 102.  The FAC further alleges a one-time receipt of

6  stock option grants as to Mr. Bachus.  Id. at ¶ 52.  In contrast to

7  some of the other defendants whom the court will discuss below, the

8  FAC does not include any particularized facts outlining Bachus'

9  alleged involvement in backdating stock options.  There is just the

10 bald and factually unsubstantiated allegation that he was involved

11 in backdating.  Bachus' resignation, even when coupled with his

12 stock sales and receipt of stock option grants does not create a

13 "malicious inference" which 'is at least as compelling as any

14 opposing innocent inference."  See Zucco, 552 F.3d at 991 (citations

15 omitted).  Thus, the court finds that plaintiff has not sufficiently

16 alleged scienter as to Mr. Bachus.  Accordingly, it grants his

17 motion to dismiss the § 10(b) & Rule 10b-5 claims as against him.

18    The FAC is similarly bereft of allegations that Ms. Govenar

19 acted with the requisite intent.  The FAC merely alleges that she

20 served on the Special Committee; later resigned; and sold Apollo

21 stock.  FAC (doc. 71) at ¶¶ 11; 24; and 93.  The FAC does not allege

22 that Ms. Govenar herself ever received stock options; and perhaps

23 more importantly, it does not allege that she had any role at all in

24 the stock option granting or accounting process.  Without such

25 allegations it is readily apparent that plaintiff has not "plead

26 with particularity facts that give rise to a . . . powerful or

27 cogent . . . inference" of scienter.  See Tellabs, 551 U.S. at ___,

28 127 S.Ct. at 2510 (citations omitted).  Hence, the court grants

1  defendant Govenar's motion to dismiss the § 10(b) and Rule 10b-5

2  claims against her.

3       On the other hand, holistically viewing the allegations of

4  scienter as to defendants Nelson, Blair, Norton, and Gonzales

5  persuades the court that plaintiff has sufficiently alleged scienter

6  as to each of them.   The primary although not only difference

7  between these four defendants and Mr. Bachus and Ms. Govenar is that

8  the FAC contains allegations as to their responsibility for, and

9  rather extensive involvement with, the stock option granting and

10 accounting processes.  As set forth below, "[each of these

11 defendants is alleged to have participated in several different

12 activities[,]" pertaining to option granting and the accounting

13 thereof, which taken together "evidenc[e] scienter."   See In re

14 Asyst Technologies, Inc. Deriv. Litig., 2009 WL 4891220, at *11

15 (N.D.Cal. 2008) (citing cases).

16      To be sure, "[i]n the options backdating context, allegations

17 that a defendant holds a high executive position," such as Nelson,

18 former Apollo CEO, and Gonzales, Apollo's former CFO, Secretary and

19 Treasurer, "without more do not support a strong inference of

20 scienter."   See id. (internal quotation marks and citations

21 omitted).  But, "allegations that the defendant signed false

22 financial documents, approved options grants, oversaw the options

23 granting process, or was intimately involved in deciding when and to

24 whom options would be granted may support a strong inference of

25 scienter."  Id. (internal quotation marks and citations omitted);

26 see also Juniper, 542 F.Supp.2d at 1047-48 (allegations that CEO and

27 CFO received sizeable backdated stock options; issued and signed

28 false securities filings; knew of or recklessly disregarded

1  backdating; signed false financial documents knowing they were false
2  or recklessly not knowing they were false; and who were in positions
3  to oversee stock options such that they were in a position to know
4  or were reckless in not knowing that options were inconsistent with
5  financial statements supported strong inference of scienter).

6      The FAC alleges that defendant Nelson engaged in not just one of
7  the activities listed above, but in all of them and more.   In
8  particular, allegedly he: (1) received backdated stock options;
9  (2) signed "false and misleading" Forms 10-K and 10-Q; signed false
10  SOX certifications "attest[ing] to the adequacy of [Apollo's]
11  internal controls, and the accuracy of [Apollo']s reported financial
12  statements[;]" falsely certified 10-K forms; and was an integral
13  part of the option granting process, including "generally
14  select[ing] the grant date[,]" hence acquiring knowledge of the
15  option granting process. See, e.g., FAC (doc. 71) at ¶¶ 19, 58, 64,
16  117(a)-(e), 119, 120, and 199, and exh. G thereto.  The FAC further
17  alleges that Nelson profited from insider trading by selling shares
18  of Apollo stocks resulting in proceeds of $82,789,312.  Id. Exh. 6
19  thereto.  It further alleges that Nelson resigned as Apollo's CEO in
20  January 2006, less than a month after the Apollo's 8-K indicated
21  that the "Special Committee . . . reported that certain former
22  officers took steps that may have been intended to mask failures in
23  the grant approval process with respect to [Apollo's] financial
24  reporting and payment of taxes."  Id. at ¶¶ 19 and 104; and exh. G
25  thereto.  Additionally, the FAC alleges that backdating violated
26  Apollo's own stock option plans.  Id. at ¶ 6. Lastly, the FAC
27  alleges that ultimately Apollo was forced to issue a Restatement,
28  the overall impact which was that a downward adjustment of its

1  "retained earnings as of September 1, 2003" by approximately $62.5

2  million dollars.  Morrison Decl'n (doc. 83), exh. 1 thereto at 15.

3      Viewing plaintiff's allegations together, although the inference

4  of scienter as to defendant Nelson may not be of the "smoking gun

5  genre," it does not need to be.  See Tellabs, 551 U.S. at ___, 127

6  S.Ct. at 2510 (internal quotation marks and citation omitted).  The

7  inference is certainly enough, however, to defeat these motions to

8  dismiss in that "the malicious inference is at least as compelling

9  as any opposing innocent inference[,]" such as an innocent

10 bookkeeping error.  See Zucco, 552 F.3d at 991 (citations omitted).

11 Put differently, the totality of these allegations supports a

12 finding that plaintiff has adequately pled that defendant Nelson

13 "either knew of the backdating, or w[as] deliberately reckless in

14 not knowing of the backdating."  See Middlesex, 527 F.Supp.2d at

15 1182.  Thus, the court denies defendant Nelson's motion to dismiss

16 to the extent it is based upon failure to adequately plead scienter.

17     For similar although not identical reasons, the court denies

18 defendant Gonzales' motion to dismiss on scienter grounds.  Gonzales

19 attempts to minimize her alleged responsibility for backdating by

20 selectively noting only the allegations of her "accounting

21 position[]" and her resignation in November 2006.  Mot. (doc. 82) at

22 11 (citations omitted).  The FAC alleges much more than that though.

23 It alleges that like defendant Nelson, Gonzales, Apollo's former

24 CFO, received stock options; profited from the sale of Apollo stock

25 in the amount of $5,257,858; knowingly signed false SOX

26 certifications, attesting to the adequacy of Apollo's internal

27 controls and the accuracy of its financial results; and also signed

28 "false and misleading" Form 10-Ks.  FAC (doc. 71) at ¶¶ 11, 20, 49-

52, 58, 64, 99, 124.  Furthermore, the FAC alleges that Ms. Gonzales "was at least deliberately reckless with respect to the options granting process at Apollo because, contrary to the SOX certifications . . . , [she] wholly failed to monitor the granting of stock options, or account for the backdated stock options at Apollo."  Id. at ¶¶ 125.  These allegations, along with Ms. Gonzales' supposed unawareness of APB 25, taken together meet the threshold pleading requirements for scienter.  This is all the more so in light of recent Ninth Circuit pronouncements, set forth earlier, that "[v]ague or ambiguous allegations are now properly considered as part of a holistic review when considering whether the complaint raises a strong inference of scienter."  Zucco 552 F.3d at 1006, South Ferry, 542 F.3d at 784.

Defendants Norton and Blair are not current or former Apollo officers. Norton did, however, serve as Chair of the Compensation Committee and he was a member of the Audit Committee.  Defendant Blair served as Chair of the Audit Committee and also was a member of the Compensation Committee.  Given their membership on the Compensation Committee, both of these defendants allegedly were an integral part of Apollo's grant process, as the Special Committee's investigation demonstrates.  "[M]ost grant dates were selected at Board or Compensation Committee meetings[] . . . prior to August 2001[.]" FAC (doc. 71) at ¶ 115(b) (internal quotation marks omitted).  "Under the LTIP and the [2000 Plan], only the Compensation Committee could approve grants to the Former CEO[,]" defendant Nelson.  Id. at ¶ 115(f) (internal quotation marks omitted).  "In many instances, the Approval Memorandum" for the option grants "was signed by only the Chairman of the Compensation

1  Committee [Norton][;] and there was a "lack [of] evidence as to
2  whether all of the grants were, in fact, approved by a majority of
3  the members of [that] Committee." Id. at ¶ 115(e) (internal
4  quotation marks omitted).  There were also Approval Memorandum
5  signed by the Compensation Committee as a whole.  See id. at
6  ¶ 117(c).  The Compensation Committee minutes reflect that
7  "typically . . . option grants were discussed and approved[]" at
8  meetings of that Committee.  Id. at ¶ 117(e).

9      In light of the foregoing, it is apparent that defendant
10 Norton's and Blair's respective positions on the Compensation
11 Committee gave them detailed knowledge as to the option grant dates.
12 The other allegations against them such as Blair's profits of
13 slightly more than $3.5 million from insider trading, and Norton's
14 profits of nearly $8.0 million, along with the allegations discussed
15 in preceding sections, such as their resignations, individually
16 might not suffice to plead scienter.  Mindful of the Court's
17 acknowledgment in South Ferry, that "federal courts certainly need
18 not close their eyes to circumstances that are probative of scienter
19 viewed with a practical and common-sense perspective[,]" the court
20 finds that the allegations against defendants Norton and Blair give
21 rise to the inference that at the very least they were deliberately
22 reckless in not knowing of the backdating.

23      Based upon In re Nash Finch Co. Sec. Litiq., 323 F.Supp.2d 956
24 (D.Minn. 2004), defendants strongly urge this court to find that
25 "[j]ust as two plus two will never equal five, the[] allegations [in
26 the FAC] – whether considered apart or together – do not add up to a
27 strong inference of scienter."  See id. at 964 (footnote omitted).
28 While that is true with respect to defendants Bachus and Govenar, it

1   is not true to defendants Nelson, Gonzales, Norton and Blair.  The

2   allegations against those four defendants, in sharp contrast to

3   Nash, are neither "trivial [n]or irrelevant[.]" See id.

4   Collectively the FAC's allegations as to defendants Nelson,

5   Gonzales, Norton and Blair go far beyond the "collective minutia

6   offered" in Nash.   In short, the allegations as to these four

7   defendants "create an inference greater than the sum of [their]

8   parts," that they acted with knowledge or at least were deliberately

9   indifferent as to th falsity of their statements regarding

10  accounting for stock-based compensation expenses and the existence

11  of internal controls in that regard.  See Zucco, 552 F.3d at 1006.

12  That inference is "still . . . at least as compelling as an

13  alternative innocent explanation[,]" of innocent bookkeeping error

14  or a simple failure to cross every "t" and dot every "i".  See

15  id.  Consequently, the court denies the motion to dismiss for

16  failure to adequately plead scienter by these four defendants.

17  Likewise, it denies Apollo's motion to dismiss on that same basis

18  because "[t]he scienter of the[se] individual defendants, as

19  directors and officers of [Apollo] is imputed to [Apollo]." See

20  Batwin, 2008 WL 2676364, at *15 n. 8 (citation omitted).

21          *e.  Remaining Individual Defendants*

22       As did the parties, to this point the court has deliberately not

23  addressed the remaining defendants – John and Peter Sperling, Brian

24  Mueller, Dino DeConcini, and Laura Noone.  As Apollo reads the FAC,

25  plaintiff is asking the court to infer scienter based "merely" on

26  the individual defendant's "corporate titles and responsibilities."

27  Mot. (doc. 81) at 26.  This amounts to impermissible "group

28  pleading," according to Apollo.  Id.   "[T]he group pleading

                                    - 84 -

1  doctrine establishes a presumption, for purposes of drafting a

2  complaint, that statements in group-published information such as

3  prospectuses, registration statements, annual reports, or press

4  releases are the collective work of those individuals with direct

5  involvement in the day-to-day affairs of the company." New Century,

6  supra, 2008 WL 5147991, at *13 (internal quotation marks and

7  citations omitted).  It is possible to interpret the FAC as relying

8  upon the group pleading doctrine, but plaintiff does not mention

9  that doctrine anywhere in its response or supplemental memorandum.

10 Presumably, then, plaintiff is not invoking that doctrine.  To the

11 extent that plaintiff may be relying upon group pleading, however,

12 the court adopts the thorough and well-reasoned analysis in New

13 Century, id. at *13-*14, and "[j]oin[s] the majority of other courts

14 in this Circuit, . . . hold[ing] that group pleading is no longer

15 viable under the PSLRA."  Id. at *14.[13]

16     Much like Apollo, the five defendants identified above, contend

17 that plaintiff has not sufficiently pled scienter as to each of them

18 because it "does no more than identify their positions at [Apollo]

19 and allege that, based on their . . . positions, they had access to

20 information concerning [Apollo's] stock option plans."  Mot. (Doc.

21 82) at 23 (citing FAC at ¶ 112).  Such "tactics" are "never," these

22 defendants broadly assert, "sufficient to plead knowledge of fraud."

23 Id. (footnote omitted).  Defendant Mueller seeks dismissal on that

24

---

25     [13]   Of course, "the group pleading doctrine is not fatal to allegedly
26 misleading statements in SEC filings signed by the Officer Defendants[.]"  New
   Century, 2008 WL 5147991, at *14 (citing Howard v. Everex Systems, Inc., 228 F.3d
27 1057, 1061-62 (9th Cir. 2000)). Those defendants cannot, however, "be liable for the
   press releases, except to the extent that there are specific statements attributed
28 to them, or the press releases are otherwise connected to them[.]" Id. (citation
   omitted).

1   same ground.  In addition, he asserts that plaintiff has not

2   sufficiently pled scienter based solely upon two allegedly false

3   statements which he made, and which will be discussed more fully

4   below.

5       Retorting that it has "plead far more than fraud by job

6   title[,]" plaintiff emphasizes "the essential roles that Nelson,

7   Blair and Norton played in the granting and approval of backdated

8   stock options at [Apollo]."  Supp. Br. (doc. 101) at 4 (citation

9   omitted).  Significantly though, plaintiff does not mention any of

10  the defendants discussed above.  By its silence, the court assumes

11  that plaintiff concedes that it has not adequately pled scienter as

12  to those defendants.  The court thus grants the motion to dismiss as

13  to John and Peter Sperling, Brian Mueller, Dino DeConcini and Laura

14  Noone.

15      Even without plaintiff's implicit concession that it has not

16  adequately pled scienter as to the just named defendants,

17  nonetheless, they are entitled to dismissal of the 10(b) claims.

18  Dismissal is mandated because, as discussed below, the FAC is

19  glaringly deficient in terms of scienter allegations as to any of

20  these defendants.

21      Ordinarily, "corporate management's general awareness of the

22  day-to-day workings of the company's business does not establish

23  scienter-at least absent some additional allegations of specific

24  information conveyed to management and related to the fraud or other

25  allegations supporting scienter."  South Ferry, 542 F.3d at 784-85

26  (internal quotation marks and citation omitted).  In South Ferry,

27  the Ninth Circuit did "recognize two exceptions to th[at] general

28  rule[.]"  Zucco, 552 F.3d at 1000 (citing South Ferry, 542 F.3d at

785).  "The first permits general allegations about 'management's
role in a corporate structure and the importance of the corporate
information about which management made false or misleading
statements' to create a strong inference of scienter when these
allegations are buttressed with 'detailed and specific allegations
about management's exposure to factual information within the
company.'"  Id. (quoting South Ferry, 542 F.3d at 785).  "To satisfy
this standard," the Ninth Circuit has explained, "plaintiffs might
include in their complaint specific admissions from top executives
that they are involved in every detail of the company and that they
monitored portions of the company's database, . . . a specific
admission from a top executive that [w]e know exactly how much we
have sold in the last hour around the world, . . . , or other
particular details about the defendants' access to information
within the company."  Id. (internal quotation marks and citations
omitted).

     The Zucco complaint did not allege the necessary particularized
details, although it did "include allegations that senior management
. . . closely reviewed the accounting numbers generated [by the
defendant company] each quarter . . . , and that top executives had
several meetings in which they discussed quarterly inventory
numbers[.]" Id.  Those allegations, according to the Ninth Circuit,
did "not support the inference that management was in a position to
know that such data was being manipulated[]" because "[n]othing in
the complaint suggest[ed] that [one of the company's officers] had
access to the underlying information from which the accounting
numbers were derived."  Id.

     "The second exception . . . permits an inference of scienter

1   where the information misrepresented is readily apparent to the

2   defendant corporation's senior management."  Id. at 1001.  Thus,

3   "[w]here the defendants 'must have known' about the falsity of the

4   information they were providing to the public because the falsity of

5   the information was obvious from the operations of the company, the

6   defendants' awareness of the information's falsity can be assumed."

7   Id. (quoting Berson, 527 F.3d at 987-89).  By the same token, in

8   quite strong language, the Ninth Circuit has held that "reporting

9   false information will only be indicative of scienter where the

10  falsity is patently obvious - where the facts [are] prominent enough

11  that it would be absurd to suggest that top management was unaware

12  of them."  Id. (internal quotation marks and citations omitted).

13      Berson is an example of a case with such "prominent" facts.

14  Berson fell "into the exceedingly rare category of cases in which

15  the core operations inference, without more, [wa]s sufficient under

16  the PSLRA."  South Ferry, 542 F.3d at 785 n.3.  The "unusual

17  circumstances" which led the Berson Court to find "that the

18  defendant company's misrepresentation of the status of stop-work

19  orders was enough to infer scienter" were the issuance of "four

20  stop-work orders [which] . . . respectively halted between $10 and

21  $15 million of work on the company's largest contract with one of

22  its most important customers, halted $8 million of work, caused the

23  company to reassign 50-75 employees, and required [Defendant] to

24  complete massive volumes of paperwork."  Zucco, 552 F.3d at 1001

25  (internal quotation marks and citation omitted).

26      Here, the allegations in the FAC are, in many respects, even

27  weaker than those in Zucco, and nothing on the magnitude of those in

28  Berson.  The court thus has little difficulty finding that plaintiff

1  cannot rely upon the core-operations inference to create a strong

2  inference of scienter with respect to John and Peter Sperling, Laura

3  Noone, and Brian Mueller.

4      Before separately considering the allegations as to these

5  defendants, it should be noted that the FAC includes two paragraphs

6  of what can best be described as "catch-all" scienter allegations

7  against all defendants.  See FAC (doc. 71) at ¶¶ 112-113.

8  Particularly noteworthy at this point is the allegation that

9  "defendants acted with scienter in that they . . . had access to all

10 internal data concerning [Apollo's] stock option plans[.]" Id. at

11 ¶ 112.  The FAC does not indicate exactly how each of the defendants

12 achieved that access and, perhaps more importantly, it does not

13 allege the exact nature of that "internal data."  In similarly broad

14 language, the FAC further alleges that "[a]dditional facts provide

15 actual and strong circumstantial evidence of defendants' scienter

16 including[,]" among other things, "defendants' roles,

17 responsibilities, and specifically articulated duties for granting

18 and administering grants[.]" Id. at ¶ 113.  As will be more fully

19 explained below, while this is an accurate allegation as to some of

20 the defendants, it is not as to all of them.

21     As to Peter Sperling, the allegations in the FAC are few.  He is

22 Apollo's Senior Vice President and a director, and allegedly

23 received backdated stock option grants.  FAC (doc. 71) at ¶¶ 27; 49;

24 and 51-52.  Further, he, along with John Sperling, appointed the

25 Special Committee.  Id. at ¶ 93.  Finally, Peter Sperling

26 purportedly indicated that Ms. Gonzales resigned due to backdating,

27 and that she was "'unaware of APB 25.'"  Id. at ¶¶ 99 and 127.  Such

28 allegations do not come close to meeting the standards recently

1  explicated by the Ninth Circuit.  There are no specific admissions

2  of the type described in South Ferry.  Nor does the FAC include any

3  "details about [Peter Sperling's] access to information within

4  [Apollo][.]"  See Zucco, 552 F.3d at 1001 (internal quotation marks

5  and citation omitted).

6      Moreover, this is not an "exceedingly rare" case such as Berson

7  where the "falsity is patently obvious – where the facts [are]

8  prominent enough that it would be absurd to suggest that top

9  management[,]" such as Peter Sperling, "was unaware of them." See

10  Berson, 527 F.3d at 989 (internal quotation marks and citation

11  omitted).  The allegedly false statements pertain, inter alia, to

12  Apollo's misapplication of certain accounting principles, such as

13  how it did or did not account for stock-based compensation expenses,

14  and the existence of internal controls in that regard.  Lastly, the

15  FAC is devoid of any allegations that Peter Sperling had any role in

16  granting stock options, accounting for them, or that he had any

17  information as to the approval process for those grants.  For all of

18  these reasons, the court grants his motion to dismiss the § 10(b)

19  and Rule 10b-5 claims.

20      The FAC includes more detailed allegations as to John Sperling,

21  but in the end those additional allegations are not enough to defeat

22  dismissal of the § 10(b) and Rule 10b-5 claims.  As with Peter

23  Sperling, there are no allegations in the FAC as to John Sperling's

24  role, if any, in the granting of or accounting for Apollo stock

25  options.  Further, there are no details as to his access to any

26  Apollo information, much less his access to grant process or

27  accounting information.  Nor, as just explained in connection with

28  Peter Sperling, does the FAC include allegations bringing it within

either of the two exceptions to the "general rule that falsity alone cannot create a strong inference of scienter."  See Zucco, 552 F.3d at 1001.   Consequently, plaintiff cannot rely upon the core-operation inference to salvage its section 10(b) claims against John Sperling.

Defendant Laura Noone did not hold a management position at Apollo per se, but since September 2000, she has been President of the University of Phoenix, purportedly "Apollo's most important and well known subsidiary."  See FAC (doc. 71) at ¶ 24.  Arguably, therefore, assuming the allegations are otherwise sufficient, the core-operations inference may apply to create a strong inference of scienter as to her.  However, the FAC does not contain the necessary allegations as to Ms. Noone.  What the FAC does allege is that:

> Because of [her] position, [Noone] knew the adverse non-public information about the business of Apollo, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to her in connection therewith.

Id. at ¶ 28.

This sweeping allegation is nothing more than a statement of Ms. Noone's "general awareness of the day-to-day workings of [Apollo's] business[,]" which the Ninth Circuit has repeatedly held cannot support a strong inference of scienter "absent some additional allegations of specific information conveyed to management and related to the fraud or other allegations supporting scienter."  See, e.g., South Ferry, 542 F.3d at 784-85 (internal quotation marks and citation omitted) (emphasis added).  Conspicuously absent from the FAC are any such particularized allegations.  Besides the

1  paragraph quoted above, the only other allegations in the FAC as to

2  Ms. Noone are that she received stock option grants on three

3  occasions.  See FAC (doc. 71) at ¶¶ 49; and ¶¶ 51-52.  Clearly these

4  allegations do not create the requisite strong inference of

5  scienter.

6      The expansive scienter allegations in paragraphs 112 and 113,

7  quoted earlier, do not convince the court otherwise.  See, supra at

8  88-89.  The inference that Ms. Noone, University of Phoenix's

9  President – not an Apollo director or manager -- "would not have

10 responsibility or control over the grant of employee stock options

11 is significant[.]" See Juniper, 542 F.Supp.2d at 1048.  In light of

12 the foregoing, the court finds that plaintiff has not sufficiently

13 alleged scienter as to defendant Noone.

14     Next the court turns to the allegations pertaining to defendant

15 Mueller, Apollo's President since 2006, who served "in a variety of

16 executive positions" with Apollo prior to that.  FAC (doc. 71) at

17 ¶ 128.  In addition to relying upon his "executive" status at

18 Apollo, the FAC alleges that "[f]rom at least June 2006, Muller

19 issued a series of knowingly false statements regarding the

20 backdating at Apollo[.]" Id. at ¶ 129 (emphasis added).  Purportedly

21 those statements are "specifically designed to mislead Apollo's

22 investors."  Id.  Close scrutiny of the FAC reveals, however, that

23 it contains only two allegations that defendant Mueller made

24 "knowingly false statements."  The first is that Mueller allegedly

25 stated that defendant Gonzales "resigned to 'spend more time with

26 her family.'"  Id. at ¶¶ 99 and 130.  Plaintiff alleges that "[it]

27 is simply inconceivable that Mueller, as President of Apollo, would

28 not know why his CFO resigned."  Id. at ¶ 130.  The second is

1 Mueller's purported statement on November 3, 2006, "that 'to date

2 there has been no indication that there has been any backdating.'"

3 Id. at ¶ 131.

4     Defendant Mueller's status as an Apollo executive of

5 longstanding in a variety of capacities clearly is insufficient to

6 support a strong inference of scienter as to him.  Nor do his

7 allegedly false statements just quoted support such an inference,

8 especially given the complete absence of  "particular details about

9 [Mueller's] access to information within [Apollo]."  See Zucco, 552

10 F.3d at 1000 (internal quotation marks and citations omitted).

11 Thus, the court also finds the defendant Mueller is entitled to

12 dismissal of the section 10-b claims as against him.

13     Defendant DeConcini stands in a slightly different position

14 than the defendants just discussed in that he was not an Apollo

15 officer; nor did he hold a management position there.  It is thus

16 questionable, in the first instance, whether the core-operation

17 inference would apply to him.

18     Regardless, given the relatively de minimis nature of the

19 allegations against them, it is readily apparent that plaintiff has

20 not adequately pled scienter as to Mr. DeConcini.  Mr. DeConcini's

21 name appears in only two of the FAC's 200 paragraphs.  At one point

22 the FAC alleges that he has been an Apollo director since 1981, and

23 an Audit Committee member.  Id. at ¶ 26.  Later in the FAC it

24 generally alleges his "responsib[ilities]" as a member of that

25 Committee:

26          (I) reviewing and discussing the audited financial
           statements of [Apollo] with management; (ii) discussing
27         with [Apollo's] independent accountants the matters
           required to be discussed by the Statement of Accounting
28         Standards . . . ; (iii) receiving and reviewing the

written disclosures and letters from its independent
accountants . . . ; (iv) discussing with its independent
accountants, the independent accountants' independence;
and (v) recommending to the Board . . . that the
audited financial statement be incorporated by reference
into [Apollo's] Annual Reports.

Id. at ¶ 40.   Reciting a laundry list of defendant DeConcini's

alleged Audit Committee responsibilities does not create a strong

inference of scienter, primarily because without more the inference

that he "had knowledge of the relevant facts will not be much

stronger, if at all, than the inference that [he] remained unaware."

See South Ferry, 542 F.3d at 784.   Hence, this generic allegation

cannot save this otherwise deficient FAC in terms of Mr. DeConcini's

scienter.   There is nothing linking him to any aspect of stock

option granting or the associated accounting.   Accordingly, these

meager allegations, even when viewed collectively under the rubric

of Tellabs and its progeny, do not create a strong inference of

scienter as to Mr. DeConcini.   Thus, the court grants his motion to

dismiss the section 10(b) claims.

     Having found that the FAC sufficiently alleges scienter as to at

least some of the defendants, the court will next turn to the

adequacy of the loss causation allegations.

     **3.  Loss Causation**

          **a.  Pleading Standards**

               **I.  Rule 8 v. Rule 9**

     Preliminarily, the court must address the parties' disagreement

as to the pleading standard for loss causation.   Rule 8(a)(2)

requires "a short and plain statement of the claim showing that the

pleader is entitled to relief[.]"   Fed. R. Civ. P. 8(a)(2).   "In

alleging "fraud or mistake," however, Rule 9(b) requires a party to

1  "state *with particularity* the circumstances constituting [that]

2  fraud or mistake."  Fed. R. Civ. P. 9(b) (emphasis added).

3  Plaintiff contends that Rule 8(a)(2)'s "short and plain statement"

4  supplies the relevant pleading standard, whereas Apollo "suggests

5  that the heightened pleading requirements of Fed. R. Civ. P. 9(b)"

6  apply.  Reply (doc. 97) at 17 (citations omitted).

7      Logically, loss causation is one of the "'circumstances

8  constituting fraud for which Rule 9(b) demands particularity[]'"

9  because without loss causation, there is no securities fraud claim.

10 See Teachers' Ret. Sys. of La. v. Hunter, 477 F.3d 162, 186 (4th

11 Cir. 2007) (citing, *inter alia*, Dura Pharmaceuticals, Inc. v.

12 Broudo, 544 U.S. 336, 343-44, 125 S.Ct. 1627, 161 L.Ed.2d 577

13 (2005)) (other citations omitted).  Following that reasoning would

14 require that loss causation be pled in conformity with Rule 9(b)'s

15 particularity requirement.

16     Neither the Supreme Court nor the Ninth Circuit has definitively

17 held that Rule 9(b) applies when pleading loss causation, however.

18 Instead, the Supreme Court in Dura "assum[ed] at least for

19 argument's sake, that neither the [Federal] Rules [of Civil

20 Procedure] nor the securities statutes impose any special further"

21 pleading requirement, apart from Rule 8(a)(2), when pleading loss

22 causation.  Dura Pharms., 544 U.S. at 346, 125 S.Ct. 1627.  The Dura

23 Court was able to sidestep that issue because the complaint there

24 did not "provide the defendant with 'fair notice of what the

25 plaintiff's claim is and the grounds upon which it rests.'"  Id.

26 (quoting Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d

27 80 (1957)).  Thus, the Dura complaint "fail[ed]" the "simple test[]"

28 of Rule 8(a)(2), which requires a "'short and plain statement'"

showing entitlement to relief.  <u>Id.</u>

     The Ninth Circuit in <u>Berson</u> purported "not to decide the question" of whether loss causation allegations are subject to Rule 8(a)(2) or Rule 9(b) pleading standards.  <u>Berson</u>, 527 F.3d at 989. At the same time, though, the <u>Berson</u> Court made the opposite assumption from the Supreme Court in <u>Dura</u>.  <u>Berson</u>, 527 F.3d at 989. Rather than assuming the applicability of Rule 8, the Ninth Circuit "[a]ssum[ed]-without deciding-that Rule 9(b) governs[.]"  <u>Id.</u>  Based upon that assumption, the <u>Berson</u> Court opined "that plaintiffs bringing a 10b-5 securities fraud claim must plead . . . loss causation with particularity[.]"  <u>Id.</u>  The <u>Berson</u> plaintiffs met that standard "by alleging particular facts indicating that but for the circumstances that the fraud concealed . . . [plaintiffs'] investment . . . would not have lost its value."  <u>Id.</u> (internal quotation marks and citations omitted).  The <u>Berson</u> Court further reasoned that because the complaint there gave "defendants ample notice of plaintiffs' loss causation theory," as well as "giv[ing] some assurance" to the Court "that the theory has a basis in fact[,] . . . Rule 9(b) require[d] no more."  <u>Id.</u> at 989-990 (citations omitted).

     More recently, in <u>Gilead</u>, the Ninth Circuit once again declined to decide whether Rule 8(a)(2) or Rule 9(b) controls loss causation pleading, holding that "under either Rule 8 or Rule 9, the Investors ha[d] sufficiently ple[d] loss causation."  <u>See Gilead</u>, 536 F.3d at 1056.  Plaintiffs alleged that Gilead, a biopharmaceutical company, misled investors by claiming that there was a high demand for one of its drugs without disclosing that unlawful off-label marketing caused that demand.  In assessing the strength of the loss causation

1  allegations in <u>Gilead</u>, the Court once again focused on Rule 9(b)'s

2  heightened pleading requirement.

3      The <u>Gilead</u> complaint met that standard because it was

4  "meaningfully different" from the <u>Dura</u> complaint.  <u>See id.</u>  The <u>Dura</u>

5  plaintiffs merely alleged that they "paid artificially inflated

6  prices for Dura securities" and that they "suffered damage[s]

7  thereby."  <u>Dura Pharms.</u>, 544 U.S. at ___, 125 S.Ct. at 1630

8  (emphasis, quotation marks and citation omitted).  In contrast, the

9  <u>Gilead</u> complaint alleged a specific economic loss caused by Gilead's

10 misrepresentations.  Additionally, the <u>Gilead</u> plaintiffs "provide[d]

11 abundant details of Gilead's off-label marketing, . . . assert[ing]

12 that th[at] lead to higher demand [for the drug], which in turn

13 inflated Gilead's stock price."  <u>Gilead</u>, 536 F.3d at 1056 (footnote

14 omitted).  These allegations allowed "the fraud-action defendant" to

15 prepare an adequate answer[,]" in accordance with Rule 9(b).  <u>See</u>

16 <u>id.</u> (internal quotation marks and citation omitted).

17     Although <u>Berson</u> and <u>Gilead</u> left open the issue of whether Rule 8

18 or Rule 9 governs loss causation pleading, the Ninth Circuit was

19 clear on one point. A securities fraud complaint must, as the

20 foregoing discussion shows, "offer sufficient detail to give

21 defendants ample notice of [their] loss causation theory, and to

22 give [the court] some assurance that the theory has a basis in

23 fact." <u>Id.</u> (internal quotation marks and citation omitted).  In

24 other words, ample notice is the cornerstone of loss causation

25 pleading.  Here, as explained below, the FAC provides the requisite

26 ample notice, but only as to one of the three alleged disclosures.

27         ***ii.  Dura and its Progeny***

28     As the Ninth Circuit recently stressed, "[a] plaintiff does not,

1  of course, need to *prove* loss causation in order to avoid dismissal;

2  but the plaintiff must properly allege it." <u>Metzler Inv.</u>, 540 F.3d

3  at 1062 (citation omitted).  Loss causation is simply the proximate

4  cause element of a securities fraud claim.  <u>Johnson v. Aljian</u>, 490

5  F.3d 778, 782 (9th Cir. 2007).  This loss causation requirement

6  furthers the objectives of federal securities laws, which are

7  designed "not to provide investors with broad insurance against

8  market losses, but to protect them against those economic losses

9  that misrepresentations actually cause." <u>Dura Pharms.</u>, 544 U.S. at

10  345, 125 U.S. at 1633.

11      In the seminal case of <u>Dura Pharmaceuticals</u>, the Supreme Court

12  held that a plaintiff invoking the fraud-on-the-market theory must

13  do more than simply plead an artificial inflation of a company's

14  stock to satisfy the loss causation element of a securities fraud

15  action.  Such allegations do not suffice to plead loss causation

16  because the link between an inflated share price and a subsequent

17  economic loss "is not invariably strong." <u>Dura</u>, 544 U.S. at 342,

18  125 S.Ct. at 1632.  To illustrate, the Court pointed out that if a

19  share with an allegedly inflated price is later sold at a lower

20  price, that lower price is not necessarily reflective of an alleged

21  misrepresentation.  That lower price could be due to "changed

22  economic circumstances, changed investor expectations, new industry-

23  specific or firm-specific facts, conditions, or other events[,]"

24  none of which may have any relation to the earlier

25  misrepresentation.  <u>See</u> <u>id.</u> at 343, 125 S.Ct. at 1632.  Because the

26  <u>Dura</u> plaintiffs did not attempt to link their damages to any defense

27  conduct, the Supreme Court held that they did not sufficiently plead

28  loss causation.

1    Recognizing that that requirement is "not meant to impose a
2  great burden upon a plaintiff," nonetheless, the Dura Court requires
3  a plaintiff to "provide [a] defendant with notice of what the
4  relevant economic loss might be or of what the causal connection
5  might be between that loss and the misrepresentation[.]"  Id. at
6  347, 125 S.Ct. at 1634.  Allegations short of that "would bring
7  about harm of the very sort the statues seek to avoid[,]" and
8  "transform a private securities action into a partial downside
9  insurance policy."  Id. (citation omitted).

10   Shortly after Dura, in In re Daou Sys., Inc., 411 F.3d 1006
11  (9ᵗʰ Cir. 2005), the Ninth Circuit reversed the dismissal of
12  plaintiff's complaint finding that they had sufficiently alleged
13  loss causation.   The Daou Court held that "[t]o establish loss
14  causation, 'the plaintiff must demonstrate a causal connection
15  between the deceptive acts that form the basis for the claim of
16  securities fraud and the injury suffered by the plaintiff.'"  Gilead,
17  536 F.3d at 1055 (quoting Daou, 411 F.3d at 1025).  In so holding,
18  the Daou Court set forth two important principles.  First, it
19  explained that "[a] plaintiff is not required to show that a
20  misrepresentation was the *sole* reason for the investment's decline
21  in value in order to establish loss causation."  Daou, 411 F.3d at
22  1025 (internal quotation marks and citation omitted) (emphasis in
23  original).  However, the misrepresentation "must be a substantial
24  cause. . . for the decline in the value of the securities[.]"
25  Gilead, 536 F.3d at 1055-56 (internal quotation marks and citation
26  omitted).  Other causes of decline are factored into any subsequent
27  damages analysis.  Therefore, so "long as the misrepresentation is
28  one substantial cause of the investment's decline in value, other

1  contributing forces will not bar recovery under the loss causation

2  requirement but will play a role in determining damages." <u>Daou</u>, 411

3  F.3d at 1025 (internal quotation marks and citation omitted).

4      Second, there is a temporal component to loss causation, which

5  <u>Daou</u> illustrates. "[C]areful[ly] delineati[ng] between losses

6  caused after the company's conduct was revealed, and losses suffered

7  before the revelation[,]" the <u>Daou</u> Court "confirm[ed] that the

8  complaint must allege that the practices that the plaintiff contends

9  are fraudulent were revealed to the market *and* caused the resulting

10  losses." <u>Metzler Inv.</u>, 540 F.3d at 1063 (emphasis added).

11  Plaintiffs' theory of fraud in <u>Daou</u> "was that the defendant was

12  systematically recognizing revenue on contracts that had not been

13  completed." <u>Id.</u> (citation omitted).  The <u>Daou</u> Court held that

14  plaintiffs adequately pled loss causation "because their complaint

15  alleged that the market learned of and reacted to this fraud, as

16  opposed to merely reacting to reports of the defendant's poor

17  financial health generally." <u>Id.</u> (citations omitted).

18      The Ninth Circuit revisited the loss causation pleading

19  requirements in a recent trilogy of cases, <u>Berson</u>, 527 F.3d 982;

20  <u>Gilead</u>, 536 F.3d 1049; and <u>Metzler Inv.</u>, 540 F.3d 1049.[14]  <u>Gilead</u>

21  provides another example of the temporal component of loss

22  causation.  Allegedly Gilead illegally marketed one of its drugs,

23  Viread, for off-label purposes.  As a result of those aggressive

24  off-label marketing tactics, plaintiffs further alleged that sales

25  of Viread improperly increased, in turn driving Gilead's stock

26

---

27      [14]   As ordered by this court, the parties provided "limited supplemental
   briefing . . . on the issues of loss causation and scienter" as discussed in this
28   trilogy.  Doc. 99 at 1-2.

prices higher.

The Food and Drug Administration ("FDA") issued two warning letters informing Gilead that it was violating FDA regulations pertaining to off-label marketing.  When one of the FDA letters became public on August 7, 2003, the market did not react negatively.  Gilead challenged the sufficiency of plaintiffs' loss causation allegations given the absence of a market decline at that point.

Three months later though, on October 29, 2003, one day following Gilead's issuance of a press release explaining that Viread's sales volume was below expectations, Gilead's stock fell 12%.  The district court declined to "make the unreasonable inference that a public revelation on August 8 *caused* a price drop *three months later* on October 28."  Id. at 1057 (internal quotation marks and citation omitted).  In reversing, the Ninth Circuit held that the allegations of a "specific economic loss[]" -- the October 29th stock price - coupled with allegations that that loss was caused by Gilead's misrepresentations, was sufficient to allege loss causation, despite the three month gap.  Id. at 1056.
Finding that "what truly motivated the dismissal was the district court's incredulity[,]" the Ninth Circuit admonished that such "skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds."  Id.

Quoting from Twombly, the Ninth Circuit emphasized: "'[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'"  Id. at 1057 (quoting Twombly, 550 U.S.

1  at ___, 127 S.Ct. at 1965) (internal quotation marks omitted).  The

2  loss causation element is "no exception to this rule[.]"  Id.

3  Indeed, the Gilead Court expressly "agree[d]" with the Third

4  Circuit's view "that loss causation becomes most critical at the

5  proof stage[;]" and noted that Circuit's "cit[ation] [to] scholarly

6  authority stating that it is normally inappropriate to rule on loss

7  causation at the pleading stage."  Id. (internal quotation marks and

8  citation omitted).  Likewise, the Gilead Court expressly "agree[d]"

9  with the Second Circuit "that loss causation is a matter of proof at

10 trial and not to be decided on a Rule 12(b)(6) motion to dismiss."

11 Id. (internal quotation marks and citations omitted).

12 Accordingly,"[s]o long as the complaint alleges facts that, if taken

13 as true, plausibly establish loss causation," the Ninth Circuit

14 opined that "a Rule 12(b)(6) dismissal is inappropriate."  Id.

15 Again quoting from Twombly, the Ninth Circuit pointed out that

16 "[t]his is not 'a probability requirement . . . it simply calls for

17 enough fact to raise a reasonable expectation that discovery will

18 reveal evidence of' loss causation."  Id. (quoting Twombly, 550 U.S.

19 at ___, 127 S.Ct. at 1965).  Thus, in Gilead a three month gap

20 between the revelation of a misrepresentation and a drop in stock

21 price did not necessarily foreclose the possibility that that

22 earlier misrepresentation caused that later loss.

23    The temporal aspect of loss causation was not an issue in

24 Metzler Inv., decided just a few weeks after Gilead.[15]  Rather, the

25 Metzler Inv. Court held that simply alleging a risk of loss or

26

27    [15]   Metzler was originally decided on July 25, 2008, before Gilead.  See
   Metzler Inv. GmbH v. Corinthian Colleges, Inc., 534 F.3d 1068 (9th Cir. 2008).  On
28 August 26, 2008, however, the Ninth Circuit withdrew that earlier decision because
   it was superseded and amended by Metzler Inv., 540 F.3d 1049.

1  misrepresentation without more does not satisfy the loss causation

2  element of a securities fraud claim.   There, the plaintiffs alleged

3  that Corinthian Colleges artificially inflated its stock prices by

4  (1) manipulating student enrollment figures, which it then used to

5  fraudulently obtain federal funding; and (2) by improperly

6  recognizing federal funding as income in violation of GAAP.   Two

7  public disclosures allegedly caused the company's stock to drop.

8  The first was a June 24, 2004 "Financial Times" article disclosing a

9  Department of Education investigation of enrollment irregularities

10 at one of Corinthian's campuses.   The second disclosure was an

11 August 2, 2004, company press release announcing reduced earnings

12 and an adjusted revenue forecast.

13     The Ninth Circuit found, however, that neither of those

14 disclosures "disclosed – or even suggested to the market that

15 Corinthian was manipulating student enrollment figures. . . which is

16 the fraudulent activity that Metzlers contend[ed] forced down the

17 stock that caused its losses."  Id. at 1063.   The Ninth Circuit

18 reasoned that a plaintiff cannot be  "allow[ed] . . . to plead loss

19 causation through 'euphemism[,]' . . . thereby avoid[ing] alleging

20 the necessary connection between defendant's fraud and the actual

21 loss."  Id. at 1064.   The Court explained:

22         So long as there is a drop in a stock's price,
           a plaintiff will always be able to contend that
23         the market 'understood' a defendant's statement
           precipitating a loss as a coded message revealing
24         the fraud.   Enabling a plaintiff to proceed on such
           a theory would effectively resurrect what Dura
25         discredited – that loss causation is established
           through an allegation that a stock was purchased at
26         an inflated price.

27 Id. (citation omitted).   Instead, "[s]tated in the affirmative, the

28 complaint must allege that the defendant's share price *fell*

1   *significantly* after the truth became known." <u>Id.</u> at 1063 (internal

2   quotation marks and citation omitted) (emphasis added).  At a

3   minimum, "[a] plaintiff's complaint must, . . . , set forth

4   allegations that if assumed true, are sufficient to provide [the

5   defendant] with *some indication* that the drop in [defendant's] stock

6   price was causally related to [the defendant's] financial

7   misstatement[s]." <u>Id.</u> at 1062 (internal quotation marks and

8   citations omitted) (emphasis added).  It is against this legal

9   backdrop which the court will examine the three allegedly corrective

10  disclosures at issue herein.

11          ***b.  Corrective Disclosures?***

12      The FAC alleges that throughout the Class Period defendants

13  "issued a series of false and misleading" statements regarding

14  Apollo's "financial results[]" and its stock option practices.  FAC

15  (doc. 71) at ¶ 53.  Due to those alleged misstatements, the FAC

16  further alleges Apollo's stock price was artificially inflated.

17  Plaintiff's theory is that when the "truth" about those alleged

18  misstatements became known to the market in three separate

19  disclosures, it resulted in a decline in the price of Apollo's

20  stock.

21      From Apollo's perspective, the "truth" was not revealed to the

22  market, however, until May 22, 2007.  On that date Apollo issued a

23  Restatement correcting its prior misstatements regarding its stock

24  option practices, and, for the first time, quantifying the financial

25  impact of its accounting errors resulting therefrom.  Apollo

26  stresses that after that Restatement its stock value actually rose.

27  Based upon this scenario, framed in terms of the standard applied in

28  <u>Gilead</u>, Apollo contends the loss causation allegations are "facially

1  implausible[,]" thus mandating dismissal.  See Gilead, 536 F.3d at

2  1057.  Plaintiff retorts that the FAC contains "extensive factual

3  detail far beyond the required 'plausible' standard[,]" and thus it

4  can withstand these dismissal motions.  See Supp. Br. (doc. 101) at

5  6 (citations omitted).

6      "One way in which [a] plaintiff can prove [loss causation] is

7  by showing that a corrective disclosure caused the stock price to

8  decline."  In re Apollo Group, Inc. Sec. Litig., 2008 WL 3072731, at

9  *2 (D.Ariz. Aug. 4, 2008) (citations and footnote omitted).

10 Succinctly put, "[a] 'corrective disclosure' is a disclosure that

11 reveals the fraud, or at least some aspect of the fraud, to the

12 market."  Id. (citing Lentell v. Merrill Lynch & Co., Inc., 396 F.3d

13 161, 175 n.4 (2nd Cir. 2005) (holding that, to be corrective, a

14 disclosure must "reveal to the market the falsity of the prior

15 [representations]).  It stands to reason then that "[a] disclosure

16 that does not reveal anything new to the market is, by definition,

17 not corrective."  Id. (citing Omnicom Group, Inc. Sec. Litig., 541

18 F.Supp.2d 546, 551 (S.D.N.Y. 2008)).

19     As just shown, revelation of the fraud, or at some aspect of it,

20 is critical in terms of assessing whether a given disclosure is

21 corrective.  Consequently, before examining the claimed corrective

22 disclosures here, it is necessary to determine the fraudulent

23 activity which the FAC alleges.  The FAC alleges that Apollo engaged

24 in three types of fraudulent activity.  First, allegedly Apollo's

25 "financial statements were false and misleading because they failed

26 to account for stock option expenses[.]" Supp. Br. (doc. 101) at 10

27 (citing FAC, e.g., ¶¶ 53 and 135).  Second, the FAC alleges that

28 Apollo falsely represented that it "account[ed] for its stock-based

1   awards in accordance with [APB 25][.]" Id. (citing FAC, e.g., ¶¶ 46
2   and 53).  The third alleged fraudulent activity is that "defendants
3   signed false [SOX] . . . certifications . . . attest[ing] to the
4   adequacy of Apollo's internal controls" pertaining to stock option
5   grants.  Id. (citing FAC, e.g., ¶¶ 53 and 124).

6       As Apollo reads the FAC, plaintiff is attempting to plead loss
7   causation based upon three supposed "corrective disclosures," which
8   purportedly revealed the claimed fraudulent activities listed above.
9   The first such disclosure is a June 8, 2006, report by Lehman
10  Brothers (the "Lehman Report" or "the Report") questioning Apollo's
11  stock option history.  The second is a June 19, 2006, announcement
12  that the U.S. Attorney for the Southern District of New York had
13  issued a subpoena to Apollo requesting documents pertaining to its
14  stock option grants.  Third, plaintiff is relying upon an October
15  18, 2006, news release by Apollo regarding the identification of
16  "various deficiencies in the process of granting and documenting
17  stock options[.]" FAC (doc. 71) at ¶ 98 (emphasis omitted).

18      From Apollo's perspective, none of these disclosures are
19  corrective.  Taking the opposite view, believing that each of the
20  three "either disclosed – or . . . suggested that Apollo's prior
21  statements were false[,]" plaintiff asserts that those disclosures
22  are corrective.  See Supp. Br. (doc. 101) at 15 (citation omitted).
23  The court will separately examine each of these three disclosures to
24  ascertain whether they are corrective in the first place.

25          *i.  Lehman Report*

26      The FAC alleges that "[o]n June 8, 2006, . . . an analyst at
27  Lehman Brothers[] published a report titled, 'Did Apollo Backdate
28  Options?'[.]" FAC (doc. 71) at ¶ 89.  The FAC selectively quotes

from one sentence in that nine page Report: "'While it is impossible to tell definitively from a company's proxy and other SEC filing whether or not it is guilty of backdating, *Apollo['s] . . . option grant history looks highly questionable*. . . .'" Id. (emphasis added in FAC).   The FAC also relies upon tables in that Report "showing that Apollo's option grant prices occurred" at what the FAC characterizes "almost miraculously at the lowest price of the year in 2000, 2001, 2002 and 2004."   Id.   The FAC goes on to allege that the same day as the Lehman Report, Apollo's stock price "fell 2.7%" from the previous day's closing price.   Id..

Apollo strenuously contends that the Lehman Report "did not 'correct' Apollo's historical financial statements[,]" or "indicate" a need for their correction.   Mot. (doc. 81) at 18.   Hence, that Report is not a corrective disclosure which can form the basis for pleading loss causation.

Basically plaintiff responds that the Lehman Report "revealed, at least in part, the 'fraudulent activity'" which it is alleging, and that is all that Dura and its progeny require.   Supp. Br. (doc. 101) at 14 (citation omitted).   Although the FAC does not make this allegation, in its supplemental brief, plaintiff baldly asserts that the Lehman Report "*explicitly alerted* the *market* that *Apollo* had *very likely engaged* in *backdating*, and thereby *revealed* that its *prior statements* which failed to disclose or account for such backdating *may well have been false*."   Supp. Br. (doc. 101) at 10 (emphasis added).   This characterization, even if included in the FAC, does not comport with even the relatively minimal loss causation pleading standards of Dura.   Moreover, plaintiff is overstating what the Lehman Report actually states.

1    Certainly the snippet which the FAC quotes does not substantiate
2    the view that the Lehman Report "explicitly alerted [the market]
3    that Apollo had very likely engaged in backdating[.]" See id.
4    Indeed, a careful review of that entire Report demonstrates the
5    fallacy in this assertion. Nowhere in the Lehman Report does it
6    reveal any of the three types of fraudulent activity of which
7    plaintiff complains, or even reveal some aspect of those allegedly
8    fraudulent activities.  Instead, much like one of the disclosures at
9    issue in Metzler Inv., *at most*, the Lehman Report "reveals a 'risk'
10   or 'potential' for widespread fraudulent conduct."  See Metzler
11   Inv., 540 F.3d at 1063 (emphases omitted).  As the FAC itself
12   highlights, the Lehman report stated that "***Apollo['s] . . . option***
13   ***grant history looks highly questionable***. . . .'" FAC (doc. 71) at
14   ¶ 89 (emphasis added in FAC).  Having a "questionable" grant
15   history, even a "highly questionable grant history" is not
16   equivalent to revealing a fraud, or at least some aspect of a fraud,
17   however.
18     Again quoting from the Lehman Report, the FAC candidly
19   acknowledges that "it is impossible to tell definitively from a
20   company's proxy and other SEC filings whether or not it is guilty of
21   backdating[.]"  Id.  The Lehman Report goes on to explain that it
22   has "**taken a look at the history of the option grant prices . . . as**
23   **an *attempt to determine if any questionable activity exists*.**"
24   Farrell Decl'n (doc. 80), exh. B thereto at 2 (bold emphasis in
25   original) (italicized emphasis added).  The Report itself expressly
26   "reiterated[d][,]" not once but twice "that it is *impossible* to tell
27   *definitively* if a company has backdated options from the disclosure
28   in its SEC finings [sic]."  Id. at 2 and 4 (emphasis added).

1   "[B]eliev[ing] the probability" to be "very small" that Apollo's

2   option grant timing could be due to "either luck or excellent

3   timing[,]" the Report twice opined that Apollo "**is highly**

4   **susceptible to** *future* *scrutiny* **by either the press or the two**

5   **government agencies who have been investigating and prosecuting**

6   **other option backdating cases (the SEC and U.S. Attorney's Office)."**

7   Id. at 4 (bold emphasis in original) (italicized emphasis added).

8   The Lehman Report, therefore, cautioned "investors to tread lightly

9   with [Apollo] shares at current levels."   Id.    None of these

10  speculative observations, even had they all been included in the

11  FAC, comport with the loss causation pleading requirements of Dura

12  as recently elucidated by the Ninth Circuit, however.   See Metzler

13  Inv., 540 F.3d at 1064 ("[Neither *Daou* nor *Dura* support the notion

14  that loss causation is pled where a defendant's disclosure reveals a

15  'risk' or 'potential' for widespread fraudulent conduct.")

16      As the foregoing demonstrates, the FAC's allegations do not, as

17  they must, "confirm that the practices . . . plaintiff contends are

18  fraudulent were revealed to the market" through the Lehman report.

19  See Metzler Inv., 540 F.3d at 1063.  All that the Lehman Report

20  "revealed to the market" on June 8, 2006, was a "highly

21  questionable" option grant history by Apollo.  Despite how plaintiff

22  depicts it, that Report did not "explicitly alert[] the market that

23  Apollo had very likely engaged in backdating and thereby reveal that

24  its prior statements which failed to disclose or account for such

25  backdating may well have been false."  Supp. Br. (doc. 101) at 10.

26      There is nothing in the Lehman Report even hinting that Apollo

27  engaged in any of the three fraudulent activities which the FAC

28  alleges.   Indeed, there is no mention in the Lehman Report of

1   Apollo's prior financial statements, let alone that they "were false
2   and misleading because they failed to account for stock option
3   expenses[.]" See id. (citations omitted).  That Report is similarly
4   silent regarding the allegedly false SOX certifications, and
5   Apollo's purported false representations as to how it accounted for
6   its stock-based awards.  While the court is well aware that "a
7   disclosure need not reflect every detail of the alleged fraud,"
8   nonetheless, it "must reveal some aspect of it."  See Omnicom, 541
9   F.Supp.2d at 551. The Lehman Report does not make any such
10  revelations.  Succinctly put, no "truth of a misrepresentation about
11  [Apollo's] stock was revealed[]" in the Lehman Report.  See Amkor,
12  527 F.Supp.2d at 946 (citations omitted).

13      The weakness in plaintiff's reliance upon the Lehman Report to
14  support loss causation becomes even more evident considering the
15  relatively insignificant drop in the price of Apollo stock which
16  followed that Report.  As noted earlier, the FAC alleges a 2.7
17  percent drop in Apollo's stock price on June 8, 2006, the date the
18  Lehman Report was issued.  This allegation does not meet Dura's
19  requirement of an allegation "that the defendant's 'share price fell
20  significantly after the truth became known." See Metzler Inv., 540
21  F.3d at 1062 (quoting Dura, 544 U.S. at 347) (emphasis added).
22  Certainly if, as in Metzler Inv. "stock recover[y] very shortly
23  after the modest 10% drop that accompanied" the alleged corrective
24  disclosure does not suffice to allege loss causation, the modest 2.7
25  percent drop alleged herein is not sufficient either.  See id. at
26  1064 (footnote omitted).  In sum, the Lehman Report is not a
27  corrective disclosure which can, in turn, support a finding that
28  plaintiff's loss causation allegations are sufficient.

1

### ii.  Subpoena Disclosure

2    The next alleged "corrective disclosure" occurred on June 19,

3 2006.  On that date, the FAC alleges, Apollo "disclosed that it

4 received a subpoena from the U.S. Attorney for the Southern District

5 of New York requesting documents relating to [its] stock option

6 grants."  FAC (doc. 71) at ¶ 92.  The FAC further alleges that at

7 that point, "Apollo again denied any impropriety, stating that

8 '[its] board of directors has hired an outside firm to review and

9 confirm the company's initial conclusions that the Company acted

10 appropriately regarding its stock option practices.'"  Id.

11 Allegedly this "disclosure caused Apollo's stock price to drop 5.3%

12 on the next trading day[.]" Id.

13    Apollo contends that these allegations do not constitute a

14 corrective disclosure because, as with the Lehman Report, they do

15 not correct prior financial statements, or state a need for such a

16 correction.  Moreover, Apollo contends, the fact that a public

17 company is subject to a "regulatory investigation[,]" or conducts

18 its own internal review, does not amount to a corrective disclosure.

19 Mot. (doc. 81) at 19.  From plaintiff's standpoint, however, the

20 significance of the allegations quoted above is that they "began to

21 reveal the falsity of Apollo's prior statements or omissions, which

22 is all that Daou and Metzler Inv. require."  Supp. Br. (doc. 101) at

23 11 (internal quotation marks and citations omitted).

24    For several reasons, Apollo has the stronger argument.  First,

25 neither of these announcements disclose any wrongdoing by

26 defendants.  As in Amkor, Apollo's June 19th news release did "not

27 signal, much less state, that any prior option grants were

28 incorrect, that [the company's] internal controls were weak, that

1  there was evidence supporting a finding [of] intentional[]

2  manipulat[ion] [of] stock option pricing or that prior financial

3  statements were incorrect in any way." Amkor, 527 F.Supp.2d at 947.

4      Second, the court agrees with those courts finding that

5  standing alone the announcement of an internal investigation does

6  not give rise to a viable loss causation allegation. See, e.g.,

7  Hansen, supra, 527 F.Supp.2d at 1162 (internal quotation marks and

8  citations omitted) ("[T]he mere existence of [an] investigation

9  cannot support any inferences of wrongdoing . . .on the part of [a]

10 company or its senior management."). Plaintiff does not attempt to

11 distinguish that line of cases, but instead directs the court's

12 attention to UTStarcom II, supra, 2008 WL 4002855. As plaintiff

13 reads that case, it stands for the proposition that "merely

14 announc[ing] . . . an internal investigation [is] sufficient to

15 allege loss causation." Supp. Br. (doc. 101) at 12 (citation

16 omitted). That is too broad a reading of UTStarcom II, however. As

17 will be discussed more fully below, it was not the "mere"

18 announcement of an internal investigation upon which the court there

19 based its finding that plaintiff had adequately pled loss causation.

20 Rather, it was the content of that announcement and the message it

21 sent to the market – content which is missing from Apollo's June

22 19th announcement.

23     In Rudolph v. UTStarcom, 560 F.Supp.2d 880 (N.D.Cal. 2008)

24 ("UTStarcom I"), the court held that a press release announcing an

25 internal investigation into the company's historical equity award

26 grant practices did not sufficiently allege loss causation. Among

27 other reasons, the court in UTStarcom I held that that announcement

28 did not sufficiently plead loss causation because "prior to any

1  revelation by defendants of actual backdating, the 'true nature of

2  [the company's] financial condition had not yet been disclosed.'"

3  Id. at 888 (quoting Daou, 411 F.3d at 1027).  Upon reconsideration,

4  however, applying Gilead's plausibility standard, the court held

5  that the announcement of an internal investigation "could plausibly

6  establish loss causation." UTStarcom II, 2008 WL 4002855, at *4.

7      At first glance UTStar II might appear to compel the conclusion

8  that Apollo's June 19th announcement sufficiently pleads loss

9  causation.  What plaintiff fails to consider though is the critical

10 distinction between the language of the UTStar press release and

11 that of Apollo's news release.  Like Apollo's June 19th news

12 release, the UTStar press release, "did not definitively state that

13 backdating had occurred or that UTStarcom would adjust its prior

14 financial statements as they related to equity grants[.]" UTStarcom

15 II, 2008 WL 4002855, at *4.  What the press release in UTStarcom II

16 did accomplish, however, was, "for the first time, [to] put the

17 market on notice that such disclosures *might be forthcoming*." Id.

18 (emphasis added).  The UTStarcom press release foreshadowed the

19 possibility that the Company would be correcting its prior financial

20 statements, although that release "specifically stated that no

21 conclusions have been reached about whether the Company would need

22 to record any non-cash adjustments to its financial statements

23 related to prior equity grants." UTStarcom I, 560 F.Supp.2d at 888

24 (internal quotation marks and citation omitted).

25     Apollo's June 19th news release does not contain any similar

26 language.  As will be discussed in detail momentarily, here, such a

27 revelation did not occur until October 18, 2006.  Given this

28 significant distinction between the UTStarcom press release and

1    Apollo's June 19th news release, plaintiff's reliance upon <u>UTStarcom</u>

2    <u>II</u> is unavailing.

3         Further undermining plaintiff's reliance upon the June 19th news

4    release to plead loss causation is the fact that that release

5    explicitly states, "[a]s *previously* announced, Apollo . . . has

6    hired an outside firm" to review its stock option practices.

7    Farrell Decl'n (doc. 80), exh. 4 thereto at 6 (emphasis added).

8    Therefore, even if the court agreed that that release revealed a

9    fraud, it would not be a new fraud to which the market was

10   purportedly reacting.  It could not be a new fraud because that

11   information had already been revealed to the public in a prior

12   announcement.  <u>Cf.</u> <u>Apollo Group</u>, <u>supra</u>, 2008 WL 3072731, at *3

13   (emphasis added) ("evidence . . . insufficient to show . . . any

14   . . . aspect[]" of analyst's reports were corrective where they "did

15   not provide any *new, fraud-revealing* analysis[]").

16        Having found that the June 19, 2006, news release is not a

17   corrective disclosure which can form the basis for pleading loss

18   causation, there is no need to address the parties' arguments as to

19   whether the alleged 5.3% drop in the price of Apollo stock on June

20   20, 2006 is sufficient to support a loss causation allegation.  In

21   any event, it is highly doubtful that a 5.3 percent price drop,

22   assuming it was sufficiently tethered to the June 19th disclosure,

23   would satisfy <u>Dura</u>'s requirement that the "share price f[a]ll

24   significantly after truth bec[o]me[s] known."  <u>See</u> <u>Dura</u>, 544 U.S. at

25   347.  Thus, as with the Lehman Report, the June 19th press release

26   cannot form the basis for pleading loss causation here.

27                  ***iii.  News Release & Earnings Announcement***

28        The third purported corrective disclosure is a "news release and

                                   - 114 -

1  disappointing earnings announcement" issued by Apollo on October 18,
2  2006.  FAC (doc. 71) at ¶ 98.  Plaintiff alleges that in those items
3  Apollo "stated, for the first time, and in contrast to Apollo's
4  previous denials, . . . '**various deficiencies in the process of**
5  **granting and documenting stock options have been identified to date.**
6  The accounting impact of these matters has not been quantified.
7  **There can be no assurances that the results of the investigation**
8  **will not require a possible restatement of the Company's financial**
9  **statements** when the potential errors are quantified and assessed.'"
10 Id. at ¶ 98 (emphasis added in FAC).  Although the FAC does not
11 allege it, the news release itself (of which the court has taken
12 judicial notice), continues: "The attached unaudited financial
13 statements do not include the impact of any unrecorded non-cash
14 equity-based compensation charges that may be required at the
15 conclusion of the review."  Farrell Decl'n (doc. 80), exh. 6 thereto
16 at 7.  "Following this announcement," the FAC alleges that "Apollo's
17 stock price dropped dramatically, falling 22.9% in one day to a 4-
18 year low[.]" FAC (doc. 71) at ¶ 98.

19      Stressing that that news release merely indicates that "a
20 restatement might be 'possible,'" Apollo asserts that this
21 announcement is not a corrective disclosure which can form the basis
22 for pleading loss causation.  Mot. (doc. 81) at 19.  Apollo further
23 reasons that this disclosure is not corrective because it gives no
24 indication of the number of stock option grants potentially affected
25 by the identified deficiencies.  As Apollo depicts it, this
26 disclosure simply "identified options process 'deficiencies' with
27 unknown accounting impact that may possibly necessitate an as-yet-
28 unquantified restatement."  Supp. Memo. (doc. 102) at 3.

1    Apollo's attempts to minimize the significance of the October
2    18th news release is not persuasive.   Surely if the press release
3    in <u>UTStarcom</u> was sufficient to put the market on notice of the
4    possibility of forthcoming restatements, the October 18th press
5    release did the same.   As discussed earlier, the press release in
6    <u>UTStarcom</u> "specifically stated that no conclusions have been reached
7    about whether the Company would need to record any non-cash
8    adjustments to its financial statements related to prior equity
9    grants." <u>UTStarcom I</u>, 560 F.Supp.2d at ___ (internal quotation
10   marks and citation omitted).   Yet, the court was willing to find
11   that loss causation was sufficiently pled there because that
12   disclosure "for the first time, put the market on notice that such
13   disclosures might be forthcoming." <u>UTStarcom II</u>, 2008 WL 4002855,
14   at *4.

15       Here, as the highlighted language quoted above shows, the
16   October 18th release is cast in far more definite terms when it
17   comes to suggesting the possibility of future restatements.   What is
18   more, that release explicitly "identified . . . various
19   deficiencies" in Apollo's stock option grant processes.   Farrell
20   Decl'n (doc. 80), exh. 6 thereto at 7.   Thus, plaintiff's theory
21   that Apollo's stock price dropped in response to the October 18th
22   announcement is "not facially implausible[.]" <u>See</u> <u>Gilead</u>, 536 F.3d
23   at 1057.   After <u>Gilead</u>, that is all the Ninth Circuit demands.

24       In addition, "[l]oss causation may be premised on partial
25   revelations that do not uncover the complete extent of the falsity
26   of specific prior statements." <u>In re Take-Two Interactive Sec.</u>
27   <u>Lit.</u>, 551 F.Supp.2d 247, 283 (S.D.N.Y. 2008) (citation omitted).
28   This significantly undercut's Apollo's assertion that the October

1 | 18th news release is not a corrective disclosure because,

2 | essentially, it is too vague in terms of what it is revealing.

3 |     Apollo further argues that the October 18th news release cannot

4 | form the basis for allegations of loss causation because

5 | contemporaneously therewith Apollo made a "disappointing earnings

6 | announcement[.]" FAC (doc. 71) at ¶ 98.  Apollo announced "fourth-

7 | quarter earnings fell 12 percent" because of enrollment issues.

8 | Farrell Decl'n (doc. 80), exh. 7 thereto at 2.  Apollo also stated

9 | that it missed analysts' earnings expectations by 12 cents per

10 | share, or 18%.  Id.  Based upon the foregoing, Apollo contends that

11 | the stock drop is attributable to factors other than the announced

12 | identified deficiencies in its option grant process.  Therefore,

13 | Apollo contends that the causal link between the announcement of a

14 | possible restatement and the stock price drop was effectively

15 | severed.

16 |     If the only announcement on October 18th had been a weak

17 | earnings statement, then perhaps Apollo would prevail on this

18 | argument.  See, e.g., In re Initial Public Offering Sec. Litig., 399

19 | F.Supp.2d 261, 265-267 (S.D.N.Y. 2005) (disclosures of failure to

20 | meet revenue forecasts and downward revisions of forecasts did not

21 | allege loss causation); and In re First Union Corp. Sec. Litig.,

22 | 2006 WL 163616 (W.D.N.C. Jan. 20, 2006) (allegations that stock

23 | price decline was caused by two public revised earnings statements

24 | did not allege loss causation where no fraud revealed).  In the

25 | present case, plaintiff alleges more than that, however.  The

26 | allegations here of a "disappointing earnings announcement" coupled

27 | with the announcement of identified deficiencies in Apollo's option

28 | grant processes, along with raising the possibility of a

1  restatement, are sufficient at the pleading stage.  Whether the

2  October 18th stock drop is attributable to some other cause, as

3  Apollo maintains, is best left for another day.  See In re Openwave

4  Systems Sec. Litig., 528 F.Supp.2d 236, 253 (S.D.N.Y. 2007)(citation

5  omitted).

6     Based upon the foregoing, the court finds plaintiff's

7  allegations of loss causation are, as the Ninth Circuit requires,

8  "not facially implausible" with respect to the October 18th

9  announcement.  See Gilead, 536 F.3d at 1057.  For the reasons set

10 forth above, however, the other two claimed corrective disclosures

11 cannot form the basis for pleading loss causation.

12    Having ruled on defendants' motions insofar as they are directed

13 at plaintiff's section 10(b) claims, the court will turn to

14 plaintiff's remaining four causes of action.

15    **_D. Insider Trading_**

16    Section 20A(a) of the Exchange Act creates a private cause of

17 action for "contemporaneous" insider trading.  See 15 U.S.C. § 78t-

18 1(a) (West 1997).  Pursuant to that statute, plaintiff is seeking to

19 hold those "defendants that sold Apollo stock during the Class

20 Period[,]" FAC at ¶ 184, meaning all of the defendants except Apollo

21 and Mr. Mueller, liable for insider trading.  The FAC alleges, "for

22 example," that "Lead Plaintiff and members of the Class traded

23 contemporaneously with defendants Blair, Bachus and Govenar by

24 purchasing Apollo securities at artificially inflated prices on

25 January 6-7, 2005 and suffered damages."  FAC (doc. 71) at ¶ 186(a).

26 As another "example," the FAC alleges that "Lead Plaintiff . . . and

27 members of the class" also "traded contemporaneously with defendants

28 Bachus and Govenar . . . on January 10-12, 2005[.]" Id. at ¶ 186(b).

1   Apart from the individuals just named, the insider trading claim

2   does not specifically mention any of the other individual

3   defendants.  Exhibit G to the FAC is a detailed list, however, of

4   purported "insider sales" during the Class Period, listing every

5   individual defendant except Brian Mueller, the dates of sale, shares

6   sold, price and proceeds.

7       To state a cause of action under § 20A(a), "a plaintiff must

8   plead . . . a predicate violation of the securities laws," and

9   "facts showing that the trading activity of plaintiffs and

10  defendants occur[ed] 'contemporaneously[.]'" In re Countrywide

11  Financial Corp. Deriv. Litig., 554 F.Supp.2d 1044, 1074 (C.D.Cal.

12  2008) (quoting Neubronner, supra 6 F.3d at 670).  The individual

13  defendants assert that plaintiff has not plead either of those two

14  elements; and hence the court should dismiss the §20A(a) insider

15  trading claim in its entirety.

16      Plaintiff has not, as the court previously found, adequately

17  pled a violation of § 10(b) as to the following defendants - Bachus,

18  DeConcini, Govenar, Noone, and John and Peter Sperling.  Therefore,

19  its § 20A(a) insider trading claim against those six defendants

20  necessarily fails and the court grants their motion to dismiss in

21  that regard.  See Johnson v. Aljian, 490 F.3d 778, 781 (9th Cir.

22  2007) (§ 20A claims require an independent violation of the Exchange

23  Act).

24      Defendants Nelson, Gonzales, Blair and Norton stand on different

25  footing that the defendants listed above, however, given the court's

26  finding that the FAC adequately alleges § 10(b) claims as to them.

27  Thus, the court must consider whether, nonetheless, these particular

28  defendants are entitled to dismissal of the § 20A(a) claim for

1  failure to plead contemporaneous trading.  Contemporaneous trading

2  is a "judicially-created standing requirement, specifying that to

3  bring an insider trading claim, the plaintiff must have traded in a

4  company's stock at about the same time as the alleged insider."

5  Brody v. Transitional Hosps. Corp., 280 F.3d 997, 1001 (9th Cir.

6  2002).   The underlying purpose of that requirement is to ensure

7  that "only parties who have traded with someone who had an unfair

8  advantage will be able to maintain insider trading claims; those who

9  did not trade contemporaneously could not have suffered a

10  disadvantage from the insider's failure to disclose."   In re Silicon

11  Graphics, Inc. Sec. Litig., 970 F.Supp. 746, 761 (N.D.Cal. 1997).

12      Based upon Neubronner, Nelson, Norton and Gonzales contend that

13  because the FAC does not "identify stock purchases [plaintiff] made

14  contemporaneously with stock sales" by them, the court should

15  dismiss the insider trading claim as against them.  Plaintiff

16  counters, in essence, that it is excused from that pleading

17  requirement because "contemporaneous trading can encompass

18  defendants' entire scheme."  Resp. (doc. 94) at 53 (citation

19  omitted).  Defendants retort that this argument runs afoul of the

20  Ninth Circuit's holding in Neubronner.

21      These arguments can easily be laid to rest.  The "ultimate

22  conclusion" in Neubronner was "that contemporaneous trading must be

23  plead with particularity."  Brody, 280 F.3d at 1001 (citing

24  Neubronner, at 673).  That particularity requirement encompasses

25  allegations, at a minimum, of the dates upon which defendants sold

26  their stock compared with the dates upon which plaintiff purchased

27  stock.  See, e.g., In re Connetics Corp. Sec. Litig., 2008 WL

28  3842938, at *12 (N.D.Cal. Aug. 14, 2008) (granting motion to dismiss

§ 20A claims where plaintiff did not allege the dates upon which
certain defendants traded on insider information, and declining to
find that allegations that one defendant's contemporaneous trading
sufficed to show that other defendants also did); <u>Silicon Graphics</u>,
970 F.Supp. at 761 (dismissing with prejudice plaintiffs' insider
trading claims against three defendants where plaintiffs did not
allege that they traded contemporaneously with plaintiffs); and
<u>Chan</u>, <u>supra</u>, 1998 WL 1018624, at *12, n. 10 (citations omitted)
("little basis" for insider trading claims where plaintiffs did not
allege "sufficient facts to establish that any of the Plaintiffs
traded contemporaneously with the Defendants[]").  No such
comparison can be made here.  While exhibit G lists stock sales by
ten of the 11 individual defendants, with the exception of the two
allegations quoted at the beginning of this section, the FAC does
not include similar details as to plaintiff.  The lack of
particularity as to plaintiff's trading history renders it
impossible for the court to perform any meaningful analysis of the
contemporaneous trading requirement, which at its core is a temporal
requirement.

    To illustrate, <u>In re Petco Animal Supplies Inc. Sec. Litig.</u>,
2005 WL 5957816 (S.D.Cal. Aug. 1, 2005), by comparing that
plaintiff's "certification of [its] stock trades," listing purchases
with specific settlement dates, which was included as an exhibit to
the complaint, with the SEC forms defendants provided listing their
transaction dates, the court found that contemporaneous trading had
been sufficiently alleged so as to state a claim for insider
trading.  <u>Id.</u> at *36-*37; <u>see also</u> <u>In re Countrywide Financial Corp.</u>
<u>Sec. Litig.</u>, 588 F.Supp.2d 1132, 1205 (C.D.Cal. 2008) (§20A claim

1  sufficiently alleged based on "common stock transactions" as

2  evidenced in exhibit to complaint "listing § 20A Defendants' sales

3  next to contemporaneous [lead plaintiff's] purchases").

4      Plaintiff cites to In re Am. Bus. Computers Corp. Sec. Litig.,

5  1994 WL 848690 (S.D.N.Y. Feb. 24, 1994) (Brieant, J.), as a basis

6  for circumventing this contemporaneous trading requirement.  The

7  court there did adopt the "rule that a class action may be

8  maintained on behalf of all persons who purchased stock on an

9  exchange during the period that defendants were selling that stock

10 on the basis of insider information."  1994 WL 848690, at *4.  That

11 rule does not obviate the need, however, for plaintiff to allege in

12 the first instance "the precise days when it purchased and sold

13 [defendant's] stock," as is evidenced in Middlesex, 527 F.Supp. at

14 1196.

15     After weighing different approaches to the contemporaneous

16 trading requirement, including a strict same day time frame, the

17 Middlesex court decided to follow Judge Brieant's approach.

18 Nevertheless, it granted plaintiff leave to amend its complaint "to

19 add allegations related to its purchase of [defendant's] stock."

20 Id.  In particular, it directed plaintiff to "specif[y] the precise

21 days when it purchased and sold [defendant's] stock" because neither

22 the FAC nor the exhibits thereto included such information, although

23 "another filing" before the court did.  Id.  That other filing

24 showed that "Plaintiff traded on the same day as [one defendant],

25 within eight days of [another], and within three days of [yet

26 another]."  Id.

27     Without deciding whether it will ultimately adopt Judge

28 Brieant's rule, the court will follow the approach of the Middlesex

1   court and allow plaintiff to amend its complaint so as to allege

2   contemporaneous trading in the manner specified therein.  Thus, the

3   motion to dismiss the second claim as to defendants Nelson, Norton

4   and Gonzales is denied on the condition that plaintiff amends its

5   complaint to sufficiently allege contemporaneous trading as to these

6   defendants.  In the absence of such an amendment, the court will

7   grant the motion by these three defendants to dismiss the §20A(a)

8   insider trading claim.

9        Defendant Blair's position differs from the three defendants

10  just discussed because the FAC does allege that he traded

11  contemporaneously with Lead Plaintiff on January 6-7, 2005.  FAC

12  (doc. 71) at ¶ 186(a).[16]  Nevertheless, the court agrees with

13  defendant Blair that this insider trading claim is lacking as

14  against him because plaintiff did not "plead facts to show that

15  [Blair's] trading was out of proportion with [his] usual trading."

16  See Chan, 1998 WL 1018624, at *12, n.10 (citation omitted).

17  Plaintiff makes the wholly unsupported assertion that because it has

18  adequately alleged scienter, "there is no requirement in § 20 that

19  an insider's sales . . . be out of line with prior trading history

20  to allege a violation[]" of that statute.  Resp. (doc. 94) at 53.

21  The court adheres to its view previously expressed in Chan though,

22  and on that basis finds that plaintiff has not sufficiently pled

23  insider trading against defendant Blair.

24       The court will, however, allow plaintiff to amend its complaint

25

26  [16]    Exhibit G actually shows that defendant Blair sold Apollo stock on,
among other days, January 3, 2005, but not on January 6-7, 2005.  The court assumes
27  by his silence, and his failure to move for dismissal on the grounds that the
January 3, 2005, sale date is not sufficiently close to plaintiff's alleged sale
28  dates, that he concedes that the temporal proximity aspect of contemporaneous
trading is met by these allegations.

1  insofar as it is attempting to allege insider trading against

2  defendant Blair.  Thus, as with defendants Nelson, Norton and

3  Gonzales, Blair's motion to dismiss this insider trading claim is

4  denied on the condition that plaintiff amends its complaint to

5  sufficiently allege insider trading as to defendant Blair.

6      ***E. Control Person Liability***

7      In its third claim, plaintiff alleges "control person" liability

8  against all defendants pursuant to section 20(a) of the Exchange

9  Act.  In the Ninth Circuit, to "prove a prima facie case under

10 Section 20(a), a plaintiff must prove: (1) a primary violation of

11 federal securities law and (2) that the defendant exercised actual

12 power or control over the primary violator." America West, supra,

13 320 F.3d at 945 (internal quotation marks and citation omitted).

14 However, "to make out a prima facie case, it is not necessary to

15 show actual participation or the exercise of power[,]" but "a

16 defendant is entitled to a good faith defense if he can show no

17 scienter and an effective lack of participation." Id. (internal

18 quotation marks and citation omitted).

19     The individual defendants offer two alternative bases for

20 dismissal of this section 20(a) claim.  First, they state that

21 because plaintiff has not pled an underlying violation of section

22 10(b), the control person claim necessarily fails as well.  Second,

23 the individual defendants contend that the FAC is deficient in that

24 it does not sufficiently "plead facts showing that each [of them]

25 controlled Apollo[.]" Mot. (doc. 82) at 25.  These arguments are

26 meritorious as to some, but not all of the defendants.

27     "There is no concrete test for establishing whether a defendant

28 is a control person." Howard v. Hui, 2001 WL 1159780, at *3

1  (N.D.Cal. Sept. 24, 2001) (citing <u>Wool v. Tandem Computers, Inc.</u>,

2  818 F.2d 1433, 1441 (9th Cir. 1987) ("[T]he concept of control, in

3  the context of securities law, is an elusive notion for which no

4  clear-cut rule or standard can be devised."). Accordingly,

5  "[w]hether [the defendant] is a controlling person is an intensely

6  factual question, involving scrutiny of the defendant's

7  participation in the day-to-day affairs of the corporation and the

8  defendant's power to control corporate actions." <u>America West</u>, 320

9  F.3d at 945. The SEC defines "control" as "the possession, direct

10 or indirect, of the power to direct or cause the direction of the

11 management and policies of a person, whether through the ownership

12 of voting securities, by contract, or otherwise." 17 C.F.R. §

13 230.405. Thus, among "the traditional indicia of control[]" are

14 "owning stock in the target company, or having a seat on the

15 board[.]" <u>America West</u>, 320 F.3d at 945 (internal quotation marks

16 and citation omitted). By the same token, "an individual's status

17 as an officer or director of the issuing corporation is

18 insufficient, standing alone, to demonstrate the exercise of

19 control." <u>In re Amgen Inc. Sec. Litig.</u>, 544 F.Supp.2d 1009, 1037

20 (C.D.Cal. 2008) (citing <u>Howard v. Everex Systems, Inc.</u>, 228 F.3d

21 1057, 1065 (9th Cir. 2000)). Nevertheless, there is "persuasive

22 authority indicat[ing] that an officer or director who has signed

23 false financial statements containing materially false and

24 misleading statements qualifies as a control person." <u>Id.</u>

25 (collecting cases).

26     As previously discussed, plaintiff has not adequately pled a

27 primary violation of section 10(b) as to defendants Bachus,

28 DeConcini, Govenar, Mueller, Noone, and the Sperlings. Therefore,

1  the court grants the motion by these defendants to dismiss the

2  section 20(a) claims as against them.  See Zucco, 552 F.3d at 990

3  (citations omitted)  ("Section 20(a) claims may be dismissed

4  summarily, . . . , if a plaintiff fails to adequately plead a

5  primary violation of section 10(b).")

6       However, assuming arguendo that upon amendment plaintiff can

7  adequately allege a violation of § 10(b) against defendants Nelson,

8  Norton, Gonzales and Blair, the court must address the second prong

9  of § 20(a) liability – whether any of these individuals is a

10 controlling person within the meaning of that statute.  Examining

11 the FAC in light of the principles set forth above readily shows

12 that the control person allegations are sufficient as to defendants

13 Nelson and Gonzales.[17]  The FAC alleges not just their respective

14 positions with Apollo -- Nelson as former Chair, CEO and President

15 and Gonzales as former CFO, Secretary and Treasurer -- but it also

16 describes their roles in Apollo's day-to-day operations, and more

17 specifically their involvement in the option grant and accounting

18 processes.  The FAC further alleges as to defendants Nelson and

19 Gonzales that they signed false SOX certifications.  The court thus

20 concludes that the FAC adequately alleges control person liability

21 under § 20(a) insofar as defendants Nelson and Gonzales are

22 concerned.  Accordingly it denies their motion to dismiss the

23 § 20(a) claim as against them.

24      Although he was not an Apollo officer, the FAC sufficiently

25 alleges control person liability as to defendant Blair, former

26

27        [17]    Indeed perhaps these defendants concede as much in that individual
   defendants' motion focuses only upon the insufficiency of the control person
   allegations as to defendants DeConcini, Govenar, Mueller and Noone.  See Mot. (doc.

28 82) at 25.

Chairman of the Audit Committee and Compensation Committee member,

and defendant Norton, Audit Committee member and Chairman of the

Compensation Committee.   The FAC delineates their duties and

responsibilities in the respective Committee capacities.   More

specifically, the FAC alleges that as a member of the Audit

Committee, Norton "was responsible for Apollo's public financial

statements[,]" and as Compensation Committee Chairman, allegedly he

"controlled the other defendants' backdated stock option awards."

FAC at ¶ 23; see also id. at ¶¶ 39-40; and 115.   Thus, the court

denies defendant Nelson's motion to dismiss the § 20(a) claim as

against him.   See Batwin, 2008 WL 2676364, at *25 (denying motion to

dismiss § 20(a) claim by two defendants who "controlled the Audit

Committee" and as such "direct[ed] [the defendant Company's policies

relating to accounting and auditing during the Class Period[]").

        The FAC includes similar allegations with respect to defendant

Blair, thus warranting the same result – denying his motion to

dismiss the section 20(a) claim.   In particular, the FAC alleges

that as Chairman of the Audit Committee, he "caused or allowed the

dissemination of improper public statements[.]" FAC (doc. 71) at

¶ 22.   Moreover, "[a]s a member of the Compensation Committee,

defendant Blair controlled the other defendants' backdated stock

option awards."   Id.   As the FAC describes it, while serving on the

Compensation Committee defendants Blair and Norton "were responsible

for review[ing] all aspects of compensation of executive officers

and determin[ing] or mak[ing] recommendations on such matters to the

full [Apollo] Board. . .[.]" Id. at ¶ 39 (internal quotation marks

omitted); see also id. at ¶ 115 (enumerating "the role of the

Compensation Committee . . . in the backdating at Apollo, as well as

1  the deficiencies in the conduct of th[at] . . . Committee with
2  respect to the options granting process[]").

3      To summarize, the court grants the motion to dismiss the section
4  20(a) control person liability claims as against defendants Bachus,
5  DeConcini, Govenar, Mueller, Noone, and John and Peter Sperling.
6  However, the court denies this aspect of the motion to dismiss by
7  defendants Blair, Norton, Nelson, Gonzales and Apollo.

8      ***F.  State Law Claims***

9      State law is the basis for plaintiff's remaining two claims.
10 Plaintiff's fourth claim is for "breach of fiduciary duty and/or
11 aiding and abetting" against all defendants.  FAC at 94.
12 Plaintiff's fifth and final claim is for "civil conspiracy to commit
13 fraud[,]" but it is only against defendants Nelson, Blair, Norton,
14 Bachus, Mueller, and Gonzales.  Id. at 95.

15     As an initial matter, the individual defendants argue that the
16 court should decline to exercise its supplemental jurisdiction over
17 these remaining state law claims on the theory that plaintiff has
18 failed to state a claim under federal law.  The court's rulings
19 herein undermine that argument however.  Therefore, at this point in
20 the litigation, the court will continue to exercise its supplemental
21 jurisdiction over these state law claims.

22     ***1.  Securities Litigation Uniform Standards Act of 1998***

23     Apollo's penultimate argument is that the Securities Litigation
24 Uniform Standards Act of 1998 ("SLUSA") mandates dismissal of
25 plaintiff's state law claims because they include "allegations of
26 material misrepresentation and omission . . . and incorporate the
27 fraud claims asserted throughout the [FAC]."  Mot. (doc. 81) at 29.
28 Reasoning that "[b]ecause Apollo is an Arizona corporation . . . ,

1   and plaintiff's state law claims are based on Arizona state law,"
2   plaintiff counters that those claims come within the purview of
3   SLUSA's so-called Delaware carve-out.  Resp. (doc. 94) at 55.  In
4   rejoinder, Apollo convincingly argues that plaintiff has not shown
5   that its state law claims fit within either prong of that carve-out.
6       After the enactment of the PSLRA which, *inter alia*, heightened
7   the pleading standards in federal securities cases, there was a
8   "pilgrimage of securities claims to state courts, thus circumventing
9   congressional reforms to restrict federal securities claims."
10  Falkowski v. Imation Corp., 309 F.3d 1123, 1128 (9th Cir. 2002)
11  (citations omitted).  To stem this tide, Congress enacted the SLUSA.
12  See Merrill Lynch v. Dabit, 547 U.S. 71, 82, 126 S.Ct. 1503, 164
13  L.Ed.2d 179 (2006).  "With few exceptions, SLUSA limits the
14  maintenance of certain class-action suits in either state or federal
15  court[.]"  Huang v. Reyes, 2008 WL 648519, at *2 (N.D.Cal. March 6,
16  2008) (citing 15 U.S.C. § § 77p(c), 78 bb(f)(2)).  If a court
17  determines that SLUSA precludes an action or claim, dismissal is
18  required.  See Kircher v. Putnam Funds Trust, 547 U.S. 633, 644, 126
19  S.Ct. 2145, 2155, 165 L.Ed.2d 92  (2006) ("If the action is
20  precluded [under SLUSA], neither the District Court nor the state
21  court may entertain it, and the proper course is to dismiss.")
22      Under SLUSA, no "covered class action" based on state law and
23  alleging "a misrepresentation or omission of a material fact in
24  connection with the purchase or sale of a covered security" may be
25  "maintained in any State or Federal Court by any private party."  15
26  U.S.C. § 78bb(f)(1)(A).  Because plaintiff is invoking the Delaware
27  carve-out, presumably it concedes at the outset that its state law
28  claims meet those criteria, and thus are governed by SLUSA in the

1  first instance.  In any event, as set forth below, undoubtedly that

2  is the case.

3      "A 'covered class action' is a lawsuit in which damages are

4  sought on behalf of more than 50 people[,]" such as the present

5  action.  See Dabit, 547 U.S. at 83, 126 S.Ct. at 1512 (footnote

6  omitted).  Further, "[t]he grant of an employee stock option on a

7  covered security[,]" of the kind at issue herein, "is a 'sale' of

8  that covered security for purposes of SLUSA preemption."  Falkowski,

9  309 F.3d at 1129-30.  Finally, in alleging state common law breach

10 of fiduciary duty, plaintiff expressly alleges "material

11 misrepresentations . . . regarding defendants' option backdating

12 scheme."  FAC (doc. 71) at ¶ 194.  Plaintiff similarly alleges that

13 certain defendants engaged in a civil conspiracy to commit fraud by,

14 inter alia, making false or misleading statements and/or omitting

15 material facts regarding stock option grants at Apollo.  As the

16 foregoing shows, these state law claims fall within the category of

17 claims which SLUSA precludes.  The issue thus becomes whether, as

18 plaintiff urges, it can avail itself of the Delaware carve-out

19 exception to SLUSA's broad reach.

20     That carve-out "exempts class actions based on the statutory or

21 common law of the security issuer's state of incorporation."  Huang,

22 2008 WL 648519, at *2 (citations omitted).  This exception

23 "preserves class actions based on the law of the security issuer's

24 state of incorporation when certain criteria are met."  Crimi v.

25 Barnholt, 2008 WL 4287566, at *2 (N.D.Cal. Sept. 17, 2008) (citation

26 omitted).  The action must involve either:

27                 (I)  the purchase or sale of securities by the
                   issuer or an affiliate of the issuer exclusively
28                 from or to holders of equity securities of the

issuer; or
(ii) any recommendation, position, or other
communication with respect to the sale of
securities of the issuer that—
          (I)  is made by or on behalf of the issuer or an
          affiliate of the issuer to holders of equity
          securities of the issuer; and
          (II) concerns decisions of those equity holders
          with respect to voting their securities, acting
          in response to a tender or exchange offer, or
          exercising dissenters' or appraisal rights.

15 U.S.C. §§ 77p(d)(1), 78bb(f)(3)(A)(West Supp. 2008).  A case

falling into either prong of this carve-out "may be maintained in a

State or Federal court[.]" 15 U.S.C. §§ 77p(d)(1)(A), 78

bb(f)(3)(A)(i)(West Supp. 2008).

     As Apollo correctly points out, plaintiff made no attempt

to satisfy either of those two prongs.  It is readily apparent that

plaintiff's state law claims do not meet the criteria of the first

prong.  Apparently plaintiff is attempting to rely upon the second

prong because it cites to Indiana Elec. Workers Pension Trust Fund

v. Millard, 2007 WL 2141697 (S.D.N.Y. July 25, 2007), where the

court did hold that that prong precluded removal.  Millard is

readily distinguishable, though, in that it included allegations

"that the defendants misrepresented the way the strike prices for L-

3's stock options were calculated in proxy statements sent to

shareholders . . . and that th[o]se misstatements led the

shareholders to authorize the Board to dedicate 6.5 million

additional shares to the stock option plan." Id. at *4.  The

Millard court found that those allegations "relate[d] to

communications concerning a shareholder vote[,]" thus satisfying the

"'voting their security' element of prong (II)." Id. at *8.

     Here, the FAC does not include any such similar allegations

- 131 -

1   pertaining to Apollo's proxy statements.  Accordingly, because

2   plaintiff's fourth and fifth claims based upon state law fall within

3   the ambit of SLUSA, and because these claims are not exempt under

4   the Delaware carve-out to that Act, the court grants defendants'

5   motion to dismiss these state law claims as precluded by SLUSA.

6   Having found that SLUSA clearly bars plaintiff's state law claims,

7   there is no need to address defendants' other proffered reasons for

8   dismissing these state law claims.

9   ***III.  Leave to Amend***

10      If the court grants all or, as it has, any part of defendants'

11  motions to dismiss, plaintiff specifically requests leave to amend

12  its FAC to "address any concerns" which the court "identifie[s][.]"

13  Resp. (doc. 94) at 56.  In seeking leave to amend, plaintiff

14  stresses that where, as here, a responsive pleading has not yet been

15  filed, a plaintiff "may amend its pleading once as a matter of

16  course[.]" Fed. R. Civ. P. 15(a)(1).

17      Apollo alone is taking the position that the court should not

18  allow plaintiff to amend because this is the second amended

19  complaint and "Lead Counsel had more than one year from the end of

20  the proposed class period until the [FAC] was filed to conduct an

21  investigation[.]" Reply (doc. 97) at 14.  "More importantly," from

22  Apollo's standpoint, is that granting leave to amend would not alter

23  the statute of repose; the preclusive effects of the SLUSA and

24  plaintiff's failure to adequately plead loss causation.  Id.

25  Apollo's position is well taken as to the first two issues, but not

26  as to the third - loss causation -- given the court's finding that

27  plaintiff has sufficiently pled that element.

28      It is beyond cavil that leave to amend "should [be] freely

1  give[n] when justice so requires." Fed. R. Civ. P. 15(a)(2).

2  According to the Ninth Circuit, "[t]his policy is to be applied with

3  extreme liberality." Eminence Capital, supra, 316 F.3d at

4  1052(internal quotation marks and citations omitted). In the

5  seminal case of Foman v. Davis, 371 U.S. 178, 83 S.Ct. 227,

6  9 L.Ed.2d 222 (1962), the Supreme Court specified the following

7  factors which a district court should consider in deciding whether

8  to grant leave to amend:

9  
10              In the absence of any apparent or declared
                reason – such as undue delay, bad faith or dilatory
11              motive on the part of the movant, repeated failure
                to cure deficiencies by amendments previously
                allowed, undue prejudice to the opposing party by
12              virtue of allowance of the amendment, futility of
                amendment, etc. – the leave should, as the rules
                require, be 'freely given.'
13  

14  Id. at 182, 83 S.Ct. 227.

15    "Not all of these factors merit equal weight[]" in a court's

16  analysis, however. Eminence Capital, 316 F.3d at 1052.

17  "[C]onsideration of prejudice to the opposing party . . . carries

18  the greatest weight." Id. (citation omitted). Moreover, "[a]bsent

19  prejudice, or a strong showing of any of the remaining Foman

20  factors, there exists a presumption under Rule 15(a) in favor of

21  granting leave to amend." Id. (emphasis in original) (citation

22  omitted). In a similar vein, the Ninth Circuit has stated that

23  "[a]dherence to these" relatively liberal amendment "principles is

24  especially important in the context of the PSLRA." Id. The Ninth

25  Circuit further cautioned that "we are not operating the world of

26  notice pleadings." Id. Rather, "[i]n this technical and demanding

27  corner of the law, the drafting of a cognizable complaint can be a

28  matter of trial and error." Id.

1    Preliminarily, the court notes that defendants are not
2  claiming any prejudice here, and the court can conceive of none.
3  There also has been no suggestion of bad faith and, again, the court
4  conceives of none.  Likewise, defendants do not contend that
5  amendment would be futile.  As in Cornerstone, supra, the court
6  finds that "[a]mendment may not be futile in this case, as
7  plaintiff's [FAC] contains many of the factual allegations required
8  to plead securities liability against [Apollo] and [some of] the
9  individual defendants."  Cornerstone, 355 F.Supp.2d at 1094.

10    The pleading deficiencies here do not lay "in the raw content
11  of" the FAC, "but in the absence of rigorously particularized
12  allegations in accordance with the PSLRA."  See id.  "While this
13  court regrets the accordingly painstaking effort that was required
14  by this court and [to some extent] by defendants to interpret [the
15  FAC], leave to amend will be granted[]" in accordance with the
16  court's rulings herein and as set forth below.  See id.  Plaintiff
17  is advised, however, that failure to cure the pleading deficiencies
18  identified herein, and failure to comply with the relevant case law
19  in that regard, may well lead to dismissal of these claims in the
20  future.

21  **IV.  Rule 54(b) Certification**

22    Pursuant to Fed. R. Civ. P. 54(b), a district court may direct
23  entry of final judgment, inter alia, "[w]hen an action presents more
24  than one claim for relief . . . or when multiple parties are
25  involved."  Fed. R. Civ. P. 54(b).  In deciding whether entry of
26  final judgment under that Rule is appropriate, the court
27  "must first determine that it has rendered a 'final judgment[.]'"
28  Wood v. GCC Ben, LLC, 422 F.3d 873, 878 (9th Cir. 2005).  That means

1  a decision that is "an ultimate disposition of an individual claim
2  entered in the course of a multiple claims action."  Curtiss-Wright
3  Corp. v. General Elec. Co., 446 U.S. 1, 7, 100 S.Ct. 1460, 64
4  L.Ed.2d 1 (1980) (internal quotation marks and citation omitted).
5  Here, the court has rendered a final disposition as to plaintiff's
6  claims against Messrs. Bachus, Mueller and DeConcini, and Ms.
7  Govenar and Ms. Noone by granting their respective motions to
8  dismiss all claims against them.

9  　　　Next, as Rule 54(b) requires, the court must "expressly
10 determine[] that there is no just reason for delay."  Fed. R. Civ.
11 P. 54(b).  "It is left to the sound judicial discretion of the
12 district court to determine the 'appropriate' time when each final
13 decision in a multiple claim action is ready for appeal."  Id. at 8,
14 100 S.Ct. 1460.  "This discretion is to be exercised in the interest
15 of sound judicial administration."  Id. (internal quotation marks
16 and citation omitted).

17 　　　Whether there is "no just reason for delay" involves a two-step
18 inquiry – "judicial concerns and "equitable concerns.  See Gregorian
19 v. Izvestia, 871 F.2d 1515, 1519 (9th Cir. 1989).  Succinctly put,
20 "judicial concerns" involve evaluating "the interrelationship of
21 claims so as to prevent piecemeal appeals in cases which should be
22 reviewed only as single units."  Curtiss-Wright, 446 U.S. at 10, 100
23 S.Ct. 1460.  "A judgment should not be certified . . . under Rule
24 54(b) when 'the facts on all claims and issues entirely overlap and
25 successive appeals are essentially inevitable.'"  Robinson v. De la
26 Vega, 2008 WL 4748171, at *2 (S.D.Cal. Oct. 24, 2008) (quoting Wood,
27 422 F.3d at 883) (emphasis added).  "Thus, the trial court must
28 consider whether: 1)  certification would result in unnecessary

1  appellate review; 2) the claims finally adjudicated were separate,
2  distinct, and independent of any other claims; 3) review of the
3  adjudicated claims would be mooted by any future developments in the
4  case; and 4) an appellate court would have to decide the same issue
5  more than once even if there were subsequent appeals." Id. (citing
6  Wood, 422 F.3d at 879).

7       There is some commonality among the claims against the remaining
8  defendants and the adjudicated claims of the defendants listed
9  above.  On balance, however, and focusing upon "severability and
10 efficient judicial administration[,]" Wood, 422 F.3d at 880,  the
11 court finds that the dismissed claims are "sufficiently separate and
12 distinct" from plaintiff's remaining claims so as to warrant entry
13 of final judgment as to defendants Bachus; Govenar; Mueller;
14 DeConcini; and Noone.  See Ahmadi v. Chertoff, 2008 WL 1886001, at
15 *6 (N.D.Cal. April 25, 2008).  Moreover, the facts on all claims and
16 issues certainly do not "entirely overlap."  Given that the claims
17 of the just listed defendants are easily severable from those of the
18 remaining defendants, the court finds that in the interest of
19 efficient judicial administration, judgment under Rule 54(b) is
20 appropriate here.

21      Assessing the equities, the court sees no just reason for
22 delaying an appeal as to the defendants listed in the preceding
23 paragraph.  Given the already protracted nature of this action,
24 prejudice would result to those defendants if they were forced to
25 await the final resolution of this action.  Moreover, the court
26 cannot ignore the fact that litigation of this kind is costly, both
27 from a monetary and an emotional standpoint.  Given those costs and
28 the resultant prejudice, the equities weigh heavily in favor of

1    allowing defendants Bachus, Govenar, Mueller, DeConcini, and Noone,

2    to have finality sooner rather than later.  Thus, the court finds

3    that judgment should be entered as to the above named defendants as

4    Rule 54(b) allows.

5                                 ***Conclusion***

6        For the reasons set forth above, IT IS ORDERED that the motion

7    to dismiss by defendant Apollo Group, Inc. (doc. 81) and the

8    individual defendants (doc. 82) is GRANTED in part and DENIED in

9    part:

10               (1)  defendants' motions are GRANTED to the extent
                 plaintiff's claims are based on statements outside the
11               statute of repose (*i.e.*, prior to November 2, 2001);

12               (2)  defendants motions are GRANTED on statute of
                 limitations grounds to the extent plaintiff is alleging
13               stock option backdating for grants on December 18, 1998;
                 April 19, 1999; January 12, 2000; December 15, 2000; and
14               September 21, 2001;

15               (3)  GRANTS with prejudice the motion to dismiss the §10(b)
                 and Rule 10b-5 claim against defendants Daniel E. Bachus;
16               Dino J. DeConcini; Hedy Govenar; Brian E. Mueller; and
                 Laura Noone;
17
                 (4)  GRANTS without prejudice the motion to dismiss the §
18               10(b) and Rule 10b-5 claim against defendants John G.
                 Sperling and Peter Sperling;
19
                 (5)  DENIES the motion to dismiss the § 10(b) and Rule 10b-
20               5 claims against defendants Todd S. Nelson; Kenda B.
                 Gonzales; John R. Norton III; John Blair; and the Apollo
21               Group, Inc.;

22               (6)  GRANTS with prejudice the motion to dismiss the
                 §20A(a)insider trading claim against defendants Daniel E.
23               Bachus; Dino J. DeConcini; Hedy Govenar; and Laura Noone;

24               (7)  GRANTS without prejudice the motion to dismiss the §
                 20A(a) insider trading claim against defendants John G.
25               Sperling and Peter Sperling;

26               (8)  DENIES the motion to dismiss the § 20A(a) insider
                 trading claim against defendant Todd S. Nelson; Kenda B.
27               Gonzales; John R. Norton III; and John Blair;

28               (9)  GRANTS with prejudice the motion to dismiss the §20a

                                    - 137 -

1    control person liability claims against defendants Daniel
     E. Bachus; Dino J. DeConcini; Hedy Govenar; Brian E.
2    Mueller; and Laura Noone;

3    (10) GRANTS without prejudice the motion to dismiss the §
     20a control person liability claim against defendants John
4    G. Sperling and Peter Sperling;

5    (11)  DENIES the motion to dismiss the § 20a control person
     liability claim against defendants Todd S. Nelson, Kenda B.
6    Gonzales; John R. Norton III; John Blair; and the Apollo
     Group, Inc.;
7
     (12)  GRANTS with prejudice defendants' motion to dismiss
8    the state law claim "For Breach of Fiduciary Duty and/or
     Aiding and Abetting[;]"
9
     (13)  GRANTS with prejudice the motion to dismiss the state
10   law claims for "Civil Conspiracy to Commit Fraud" by
     defendants Todd S. Nelson; John Blair; John R. Norton III;
11   Kenda B. Gonzales; Daniel E. Bachus; and Brian E. Mueller;

12   (14) GRANTS plaintiff's "request" for leave, if it so
     desires, to further amend its complaint and to file a
13   second amended complaint within thirty (30) days of the
     entry of this order as to defendants Apollo Group, Inc.;
14   John G. Sperling; Todd S. Nelson; Kenda B. Gonzales; John
     Blair; John R. Norton III; and Peter Sperling; and
15
         IT IS FURTHER ORDERED that pursuant to Fed. R. Civ. P. 54(b),
16
   the Clerk of the Court is hereby directed to enter judgment in favor
17
   of defendants Daniel E. Bachus; Hedy Govenar; Brian E. Mueller; Dino
18
   J. DeConcini; and Laura Noone.
19
         DATED this 27th day of March, 2009.
20

21

22

23   _____
     Robert C. Broomfield
24   Senior United States District Judge

25

26

27

28   Copies to all counsel of record