1   WO

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                      FOR THE DISTRICT OF ARIZONA

9

10

11

12   Teamsters Local 617 Pension    )
     and Welfare Funds, on behalf   )
13   of itself and all others       )      No. CIV 06-02674-PHX-RCB
     similarly situated,            )
14                                  )
                     Plaintiff      )        O R D E R
15                                  )
              vs.                   )
16                                  )
     Apollo Group, Inc., *et al.*,  )
17                                  )
     _____Defendants.____)
18

19        Currently pending before the court in this securities fraud

20   action are motions to dismiss the second amended complaint ("SAC")

21   for failure to state a claim pursuant to FED.R.CIV.P. 12(b)(6) by

22   defendant Apollo Group, Inc. ("Apollo") (Doc. 122); and by the

23   individual defendants John G. Sperling, Todd S. Nelson, Kenda B.

24   Gonzales, Daniel E. Bachus, John Blair, John R. Norton III, Hedy

25   Govenar, Brian E. Mueller, Dino J. DeConcini, Peter Sperling, and

26   Laura Palmer Noone ("the individuals" or "the individual

27

28

1  defendants")[1] (Doc. 120).  If the court denies their motion to

2  dismiss, alternatively, pursuant to FED.R.CIV.P. 12(f), the

3  individual defendants are moving to strike allegations which this

4  court previously dismissed or found insufficient as a matter of law

5  in Teamsters Local 617 Pension & Welfare Funds v. Apollo Group,

6  Inc., 633 F.Supp.2d 763 (D.Ariz. 2009) ("Apollo I").[2]  Oral

7  argument will not aid the court's decisional process, hence the

8  court denies the parties' requests in that regard.[3]  See

9

10      [1]      The individual defendants explicitly "join in and . . . incorporate by
   reference" Apollo's motion to dismiss and supporting memorandum, as well as
11  "join[ing]" in Apollo's reply.  Defs'. Mot. (Doc. 120) at 1:28, n.1; Defs'. Reply
   (Doc. 133) at 1:28, n.1.  Likewise, Apollo specifically "adopts and incorporates
12  the Individual[s'] . . . motion to dismiss and to strike[,]" as well as their
   reply.  Apollo Mot. (Doc. 122) at 1:4-5 (footnote omitted); and Apollo Reply (Doc.
13  132) at 1:2-3 (footnote omitted).  Thus, unless necessary to distinguish among
   them, Apollo and the individual defendants will be collectively referred to
   throughout as "the defendants."

14      [2]      In Teamsters Local 617 Pension and Welfare Fund v. Apollo Group, Inc.,
15  609 F.Supp.2d 959 (D.Ariz. 2010) ("Apollo II"), granted plaintiff's motion for
   reconsideration in part, and vacated in part the previously entered judgment.

16      [3]      The court will briefly address the parties' respective Requests for
17  Judicial Notice ("RJN") (Docs. 121; 123; and 131).  These Requests need not detain
   the court for long because they are unopposed, and in securities litigation courts
   routinely take judicial notice of the types of documents which these RJNs list.

18
       The majority of the documents which are the subject of these RJNs pertain to
19  various Securities and Exchange Commission ("SEC") filings.  All three RJNs include
   Form 10-Ks and Form 4 SEC filings.  Such SEC filings are properly subject to
20  judicial notice.  See Apollo I, 633 F.Supp.2d at 776-77; see also Metzler Inv. GMBH
   v. Corinthian Colleges, Inc., 540 F.3d 1049, 1064 n. 7 (9th Cir. 2008) (citation
21  omitted) ("proper" for district court to take judicial notice of defendant's "SEC
   filings[]").  The court reiterates that:

22            [I]t only is taking judicial notice of the content of these
              various SEC filings, and the fact that they were filed with the
23            agency. . . . The truth of the content, and the inferences
              properly drawn from them, however, is not a proper subject of
24            judicial notice under Rule 201.

25  Id. at 776 (citations and internal quotation marks omitted).

26       Further, this court will take judicial notice of the complaint filed in Alaska
   Electrical Pension Fund v. Sperling et al., No. 2:06-cv-02124-ROS (Doc. 125-5), as
27  it is a matter of public record.  See Lauter v. Anoufrieva, 642 F.Supp.2d 1060, 1077
   (C.D.Cal. 2009) (citing cases).

28       Pursuant to the incorporation by reference principles outlined in Apollo I,
   633 F.Supp.2d at 775, to the extent necessary to resolve these motions, the court

1   FED.R.CIV.P. 78(b).

2   ***I.   Overview of SAC***

3        The SAC sets forth three separate securities fraud claims.

4   The first is for an alleged violation of § 10(b) of the Securities

5   and Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), as

6   amended by the Private Securities Litigation Reform Act of 1995

7   ("the PSLRA"), and Rule 10b-5 promulgated thereunder, 17 C.F.R.

8   § 240.10b-5 (the "section 10(b) claims").  Whereas the FAC named

9   Apollo and all 11 individuals as defendants in that section 10(b)

10  claim, the SAC now limits those defendants to Apollo and four of

11  the previously named individuals.  Those individuals are: (1) John

12  Blair, an Apollo director from September 2000 until his resignation

13  in May 2007, and "Chairman of the Audit Committee" and "a member of

14  the Compensation Committee[;]" (2) Kenda B. Gonzales, Apollo's

15  "CFO, Secretary and Treasurer . . . from October 1998 until"

16  allegedly "she was forced to resign in November 2006 because of her

17  involvement in stock option backdating at Apollo[;]" (3) Todd S.

18  Nelson, who "was until 2006" variously Apollo's "Chairman, CEO and

19  President[;]" and (4) John R. Norton III, an Apollo director during

20

21  will consider the SAC's 40 attached exhibits.  That doctrine also allows the court
    to consider documents referenced in the SAC, but not attached thereto.  See id.

22  Here, those documents include the September 19, 2006, letter by SEC's Chief
    Accountant; the Bloomberg Transcript of Apollo's "Q1 2005 Earnings Call[;]" and the
    historical trading prices for Apollo stock from January 1, 1998 through December 31,

23  2007, downloaded from *Yahoo! Finance* (http://finance.yahoo.com) ("Apollo stock
    chart"). The Apollo I stock chart did not include trading dates between January 1,
    2002 and December 31, 2005.  The present chart closes that gap.  In sum, the SAC

24  references the foregoing documents, and no party is questioning their authenticity.
    The court will, therefore, take these documents into account to the extent necessary

25  to resolve these motions.

26       In accordance with FED. R. Evid. 201, the court also takes judicial notice of
    the "print out from Bloomberg Finance L.P., documenting the market price of Apollo's

27  common stock from January 2, 2003 until August 31, 2004" (RJN (Doc. 121) at 1:7-8).
    See id. at 776 (citing Metzler, 540 F.3d at 1064 n. 7) ("Rule 201 . . . provides an

28  alternative means by which the court can consider Apollo's SEC filings, reported
    stock price history, and . . . other publicly available financial documents[.]")

the relevant time frame, and "a member of the Audit Committee" and "Chairman of the Compensation Committee[.]" SAC (Doc. 112) at 8:4 and 8:5-6, ¶ 21; 7:18-20, ¶ 19; 7:8, ¶ 18; and at 8:11 and 13, ¶ 22.

After first alleging "defendants' duties with respect to granting and approving stock options[,]" the SAC devotes its next section to "backdated stock option grants at Apollo[.]" Id. at 13:6 (emphasis omitted).  The court previously granted defendants' motion "to dismiss as untimely any claims based upon backdating itself with respect to the five option grants" alleged in the FAC. Apollo I, 633 F.Supp.2d at 781.  Yet, the SAC includes precisely those same five grant allegations and adds a sixth grant date -- October 20, 2003.  The next section of the SAC enumerates "defendant's false and misleading statements issued during the class period[.]" Id. at 20:3 (emphasis omitted) (footnote added). Compared to the FAC, the SAC more than doubles the number of those statements, from 26 to 54.

The SAC's second and third claims for relief are not nearly as expansive as its first.  In the second, in contrast to the FAC which alleged insider or contemporaneous trading in violation of section 20A of the Exchange Act by all defendants, the SAC names only defendant Blair in this claim.  Just like the FAC though, the SAC's third claim for relief alleges "control person" liability against all defendants pursuant to section 20(a) of the Exchange Act.

. . .

1  ## II.  Section 10(b) Claim[4]

2     "Section 10(b) of the Securities Exchange Act makes it unlawful

3  for any person to 'use or employ, in connection with the purchase or

4  sale of any security . . . any manipulative or deceptive device or

5  contrivance in contravention of such rules and regulations as the

6  Commission may prescribe as necessary or appropriate in the public

7  interest or for the protection of investors.'"  Matrixx Initiatives,

8  Inc. v. Siracusano, ___ S.Ct. ___, 2011 WL 977060, at *7 (U.S. March

9  22, 2011) (quoting 15 U.S.C. § 78j(b)).  "SEC Rule 10b-5 implements

10 this provision by making it unlawful to, among other things, 'make

11 any untrue statement of a material fact or to omit to state a

12 material fact necessary in order to make the statements made, in the

13 light of the circumstances under which they were made, not

14 misleading.'"  Id. (quoting 17 CFR § 240.10b-5(b)).  The Supreme

15 Court has "implied a private cause of action from the text and

16 purpose of § 10(b)."  Id. (citing Tellabs, Inc. v. Makor Issues &

17 Rights, Ltd., 551 U.S. 308, 318, 127 S.Ct. 2499, 168 L.Ed.2d 179

18 (2007)).  "'In a typical § 10(b) private action a plaintiff must

19 prove (1) a material misrepresentation or omission by the

20 defendant[5]; (2) scienter; (3) a connection between the

21 misrepresentation or omission and the purchase or sale of a

---

23     [4]    Previously this court articulated the general Rule 12(b)(6) standards, as well as the dual pleading standards of the PSLRA and Rule 9(b) which apply to

24 a section 10(b) claim.  See Apollo I, 633 F.Supp.2d at 778-780; 783-784; and 787-789.  The court will apply those same standards in evaluating defendants' current motions to dismiss.  Apart from form, there are a number of similarities between

25 the FAC and the SAC.  Hence, the court incorporates by reference the "Overview of Allegations" in Apollo I, 633 F.Supp.2d at 770-775.  Other allegations will be

26 fully developed herein as necessary to resolve the pending motions.

27     [5]    In a shortened form, this is sometimes referred to as the "falsity"

28 element.  See N.Y. State Teachers' Retirement Sys. v. Fremont Gen. Corp., 2009 WL 3112574, at *2 (C.D.Cal. Sept. 25, 2009).

1  security; (4) reliance upon the misrepresentation or omission;
2  (5)economic loss; and (6) loss causation.'"   In Re Oracle Corp. Sec.
3  Litig., 627 F.3d 376, 387 (9th Cir. 2010) (quoting Stoneridge Inv.
4  Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 156, 128
5  S.Ct. 761, 169 L.Ed.2d 627 (2008) (citation omitted)).

6       In arguing that the SAC fails to state a section 10(b) claim,
7  the defendants broadly assert that the SAC does not plead backdating
8  with particularity.   Separately analyzing the newly added October
9  20, 2003 grants, defendants then turn to the sufficiency of all six
10  grants, include the five original grants which the SAC re-alleges.
11  Next, defendants argue that the SAC's "false and misleading
12  statements" do not satisfy the particularity requirements of Rule
13  9(b) and the PSLRA.   Defendants further contend that the SAC does
14  not adequately plead scienter or loss causation.   The court will
15  address these issues seriatim.

16       ***A.  October 20, 2003 Grants***

17       Paragraph 44 of the SAC adds a new grant date – October 20,
18  2003.   More specifically, the SAC alleges that "[d]efendants dated
19  certain of Apollo's 2003 grants on" that date "at $60.90 per
20  share[.]" SAC (Doc. 112) at 19:2-3, ¶ 44.   Allegedly that share
21  price was **not only the low of the month but also the low for the**
22  **entire year.**"   Id. at 19:3, ¶ 44.   Defendants John Sperling, Nelson,
23  Gonzales, and Noone allegedly received options at that price.   The
24  SAC alleges that "Carroll" received 20,000 options dated October 20,
25  2003, and that he is a defendant.   See id. at 19:5-6; and 25, ¶ 44.
26  The record shows that Mr. Carroll filed a Form 4 on October 22, 2003
27  for 20,000 options at a price of $60.90 per share.   Farrell Decl'n
28  (Doc. 124), exh. 8 thereto.   Other than this paragraph, Carroll's

1  name does not appear anywhere else in the SAC.  The caption does not

2  list him as a defendant; nor is he including the in SAC's

3  enumeration of "parties."[6]   In any event, of the six identified

4  grants, this is the only one alleging a "**2 Day Return**[.]" <u>Id.</u> at

5  19:21-22, ¶ 44.

6      Defendants argue that there are "insufficient" allegations in

7  the SAC as to that grant date "to raise any reasonable inference

8  that [it] was backdated."  Defs.' Mot. (Doc. 120) at 4:20.

9  Defendants offer two reasons as to why a reasonable inference of

10 backdating cannot be drawn as to those October 20th grants.  First,

11 those grants were publicly disclosed by the timely filing of Form 4s

12 with the SEC.  Second, despite what the SAC alleges, those grants

13 were not made at "***the low for the entire year***."  <u>See</u> SAC (Doc. 112)

14 at 16:3, ¶ 44.  Disagreeing as to the impact of the timely reporting

15 to the SEC, plaintiff maintains that such reporting "simply

16 restricts [the] backdating to two days."  Resp. (Doc. 129) at 22:7-8

17 (citations omitted).

18           ***1. Form 4 SEC Filings***

19      Pursuant to section 16(a) of the Exchange Act, "[i]nitial

20 statements of beneficial ownership of equity securities" must be

21 filed with the SEC on a Form 3, whereas "[s]tatements of changes in

22 beneficial ownership" must be filed on a Form 4.  <u>See</u> 17 C.F.R.

23 § 240.16a-3(a); <u>see</u> <u>also</u> 15 U.S.C. § 78p(a).  "On August 29, 2002,

24 Congress passed the Sarbanes-Oxley Act [("SOX")], which instituted

25

26        [6]    That is not the only inconsistency in the SAC's allegations as to the
27 October 20, 2003 grants. The associated chart indicates that defendant Bachus,
   among others,  received such options, but, in contrast to John Sperling, Nelson,
   Gonzales and Noone, there are no specific allegations preceding that chart as to
28 Bachus' actual receipt of such options.

1  new reporting requirements for stock option grants." <u>U.S. v.</u>

2  <u>Shanahan</u>, 2008 WL 2225731, at *6 (E.D.Mo. 2008).  That Act

3  significantly decreased the filing time for employees who received a

4  stock option grant, making "a company's ability to fraudulently

5  backdate option grants . . . much more difficult." <u>Id.</u> (citation

6  omitted).

7      Prior to SOX, "an employee who received a stock option grant

8  had to file financial forms with the SEC within forty-five days

9  after the company's fiscal year end." <u>Id.</u>  But after SOX, those

10  forms must be filed with the SEC "before the end of the second

11  business day" following the transaction.  15 U.S.C. § 78p(a)(2)(C).

12  Therefore, "[b]ackdaters must now work with the two-day window plus

13  the one or more late days they think will be overlooked." <u>In re</u>

14  <u>Zoran Corp. Derivative Litig.</u>, 511 F.Supp.2d 986, 1006 (N.D.Cal.

15  2007).  Or, as the <u>Zoran</u> court colloquially put it, "[t]he Form 4

16  requirement has cramped [management's] style." <u>Id.</u>  "Management no

17  longer has the latitude to backdate as far back." <u>Id.</u>

18      There is no dispute here that the Form 4s were timely filed as

19  to the October 20, 2003 grant.  <u>See</u> Farrell Decl'n (Doc. 124), exhs.

20  7-13 thereto.  Rather, the dispute centers on the impact of those

21  filings upon plaintiff's theory that those particular grants were

22  the product of intentional backdating.  Defendants argue that due to

23  the timely filing of the Form 4s, plaintiff has failed to state a

24  section 10(b) claim based upon the October 20, 2003 grants.  They

25  reason that any "inference of backdating is entirely undermined by"

26  the timely filing of those Form 4s.  Defs'. Mot. (Doc. 120) at 4:21;

27  <u>see also</u>  Apollo Mot. (Doc. 122) at 8:5-6 (emphasis omitted)

28  ("contemporaneously filed Form 4s prove that the October 20, 2003

1   grant date was not retroactively selected").

2        On the other hand, plaintiff counters that "a timely filed Form
3   4 does not eliminate the possibility of backdating, but simply
4   restricts such backdating to two days."  Resp. (Doc. 129) at 22:6-8
5   (citations omitted).  Plaintiff reasons that "there is the potential
6   for substantial self-enrichment if a company's stock price increases
7   sharply in [that] day or two" after the filing of the Form 4.  Id.
8   at 22:15-17.  To make this point, plaintiff notes that defendant
9   "Nelson's stock options were $915,000 in the money by the time such
10  options were reported" to the SEC two days later on October 22,
11  2003.  Id. at 22:17-18 (citing SAC (Doc. 112) at ¶ 44).  Thus,
12  plaintiff asserts that the October 20, 2003, grant "further supports
13  an inference of scienter with respect to defendant's backdating[.]"
14  Id. at 23:8-10.  Plaintiff's argument is not convincing.

15       The timely filing of a Form 4 has broader ramifications than
16  "simply restrict[ing] such backdating to two days[,]" as plaintiff
17  urges.  See id. at 22:7-8 (citations omitted).  In re Hansen Natural
18  Corp. Sec. Litig., 527 F.Supp.2d 1142 (C.D.Cal. 2007), to which
19  defendants cite, is illustrative.  One way the plaintiff there
20  alleged scienter was by alleging a scheme to backdate stock option
21  grants.  The court held that such allegations did not give rise to a
22  strong inference of scienter because, *inter alia*, Form 4s "were all
23  filed with the SEC within days" of the challenged grants.  Id. at
24  1156 (emphasis added).  The Hansen court soundly reasoned that the
25  timely filing of Form 4s "corroborates the grant dates, and makes
26  backdating of [stock] options *highly unlikely*[.]"  Id. (emphasis
27  added).  Significantly, the Hansen court found that to be so
28  "*regardless* of the *change* in the *stock price*."  Id. (emphasis added)

1  (citation omitted).  Thus, because the Hansen plaintiffs did not

2  otherwise adequately allege scienter, and because they did not

3  adequately plead materiality or loss causation, the court granted

4  defendants' motion to dismiss.

5       Like here, in In re CNET Networks, Inc. Shareholder Derivative

6  Litig., 483 F.Supp.2d 947 (N.D.Cal. 2007), to which Apollo cites,

7  the directors timely filed Form 4s, and there were no allegations

8  that those Forms were false.  Consequently, the court held that

9  plaintiffs "failed to plead facts that th[e] grant [at issue] and

10 the accompanying returns could not have merely been the product of

11 chance." Id. at 961.  In reaching that conclusion, the CNET court

12 astutely explained:

13           It is highly unlikely that defendants could have
             gone back in time to change the date for this grant
14           if it was on record with the SEC two days after the
             fact. Defendants would not have had time to see what
15           the stock did in the next few days in order to find
             the most advantageous grant date. This does cast doubt
16           on plaintiffs' allegations.

17 Id. at 961.  The CNET court did recognize the "possibl[ity] that as

18 part of the scheme, CNET had adopted a 'wait-and-see' approach

19 toward the timing of options trying to spot periodic low points."

20 Id.  Nonetheless, the court soundly reasoned, "the executives and

21 directors simply could not have known precisely what the stock would

22 do in the coming days.  The ability to go back and change the date

23 to a more fortuitous time is essentially the guts of any backdating

24 scheme." Id.

25      That reasoning applies with equal force here.  As in CNET, the

26 defendants which the SAC alleges received grants dated October 20,

27 2003 at a price of $60.90 per share, John Sperling, Nelson, Gonzales

28 and Noone, all timely filed their Form 4s as to those grants.  See

- 10 -

1   Farrell Decl'n (Doc. 124), exhs. 9 -12.  Also as in <u>CNET</u>, the SAC

2   does not allege that those Form 4s were false.  Moreover, quoting

3   verbatim from the Restatement,[7] the SAC alleges that based upon the

4   timely filed Forms 4 for Section 16 officers, such as Ms. Gonzales,

5   Apollo "generally determined the *original stated grant date* is the

6   *most likely measurement date* for Section 16 Officer grants *after*

7   August 2002."  SAC (Doc. 112) at ¶ 96, 47:12-13 (emphasis added).

8   Also quoting from the Restatement, the SAC further alleges that as

9   to the post-SOX grants to former CEO and a section 10(b) defendant,

10  Todd Nelson, the Restatement "generally concluded the *original*

11  *stated grant date* is the *most likely measurement date* after August

12  2002, based on the history of the filing process for Forms 4 after a

13  grant."  <u>Id.</u> at ¶ 96, 47:26-27 (emphasis added).  These allegations,

14  especially when coupled with the timely filed Form 4s, severely

15  erode a strong inference of scienter to engage in intentional

16  backdating as to the October 20, 2003 grants.

17      <u>Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.</u>, 595

18  F.Supp.2d 1253 (M.D.Fl. 2009), <u>aff'd on other grounds</u>, 594 F.3d 783

19  (11th Cir. 2010), bolsters that conclusion.  There, the complaint

20  merely alleged that "Jabil's Section 16 officers *usually*[,]" filed

21  Forms 4 within two days of the option grant."  <u>Id.</u> at 1275 (citation

22  and internal quotation marks omitted) (emphasis added).  In sharp

23  contrast to the present case, there was nothing before the <u>Jabil</u>

24  court showing that those officers actually timely filed the Form 4s.

25

26          [7]     The SAC repeatedly refers to the "restatement of May 22, 2007[.]" <u>See</u>,

27  <u>e.g.</u>, SAC (Doc. 112) at 20:25, ¶ 48.  For clarification, that Restatement was
    accomplished by and published in Apollo's May 22, 2007 Form 10-K.  <u>See</u> RJN (Doc.

28  126), exh. 19.  So although this decision will continue to refer to the
    Restatement, as does the SAC, it actually means that 2007 Form 10-K.

1  Nonetheless, the court found that because those officers "usually"
2  timely filed Form 4s such filings "*completely undermine*[d] any
3  suspicion otherwise attending any grant after 2001." Id. (emphasis
4  added).  Therefore, the court held that "plaintiffs' allegations of
5  receipt of stock options fail[ed] to support an inference of
6  scienter as to any defendant." Id.

7      The allegations and proof here, as discussed, are even more
8  compelling than in Jabil.  Certainly, if allegations that section 16
9  officers *usually* filed Form 4s "fail[]s to support an inference of
10 scienter," then allegations and proof that defendants Nelson and
11 Gonzales *actually* timely filed Form 4s for the October 20, 2003
12 grants, likewise negates any such inference.

13     Courts have recognized that theoretically it is possible to
14 backdate within the two day window for filing Form 4s, as plaintiff
15 suggests.  Plaintiff overlooks the fact, however, that ultimately
16 those same courts held that backdating was not sufficiently pled as
17 to such grants.  For example, in In re Openwave Systems, Inc.
18 Shareholder Derivative Litigation, 503 F.Supp.2d 1341 (N.D.Cal.
19 2007) ("Openwave I"), the court did remark that "[b]ackdating stock
20 options by two days is still backdating." Id. at 1350.  The court
21 thus found that the timely filed Form 4s "somewhat diminished the
22 ability to infer backdating from the allegations [in the]
23 Complaint[.]" Id. at 1349.  Consequently, the court did recognize
24 that where "the stock price increased in the two days following the
25 grants[,]" those three grants "*may* . . . still support plaintiffs'
26 claims, despite the filing of Forms 4 within two days of the
27 grants." Id. (emphasis added).  Nevertheless, because the
28 "allegations and statistical analyses [we]re simply insufficient, at

- 12 -

1  th[at] point, to allow a reasonable inference of backdating[,]" the

2  court granted nominal defendants' motion to dismiss, albeit with

3  leave to amend.  Id. at 1351.

4      Given the rise in Apollo's stock in the two days after the

5  October 20, 2003, grants plaintiff asserts that Openwave I supports

6  its backdating claim as to those grants.  Plaintiff overlooks that

7  even after amendment, the court in In re Openwave Systems, Inc.,

8  2008 WL 410259 (N.D.Cal. Feb. 12, 2008) (citation omitted)

9  ("Openwave II"), was "not convinced that a one- or two-day window

10  could give defendants enough perspective on the market to

11  intentionally choose the lowest closing prices of the quarter."  Id.

12  at *3 (citation omitted).  For that reason, among others, the court

13  held that "the specific dates . . . in [the] Amended Complaint and

14  Opposition d[id] not suggest backdating."  Id. at *4.  Thus the

15  Openwave II court again granted nominal defendants' motion to

16  dismiss, but it did again allow amendment.  Id. at *7.

17      The same is true here.  The narrow two day window between the

18  October 20, 2003 grants and the timely filed Form 4s would not have

19  "given defendants enough perspective on the market to intentionally

20  choose the lowest closing price" for fiscal year 2004.  See id. at

21  *3 (citation omitted).  This is especially so, as the individual

22  defendants emphasize, because the bulk of that time frame (e.g.,

23  October 22, 2003 through August 31, 2004) took place after the

24  filing of the Form 4s.  Thus, despite what the SAC implies, in

25  picking the October 20, 2003 grant date, for most of the relevant

26  time frame, defendants would not have had the advantage of

27  hindsight.

28      With no analysis, plaintiff also relies upon selective quotes

- 13 -

by the courts in Zoran, 511 F.Supp.2d 986, and Finisar Corp. Derivative Litig., 542 F.Supp.2d 980 (N.D.Cal. 2008) ("Finisar I"). Close examination of those cases reveals that rather than supporting plaintiff's argument, they actually support defendants' position. The Zoran court, too, acknowledged, that "backdating is [not] completely impossible within a two-day window[.]" Zoran, 511 F.Supp.2d at 1006.  But at the same time, that court indicated that "on any given business day, the range of phony dates is restricted to only two for those who file [their Form 4s] on time." Id. at 1066.  Of the six post-SOX grants discussed in Zoran, the court held that plaintiff had not sufficiently pled backdating as to three of those grants solely because, as here, the directors who received those grants timely filed their Form 4s. Id. at 1007 – 1008. Indeed, the only one of the six grants to survive defendants' motion to dismiss in Zoran was the grant where, inter alia, the Form 4s were filed three business days late. Id. at 1008.  Clearly, Zoran does nothing to advance plaintiff's argument herein that it has sufficiently pled backdating as to the October 20, 2003 grants, despite the timely filing with the SEC of the Form 4s.

Plaintiff's reliance upon Finisar I, 542 F.Supp.2d 980, is similarly unavailing.  As plaintiff mentions, the Finisar I court did observe: "The delay in filing a Form 4 with the SEC reporting option grants may support an indication of backdating in that it is theoretically possible to manipulate the grant date during the window between the grant date and the public reporting of the option grant to the SEC." Id. at 994 (citations omitted) (emphasis added). Plaintiff is ignoring both the plain language of that observation and the broader context in which it was made.

1    First, the <u>Finisar I</u> plaintiffs alleged that "of the 12
2  purportedly backdated stock options, the Form 4s related to 9 of
3  them were filed *late*." <u>Id.</u> (citation omitted) (emphasis added).  It
4  is in the context of those allegedly late filed Form 4s that the
5  court made the above observation which the plaintiff herein quotes.
6  Here, there was no delay in the filing of the Form 4s as to the
7  October 20, 2003 grants.  Thus, the <u>Finisar I</u> court's recognition
8  that it is "theoretically possible" to backdate where Form 4s are
9  late, has no bearing on the October 20, 2003 grants at issue where,
10 undisputably, the Form 4s were timely filed.
11   Second, even as to the one grant date in <u>Finisar I</u> where the
12 Form 4s were timely filed, the court found that the totality of
13 plaintiffs' allegations as to those grants did "not support a
14 finding that th[ose] . . . option grants were backdated."  <u>Finisar</u>
15 <u>I</u>, 542 F.Supp.2d at 990.  Moreover, even as to the untimely filed
16 Form 4s, the <u>Finisar I</u> court found that plaintiffs' complaint
17 "otherwise fail[ed] to support a clear showing that th[o]se grants
18 were backdated" because "the allegations d[id] not support a
19 conclusion that the Form 4s were late because the late-reported
20 grants were backdated."  <u>Id.</u> at 994.  The court thus "conclude[d]
21 that, without more, plaintiffs' allegations do not support" a
22 finding "that the 12 grants to directors and officers identified in
23 the complaint were backdated or indicate[d] a pattern of backdating
24 of grants to directors and officers."  <u>Id.</u>  Thus, plaintiff's single
25 quote from <u>Finisar I</u> regarding the "theoretical possib[ility]" of
26 backdating within the two day window for filing with the SEC does
27 not, without more, mandate a finding that backdating occurred as to
28 the October 20, 2003 grants.  Nor does such a possibility warrant a

- 15 -

1    strong inference of scienter to engage in intentional backdating.

2         To salvage the October 20, 2003 grant allegations, plaintiff

3    contends that in its motion "Apollo *admits* that for one grant date,

4    there was in fact a possibility that such grant was backdated by a

5    single day."  Resp. (Doc. 129) at 22:22-23 (emphasis added)

6    (citation omitted).  Based upon that purported "admission,"

7    plaintiff surmises that "[i]t is entirely plausible, and consistent

8    with Apollo's admissions, that on October 21, 2003, [defendant and

9    former CEO] Nelson retroactively selected the October 20 grant date,

10   giving himself almost $1 million of unvested and undisclosed gains,

11   and then reported such grants to the SEC on October 22, 2003."  Id.

12   at 23:5-8.  Notably, the SAC is void of any such allegations.

13   Nonetheless, plaintiff argues that "the 2003 grant only further

14   supports an inference of scienter with respect to defendants'

15   backdating[.]" Id. at 23:8-9.

16        Apollo's supposed admission that for *one* grant date there is a

17   *possibility* of backdating by a *single day* is important for two

18   reasons, plaintiff suggests.  First, it "directly contradicts

19   [defendants'] . . . assertions that backdating within a two-day

20   window would be impossible."  Id. at 23:3-4 (footnote omitted).

21   Second, this purported admission renders "inapplicable" the case law

22   upon which Apollo is relying "for the proposition that backdating by

23   two days would be unlikely[.]  Id. at 23:21-22, n. 8.  Plaintiff's

24   reasoning is based upon the faulty premise that in its motion Apollo

25   admitted backdating; it did not.

26        As plaintiff construes Apollo's motion, it "states 'a grant

27   date may have been retroactively selected for three grants **(one, by**

28   **a day)**.'"  Id. at 22:23 - 23:1 (quoting Mot. (Doc. 122) at 3)

1   (emphasis added by plaintiff).  Quoting from the SAC, which in turn

2   quotes from Apollo's Form 10-K for the period ending August 31,

3   2006, Apollo's motion actually states:

> The Special Committee . . . reported that, after
> analyzing all 100 grants between 1994 and 2006,
> it 'found no direct evidence that the grant dates
> for any of the large Management Grants were selected
> with the benefit of hindsight,' and that of the 100
> grants, *at most, there was a 'possibility' that a* grant
> date *may* have been retroactively selected for three
> grants (one, by a day), **but there 'was insufficient
> evidence to reach such a conclusion.'**"

9   Defs'. Mot. (Doc. 122) at 3:22-24 (quoting SAC at ¶ 96 and citing

10  Farrell Decl'n (Doc. 126), exh. 19 thereto at 50) (emphases added).

11  By omitting the phrases in italics and bold font, and disregarding

12  the equivocal nature of that statement as a whole,  plaintiff

13  mischaracterizes Apollo's motion as containing an "admission" of

14  backdating when it does not.

15      Additionally, the same SEC filing which forms the basis for the

16  SAC's allegation that "another grant . . . may have been

17  retroactively selected by a day," also alleges that for grants such

18  as the October 20, 2003 grant, where Form 4s were timely filed, "the

19  *original stated grant date* is the *most likely measurement date*[.]"

20  SAC (Doc. 112) at ¶ 96, 47:12-13; and 47:26-27 (emphasis added).

21  Therefore, the SEC filing "that raises questions whether another

22  grant (in addition to the two grants referenced in a previous Form

23  8-K dated November 6, 2006), may have been retroactively selected by

24  a day," cannot be referring to the October 20, 2003 grants.  See id.

25  at ¶ 96, 44:18-20.  For these reasons, the court finds no merit to

26  plaintiff's argument that in its motion Apollo admitted backdating.

27  That contrived admission therefore does not cure the SAC's pleading

28  deficiencies as to the October 20, 2003 grants.

1    It is clear to this court, as it has been to others, that it is

2  "theoretically possible" to backdate even within the narrow two day

3  window between the grant date and the filing of the Form 4 with the

4  SEC.   See Finisar I, 542 F.Supp.2d at 994 (citing cases).

5  Undoubtedly, it takes more than the "theoretical possibility" of

6  backdating to survive a motion to dismiss.   The allegations in the

7  SAC pertaining to the October 20, 2003 grants do not support a

8  strong inference of scienter to backdate those grants, especially as

9  discussed, taking into account the timely filing of the Form 4s as

10 to those grants.   The timely filing of those Forms is not the only

11 factor undermining plaintiff's reliance upon that grant date, as

12 discussed next.

13             **2.  Time Frame**

14    The SAC alleges in relevant part that:

15             Defendants dated certain of Apollo's 2003 option
             grants on October 20, 2003 at $60.90 per share –

16           **not only the low of the month but also the low for the
             entire year.**  The stock traded as high as $68.51 per

17           share in October and as high as $97.93 per share in the
             [sic] 2003.

18

19 SAC (Doc. 112) at 19:2-5, ¶ 44 (underline emphasis added).

20 Defendants assert that the allegation that the October 20th

21 "grant[s] w[ere] made at 'the low of the entire year' is

22 contrived[,]" further undermining any inference of backdating as to

23 those grants.   See Defs'. Mot. (Doc. 120) at 5:12-13.   Reconciling

24 paragraph 44 with Apollo's stock chart, defendants explain that the

25 alleged $60.90 price per share "purportedly" would be "the low for

26 fiscal year 2004, which ran from September 1, 2003 until August 31,

27 2004."  Mot. (Doc. 120) at 5: 16-17 (citations omitted) (emphasis in

28 original).   Defendants stress that they "could not have used

- 18 -

1  hindsight for most of th[at] time period[]" though "because most of

2  [it] (e.g., from October 22, 2003 until August 31, 2004), took place

3  **after** the grant was reported to the SEC."   Id. at 5:18-20 (emphasis

4  in original).   Defendants thus claim that plaintiff is

5  "manipulat[ing] the time period to make the [October 20, 2003]

6  grant[s] appear more improbable."   Id. at 5:20-21.

7        Assuming that paragraph 44 is referring to calendar year 2003,[8]

8  Apollo similarly argues that that paragraph contains two "false"

9  allegations.   Apollo's Mot. (Doc. 122) at 7:24.   First, Apollo

10 points out that because its "stock closed lower on 116 of the 252

11 trading days in 2003 (46% of the time)[,]" id. at 7:24-25 (citation

12 omitted), and because its "average closing price in 2003 was

13 $58.26[,]" id. at 8:1, the allegation that the October 20, 2003

14

15            [8]    On its face, the SAC does not indicate whether the allegations as to

16 the other five grant dates are referring to calendar or fiscal years.   Apollo's
   assumption that the SAC is referring to calendar years is reasonable though because
17 those other five grant date allegations comport with Apollo's stock chart only if
   they are read as referring to calendar years  - not fiscal years.

18         For example, the SAC alleges that the grants dated December 15, 2000, "at
   $14.84 per share (split adjusted)" were, inter alia, "**the low for the fourth**
19 **quarter of 2000.**"   SAC (Doc. 112) at 16:23-24, ¶ 42.   The SAC further alleges that
   Apollo's stock "hit its high for the year at $22.14 per share . . . on December 28,
20 2000[.]"  Id. at 16:28-17:1, ¶ 42 (emphasis added).   Only if those allegations are
   read as referring to calendar year 2000 do they correspond to Apollo's stock chart.
21         The same is true of the January 12, 2000 grant allegations.   The allegations
   of $8.39 per share as the "**low of the year**[,]" and $22.14 per share as the "high
22 . . . during the year[,]" only correlate to Apollo's stock chart if "year" refers
   to calendar year 2000.   See id. at 15:20-22, ¶ 41.
23         With respect to the September 21, 2001 grants, the SAC alleges that "at
   $23.33 per share" those grants were "**the low for the second half of 2001.**"   Id. at
24 17:26-27 - 18:1, ¶ 43.   Again, that allegation correlates to Apollo's stock chart
   only if it is referring to the 2001 calendar year.   However, if the SAC is
   referring to fiscal year 2001, the alleged "low for the second half of 2001" would
25 be inaccurate because Apollo's stock traded at less than $23.33 per share numerous
   times during that time frame.   See Farrell Decl'n (Doc. 125), exh. 20 thereto at
26 15-20.   Regardless, $23.33 could not be the low for fiscal year 2001 because
   September 21, 2001 does not fall within that fiscal year.   Thus, the SAC's
   allegations as to the September 21, 2001 grants also comport with Apollo's stock
27 chart only if "**the second half of 2001**[]" means calendar year 2001.   Neither the
   court nor the defendants should have to go through this exacting exercise to
28 ascertain whether the SAC's grant allegations are based upon a calendar or a fiscal
   year, however.

1  grant was the "'low for the entire year'" is "false."  Id. at 7:24.

2  Next, Apollo argues that because "[t]he highest closing price [in

3  the 2003 calendar] year was $72.72 on December 2, 2003, $25 lower

4  than what Plaintiff alleges[,]" id. at 8:2-3 (citation omitted), the

5  SAC falsely alleges that its "'stock traded . . . as high as $97.93

6  per share in the [sic] 2003.'" Id. at 7:22-23 (quoting SAC (Doc.

7  112) at ¶ 44) (sic added by Apollo).

8       Based upon the foregoing, Apollo contends that the SAC's

9  "description of the October 20, 2003 grant is replete with

10 errors[.]"  Id. at 7:17 (emphasis omitted).  The court agrees, and

11 finds that those errors, taken together with the timely filing of

12 the Form 4s, "undermin[e] any claim of intentional 'backdating'" as

13 to the October 20, 2003 grants.  See id. at 7:17-18 (emphasis

14 omitted).

15      Attempting to clarify matters, plaintiff acknowledges an

16 unspecified "inadvertent omission of the word 'fiscal' in the

17 [SAC][.]" Resp. (Doc. 129) at 21, n. 6.  Significantly, inserting

18 "fiscal" into paragraph 44 does not rectify the ambiguity

19 surrounding the phrases "entire year" or "the [sic] 2003." See SAC

20 (Doc. 112) at 19:3 and 5, ¶ 44.  Based upon Apollo's stock chart,

21 the allegation of "$60.90 per share" as **the low [price] for the**

22 **entire year**[]" is only accurate if paragraph 44 is referring to

23 fiscal year 2004, as earlier noted.  See Farrell Decl'n (Doc. 125),

24 exh. 20 thereto at 29-34.  Further, paragraph 44 pertains strictly

25 to "**2003 Stock Options**[;]" it does not mention 2004 – either as a

26 calendar or a fiscal year.  SAC (Doc. 112) at 19:1.  So, despite

27 plaintiff's urging, paragraph 44 cannot be made consistent with

28 Apollo's stock chart by merely inserting the word "fiscal."

1    Plaintiff compounds the confusion as to the exact meaning of
2  the time frames paragraph 44 alleges by stating that "the
3  individual[s] . . . correctly recognized [] the strike price on
4  October 20, 2003, $60.90, was the lowest price that Apollo's stock
5  traded during the entire 2003 *fiscal* year."  Resp. (Doc. 129) at
6  21:25, n. 6 (underlined emphasis added).  That misstates the
7  individual defendants' position; they did not recognize that $60.90
8  was the lowest trading price of fiscal year 2003.  Indeed, Apollo's
9  stock chart shows that during fiscal year 2003 the trading price for
10 its stock fell well below $60.90 to a low of $40.10 on December 13,
11 2002.  See Farrell Decl'n (Doc. 125), exh. 20 thereto at 26.
12 Instead, as defendants already clarified, and as Apollo's stock
13 chart reflects, that $60.90 was "purportedly . . . the low for
14 *fiscal* year **2004**[.]" Defs'. Mot. (Doc. 120) at 5:16 (bold emphasis
15 added).

16   Paragraph 44's allegation that Apollo stock traded "as high as
17 $97.93 per share in the [sic] **2003**[]" adds yet another layer of
18 confusion.  See SAC (Doc. 112) at 19:4-5, ¶ 44 (emphasis added).
19 Regardless of whether that allegation is referring to the 2003
20 fiscal *or* calendar year, still, it does not comport with Apollo's
21 stock chart.  Scrutinizing that chart reveals that $97.93 per share
22 was the high for fiscal year 2004.  See Farrell Decl'n (Doc. 125),
23 exh. 20 thereto at 33.  As already mentioned though, paragraph 44
24 does not refer to the year 2004 in any form.  Indeed, the SAC limits
25 its specific allegations of backdating stock options to the years
26 from 1998 - 2001, inclusive, and the October 20, 2003 grants.  The
27 foregoing makes the SAC's references to $97.93 per share all the
28 more perplexing.  Defendants strongly insinuate that plaintiff had

- 21 -

1  some nefarious motive in making the allegations in paragraph 44; but
2  it strikes the court that those allegations are nothing more than
3  the product of inexact pleading.

4      In sum, the Apollo stock chart confirms that contrary to the
5  SAC's allegations: (1) $60.90 per share was not the "low for the
6  entire year[]" of 2003 – whether read as a fiscal or calendar year;
7  and (2) Apollo's stock price did not trade "as high as $97.93 per
8  share in . . . 2003[]" – again, whether for that calendar or fiscal
9  year.  See SAC (Doc. 112) at 19:3-4 (emphasis omitted).  Thus, due
10 to the timely filing of Form 4s for each of the alleged October 20,
11 2003 grants, and the factual inaccuracies in paragraph 24 detailed
12 above, the court disagrees with plaintiff; the 2003 grant
13 allegations do not "further support an inference of scienter with
14 respect to defendants' backdating[]" – either from a legal or a
15 factual standpoint.  See Resp. (Doc. 129) at 23:8-9.  Accordingly,
16 plaintiff cannot, as it is seeking to do, rely upon the October 20,
17 2003 grants "as a circumstance contributing to a strong inference of
18 scienter[.]"[9]  See id.  at 20:13.

19      **B.  *Backdating Allegations***

20      Reasoning that because "'backdated' stock option grants[]" are
21 "a necessary predicate to all of Plaintiff's claims," and because
22 the SAC does not allege "*particular facts* to support its conclusion
23 that Apollo 'backdated' stock option grants[,]" defendants argue

24 _____

25      [9]      It is possible to construe the SAC as alleging an independent claim of
26 backdating based upon the October 20, 2003 grants.  Plaintiff disavows that
   construction though, as indicated above.  Presumably this allays Apollo's concern
27 that "Plaintiff is attempting to resuscitate a claim of fraud based on alleged
   backdating of the five time-barred grants[.]" See Apollo Mot. (Doc. 122) at 7:27
28 n. 12.

1   that dismissal is mandated.  Apollo Mot. (Doc. 122) at 13:18-20

2   (emphasis added); see also Defs'. Mot. (Doc. 120) at 7:26-27

3   (dismissal is proper because the SAC does not "plead necessary facts

4   . . . to establish that the six grants were suspicious[]").  In

5   making this argument, defendants claim that the SAC's backdating

6   allegations are "rife with errors[.]" Apollo Reply (Doc. 132) at

7   3:6.

8        Plaintiff's first response to these defense arguments is to

9   distance itself from the backdating aspect of this action.

10  Plaintiff stresses that "[a]s [it] [has] made clear[,] this case is

11  based on defendants' knowingly false and misleading statements about

12  Apollo's financial results and stock option granting practices."

13  Resp. (Doc. 129) at 2010-12 (citations omitted).  Plaintiff thus

14  maintains that in Apollo I, this court "correctly analyzed

15  backdating as contributing to a strong inference of scienter, not an

16  independent claim[,]" and that [n]othing in the [SAC] changes th[at]

17  analysis."  Id. at 20:12-14(citation omitted); and at 20:26.  In

18  light of the foregoing, by challenging the sufficiency of the SAC's

19  backdating allegations, plaintiff asserts that defendants "appear

20  intent on repeatedly advancing rejected theories."  Id. at 19:22

21  (emphasis added).  Plaintiff thus objects to what it views as

22  "renewed attacks on issues this Court has already decided, and . . .

23  issues that were previously raised[.]" Id. at 19:15-16; and 19:18

24  (emphasis added).

25       As plaintiff strongly implies, with a few exceptions not

26  applicable here, the law of the case doctrine precludes

27  consideration of previously resolved issues.  That doctrine "posits

28  that 'when a court decides upon a rule of law, that decision should

- 23 -

1  continue to govern the same issues in subsequent stages in the same
2  case[.]'" <u>United States v. Park Place Assoc., Ltd.</u>, 563 F.3d 907,
3  918 (9th Cir. 2009) (quoting <u>Arizona v. California</u>, 460 U.S. 605,
4  618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983)); <u>see also</u> <u>United States</u>
5  <u>v. Phillips</u>, 367 F.3d 846, 856 (9th Cir. 2004) (footnotes omitted)
6  (emphasis added) ("The law of the case doctrine precludes a court
7  from reconsidering an issue that it has *already resolved*.  Issues
8  that a district court *determines* during pretrial motions become law
9  of the case.")

10      The law of the case doctrine is not as all encompassing as
11 plaintiff urges, however.  It does not preclude a court from
12 subsequently addressing issues that were merely raised before, but
13 not resolved.  "For a prior ruling to become law of the case as to a
14 particular issue, that issue must have been decided explicitly or by
15 necessary implication in the previous disposition." <u>Park Place</u>, 563
16 F.3d at 925 (citations and quotation marks and alteration omitted).
17 Likewise, the "'law of the case' does *not* apply to issues or claims
18 that were *not actually decided*." <u>Mortimer v. Baca</u>, 594 F.3d 714,
19 720 (9th Cir. 2010) (citations and internal quotation marks omitted)
20 (emphasis added).

21      This court held in <u>Apollo I</u> that the five specifically pled
22 grants in the FAC were time-barred.  <u>Apollo I</u>, 633 F.Supp.2d at 782
23 n. 4.  Therefore, the court did not address various defense
24 arguments such as the lack of specificity as to the FAC's "roughly
25 100 unidentified grants[,]" or issues as to the measurement
26 standards for the five grants identified therein.  See <u>Apollo I</u>, 633
27 F.Supp.2d at 782 n.4.  Thus, the law of the case doctrine does not
28 preclude the court from now resolving those previously raised but

- 24 -

1  unresolved defense arguments.

2     Bolstering that conclusion is the fact that the operative

3  complaint now is the SAC, the filing of which this court expressly

4  permitted in Apollo I.  See Apollo I, 633 F.Supp.2d at 834.

5  Although they are similar, there are important differences between

6  the Apollo I complaint and the SAC.  One, as already discussed, is

7  the addition of the October 20, 2003 grant date.   In Apollo I, the

8  court accepted at face value the accuracy of the FAC's allegations

9  pertaining to the five grant dates therein.  The ambiguous,

10  inconsistent and sometimes erroneous allegations of the October 20,

11  2003 grants, however, has magnified the court's concern, *inter alia*,

12  regarding the factual accuracy of allegations as to those same five

13  grant dates.

14     Moreover, despite the slight shift in focus from the FAC, the

15  allegations in the SAC show that a critical part of the alleged

16  fraudulent scheme is backdating.[10]  The SAC explicitly alleges three

17  "circumstances" where "stock option manipulation," *i.e.*, backdating,

18  is "fraudulent[,]" and that "[a]ll three . . . circumstances existed

19  here."  SAC (Doc. 121) at 2:18-19; and 2:22-23.  Indeed, the SAC

20  goes so far as to specifically allege that "defendants' manipulation

21  of Apollo's stock option grants was *the linchpin* of a broader

22  fraudulent scheme[.]"  Id. at 2:26-27, ¶ 6 (emphasis added).   As the

23

24        [10]     The "crux of the fraudulent scheme" in the FAC "was a *practice* whereby
defendants *intentionally manipulated stock option grants* to [Apollo's] officers,
directors and employees in order to provide the recipients with a more profitable
25  exercise price and to under-report [Apollo's] expenses and thereby overstate
[Apollo's] earnings."  FAC (Doc. 71) at 1:10-13, ¶ 2.  Slightly shifting the
emphasis, the SAC now alleges that "the crux of the fraudulent scheme was a
26  *practice* whereby defendants *overstated Apollo's earnings and income* by failing to
report compensation expenses associated with granting in-the-money stock options,
27  which had been intentionally manipulated in order to provide the recipient with a
more profitable exercise price."  SAC (Doc. 112) at 1:9-12, ¶ 2 (emphasis added).

28

1  SAC makes abundantly clear, there are several aspects to the alleged
2  fraudulent scheme and backdating is an integral part of that scheme.
3  Thus, "[b]ecause a § 10(b) claim alleges fraud, Plaintiff[] must
4  plead with particularity the circumstances constituting the
5  fraud[,]'" including, in this case, backdating which is a critical
6  part of the alleged fraudulent scheme.  See In re Washington Mutual
7  Securities Litig., 649 F.Supp.2d 1192, 1207 (W.D.Wash. 2009)
8  (quoting FED.R.CIV.P. 9(b)).  Accordingly, the court will examine
9  the sufficiency of the SAC's backdating allegations because: (1) the
10 operative complaint here differs from that in Apollo I; (2) the
11 issues which these motions now raise were not actually decided in
12 Apollo I; (3) backdating is a critical component of the SAC's
13 alleged fraudulent scheme; (4) and the factual inaccuracies in the
14 October 20, 2003 grant allegations mandate closer examination of the
15 other five grant date allegations.

16     Defendants offer several reasons as to why the specific grant
17 allegations are insufficient.  Some of those reasons pertain to a
18 lack of facts and others pertain to purported errors in the facts as
19 alleged.  Significantly, plaintiff offers very little substantively
20 to refute any of defendants' arguments, as will quickly become
21 evident.

22          ***1.  Measuring Standards***

23     Defendants contend that the SAC uses inconsistent measuring
24 standards "because use of consistent [ones] would undercut
25 Plaintiff's case by showing that not all of the [alleged] grants had
26 positive returns[.]" Apollo Reply (Doc. 132) at 3:10-11 (citation
27 omitted).

28      The SAC, in calculating the return for the six identified

grants, does employ three different return dates.  For the 1998
grants, it uses a ten day return; for the 2003 grants, it uses a two
day return;[11] and for the other four grants, it uses a five day
return.  SAC (Doc. 112) at ¶¶ 39-44.  This lack of internal
consistency is troubling.  If the SAC had used the same five day
return for the December 18, 1998 grants as it did for the other pre-
SOX grants, the result would have been a "5 day return" of nothing
– $0.00.  That is because, as Apollo's stock price reflects, its
stock price closed at the exact same price – $11.39 - on December
18, 1998 and five trading days later, on December 28, 1998.  <u>See</u>
Farrell Decl'n (Doc. 125), exh. 20 thereto at 6.  Similarly, given
that the October 20, 2003 grants were post-SOX, plaintiff's choice
of a two day return does not seem coincidental; but use of a ten or
two day return would also undercut plaintiff's backdating theory
because it would provide returns after the filing of the Form 4s.
The court thus finds that plaintiff's "choice of comparison dates
and prices is inconsistent and therefore arbitrary."  <u>See</u> <u>Nach v.</u>
<u>Baldwin</u>, 2008 WL 410261, at *6 (N.D.Cal. Feb. 12, 2008) (variously
comparing grants with stock prices ten days later; six and five
months later and one month later).

        Even if the SAC had used the same five day return for all six
grants, without any explanatory allegations, it would be
problematic.  <u>Cf.</u> <u>Hansen</u>, 527 F.Supp.2d at 1156 (citation omitted)
("Plaintiff does not explain why a higher stock price on the tenth
day after a stock option grant date is significant, or how it gives

---

        [11]    Use of a two day return date for those 2003 grants is fully consistent
with the fact, as explained herein, that by that time SOX had been enacted, almost,
but not completely eliminating the possibility of backdating.

1   rise to a strong inference of scienter.")   The use of two, five or

2   10 day returns is all the more questionable given the SAC's

3   allegation that "Apollo's stock options typically vested over a four

4   year period."   SAC (Doc. 112) at 20:9, ¶ 46; see In re Finisar

5   Deriv. Litig., 2009 WL 3072882, at *12 (N.D.Cal. Sept. 22, 2009)

6   ("Finisar II") (use of a 20 day return was "uninformative" in part

7   because it was "untethered to any realistic scenario of exercising

8   the options[]").   The seeming arbitrariness or selective nature of

9   those dates is heightened because the SAC's representative sampling

10  of grants is so small.

11       Plaintiff's silence on the issue of inconsistent measurements

12  is deafening.   "By failing to at least meaningfully summarize and

13  combat" this sound defense argument, plaintiff has "essentially

14  abdicated [its] responsibility to rebut defendants' dismissal

15  arguments, and conceded th[is] point."   See   In re Bare Escentuals,

16  Inc. Sec. Litig., 2010 WL 3893622 (N.D.Cal. Sept. 30, 2010).

17              ***2.  Lack of Other Grant Date Allegations***

18       Quoting from the Restatement, the SAC alleges that "'57 of the

19  100 total grants made [between FY94 and September 2006] used

20  incorrect measurement dates for accounting purposes.'" SAC (Doc.

21  112) at 13:8-9, ¶ 37.   The SAC further alleges that "[w]hile many of

22  these grants were not publicly reported, several[12] grants reported

23  in Apollo's Forms 10-K had purported grants dates so improbable that

24  backdating is the only plausible explanation."   Id. at 13:10-12,

25  ¶ 38.   Defendants challenge the fact that, aside from the six grants

26  discussed herein, the SAC does not include any allegations as to the

27  ─────────────────

28       [12]     The FAC had alleged that "some" of those grants had not been "publicly
     reported[.]"  FAC (Doc. 71) at 17:25, ¶ 48.

                                   - 28 -

94 other grants which are the subject of the Restatement.  Instead

the SAC relies upon only six grants (one of which the court has now

found was not backdated).  Defendants thus claim that plaintiff

engaged in "cherry-pick[ing]," relying upon only a few selected

grants to allege backdating.  See Apollo Mot. (Doc. 122) at 9:6.

Plaintiff dismissively replies:

> Far from cherry-picking grants, the [SAC] alleges
> that, between 1998 and 2003, **all but one** (six out
> of seven) of Apollo's stock options reported in
> Apollo's Forms 10-K were backdated. . . This is
> systematic and considered fraudulent conduct by and
> for the benefit of Apollo's most senior executives,
> not 'cherry-picking.'

Resp. (Doc. 129) 25:13-17 (citation and footnote omitted).

Plaintiff then resorts to claiming that "most" of the 100 grants at

issue for purposes of the Restatement "were never publicly

disclosed[.]" Id. at 24:20.  Plaintiff asserts that "even under the

PSLRA, [it] is not required to provide details of improper

transactions known only to the defendants." See id. at 25:6-7.

The supposed lack of publicly available grant details would

carry far more weight if plaintiff had not ignored at least two

other publicly reported grants, which undermine rather than support

its backdating theory.  To illustrate, as the publicly filed Form 4s

indicate, Apollo made grants to defendants Govenar, Norton, Blair

and DeConcini on September 10, 2005.  See Farrell Decl'n (Doc. 125),

exhs. 14-17 thereto.  Apollo's stock chart shows that whether using

a two, five or ten day "return," as in the SAC, Apollo's stock

closed lower, not higher, than that September 10th grant date.  See

id., exh. 20 thereto at 39.  In fact, the "10 day return" there was

a negative 14%.  The same is true of the October 22, 2002 grants to

defendants Noone, Bachus, Peter Sperling, John Sperling, Nelson and

1   Gonzales.   See id., exhs. 1-6 thereto.   Under a two, five, or ten
2   day "return" scenario, those stocks closed lower not higher.   "The
3   '2 day return' was -2.34%; the '5 day return' was -.14% and the '10
4   day return' was -2.62%."   Apollo Mot. (Doc. 122) at 12:5-6.
5   Defendants surmise, and it certainly appears, that plaintiff
6   deliberately chose to ignore these publicly reported grants because
7   they do not conform to its backdating theory.

8        Remarkably, once again plaintiff's response is silent as to
9   this argument.   Plaintiff concedes in its response that it was aware
10  of one such grant, however.   Plaintiff declares that "the [SAC]
11  alleges that, between 1998 and 2003, **all but one** (six out of seven)
12  of Apollo's stock options reported in Apollo's Forms 10-K were
13  backdated, but the SAC does not include any such allegation.   See
14  Resp. (Doc. 129) at 25:13-15 (citing SAC (Doc. 121) at ¶¶ 37-44).
15  Moreover, the SAC is also void of any allegations regarding how many
16  publicly reported stocks there were between 1994 to September 2006.
17  Cf. City of Westland Police and Fire Ret. Sys. v. Sonic Solutions,
18  2009 WL 942182, at *7 (N.D.Cal. April 6, 2009) ("In the absence of
19  further information as to why these fourteen grants are
20  distinguishable from thousands of other grants made by [defendant],
21  these fourteen grants must be viewed as a small unrepresentative
22  sample of all stock option grants.")   "Plaintiff thus appears to
23  focus on a subset of [six] option grants, and . . . fails to explain
24  why this subset is analytically important, and why he has not
25  included data on all grants[,]" including the two other known
26  publicly disclosed grants, "during the relevant time period."   See
27  Nach, 2008 WL 410261, at *5.   In any event, because plaintiff's
28  response wholly disregards the two publicly reported grants which,

- 30 -

1  defendants have shown, undercut plaintiff's backdating theory,
2  plaintiff has "failed to discharge [its] burden to successfully
3  rebut" defendants' arguments and thus "conceded the point."  See
4  Bare Escentuals, 2010 WL 3893622, at *21 and *22.

5       Returning briefly to the claimed lack of publicly disclosed
6  grant data, plaintiff's cited cases bear no resemblance to the
7  present situation.  Hence they do not provide a means to circumvent
8  plaintiff's pleading obligations under either the PSLRA or Rule
9  9(b).  In Pirraglia v. Novell, Inc., 339 F.3d 1181 (10th Cir. 2003),
10 the Tenth Circuit merely held that plaintiff did not have "to
11 describe in detail documents and paperwork that would presumably be
12 kept, if at all, in [defendant's] private files."  Id. at 1193 n.
13 14.  That is far different than the present case where the SAC lacks
14 the necessary specificity to support its backdating allegations, and
15 in fact, disregards available information which detracts that
16 theory.  The manufacturer's complaint in United Technologies Corp.
17 v. Mazer, 556 F.3d 1260 (11th Cir. 2009), contained far more detail
18 than the SAC, to support its claim that the president of the company
19 was acting within the scope of his employment regarding the theft
20 and sale of aircraft blueprints.  The Eleventh Circuit also relied
21 upon the fact that plaintiff was "at a clear informational
22 disadvantage."  Id. at 1273 (emphasis added).  The same cannot be
23 said of the plaintiff herein.

24      Finally, "Rule 9(b) does not permit a party to make conclusory
25 allegations and then," as plaintiff herein strongly implies,
26 "through the discovery process, gain more specific information and
27 amend its pleadings to satisfy the particularity requirement."  See
28 Periguerra v. Meridas Capital, Inc., 2010 WL 395932, at *5 (N.D.Cal.

- 31 -

1 Feb. 1, 2010) (citation omitted).  "Allowing Plaintiff[] to conduct
2 discovery in order to comport with heightened pleading
3 requirement[s] applicable to fraud-based claims is directly contrary
4 to the purpose of Rule 9(b); namely, that plaintiff[] show[s] that
5 there is some substance to [its] claim of fraud before subjecting a
6 defendant to the rigors of the discovery process."  Id. (citation
7 omitted).

8     Furthermore, allowing discovery under these circumstances also
9 would contradict the PSLRA's "Stay of Discovery" provision,[13] and
10 contravene Congressional intent.  That stay provision was "intended
11 to prevent unnecessary imposition of discovery costs on defendants."
12 SG Cowen Sec. Corp. v. U.S. Dist. Court, 189 F.3d 909, 911 (citing
13 H.R. Conf. Rep. No. 104-369, 104th Cong. 1st Sess. at 32 (1995),
14 reprinted in 1995 U.S.C.C.A.N. Sess. 731)).  The Ninth Circuit has
15 held that the PSLRA's stay of discovery provision "clearly
16 contemplated that 'discovery should be permitted in securities class
17 actions only after the court has sustained the legal sufficiency of
18 the complaint.'"  Id. at 913 (quoting S.Rep. No. 104-98, at 14 (1995)
19 reprinted in U.S.C.C.A.N. 693 (emphasis added by Ninth Circuit)).
20 By suggesting that it should have access to Apollo grants which were
21 not publicly disclosed to enhance the SAC's allegations, plaintiff
22 is putting the proverbial cart before the horse, at least when it
23 comes to the PSLRA's clear pleading requirements and stay of
24 discovery provision.
25     3.  "Lows"
26
27 [13]     Under the PSLRA, "all discovery and other proceedings shall be stayed
during the pendency of any motion to dismiss, unless the court finds upon the
28 motion of any party that particularized discovery is necessary to preserve evidence
or to prevent undue prejudice to that party."  15 U.S.C. § 78u-4(b)(3)(B).

1    Accepting at face value the truth of allegations in the FAC as

2  to the "lows" for the five grants specified therein, this court

3  found that the alleged dates, "with one exception, *appear* to reflect

4  at a minimum the lowest price of the month, and in one instance the

5  lowest price for the year."   Apollo I, 633 F.Supp.2d at 793

6  (emphasis added).   Especially in light of the factual inaccuracies

7  pertaining to the October 20, 2003 grants, the court has scrutinized

8  Apollo's stock chart in terms of both the backdating and false

9  statement allegations.   Apparently plaintiff took some liberties in

10 construing Apollo's historical trading history.

11   The SAC alleges that the December 18, 1998 grants at "$11.39

12 per share" were "nearly the low for the month of December[.]" SAC

13 (Doc. 112) at 13:15-16, ¶ 39.   As defendants emphasize, however, the

14 stock price was lower the day before, December 17, 1998 at $11.17.

15 Farrell Decl'n (Doc. 125), exh. 20 thereto at 6.   The price was also

16 lower on the four trading days after: $10.22 on December 21, 1998;

17 $10.42 on December 22, 1998; $11.28 on December 23, 1998 and $10.89

18 on December 24, 1998.   Id.   Apollo's stock was also at $11.39 per

19 share on December 28, 1998  - the fifth trading date after the

20 alleged December 18, 1998 grants.   Id.  So, as alleged, the December

21 18, 1998 grant was actually the sixth lowest price of the month.

22 That seems inconsistent with plaintiff's backdating theory.   See

23 Finisar I, 542 F.Supp.2d at 989 (an option "dated at the fifth

24 lowest price seem[s] at least equally plausible the result of

25 chance[]").

26   The SAC's allegation that defendants dated the April 19, 1999

27 grant to defendant Gonzales at $10.22 per share, "*the* low of the

28 month," SAC (Doc. 112) at 14:23-24, ¶ 40 (emphasis added), creates

1  the inaccurate impression that April 19th was the only day that
2  month where Apollo stock traded at that price.  It was not.
3  Apollo's stock chart shows that its stock actually traded at that
4  price two other times that month – on April 13th and April 20th.
5  Farrell Decl'n (Doc. 125), exh. 20 thereto at 8.  To be sure, a
6  stock "need *not* be priced at *the* lowest price of the month . . . to
7  support an inference of backdating[.]"  Finisar I, 542 F.Supp.2d at
8  992 (citation omitted) (emphasis added).  But the allegation that
9  the April 19, 1999 grants were made at "the low of the month," SAC
10 (Doc. 112) at 14:23-24, ¶ 40, "*may* be misleading because," on two
11 other "instances, the stock traded at the same price" in April,
12 1999.  See City of Westland, 2009 WL 942182, at *7.  However,
13 because the SAC relies upon so few specific grants, and some contain
14 factual inaccuracies, this allegation further demonstrates the need
15 for particularity.

16             ***4.  Stock Price Charts***

17       The stock price charts in the SAC have differing y-axes
18 representing the "Dollars Per Share" price.  Compare SAC (Doc. 112)
19 at 14:2-13 with SAC (Doc. 112) at 18:6-17.  Based upon the court's
20 observation in Goodman, 595 F.Supp.2d 1253, supra, defendants argue
21 that because of those differing axes, plaintiff is "apparent[ly]
22 'attempt[ing] to 'magnify' the depth of the 'suspicious' fall and
23 subsequent rise in the share price coinciding with option grants to
24 the defendants."  Defs'. Mot. (Doc. 120) at 7:22-23 (quoting
25 Goodman, 595 F.Supp.2d at 1274 n. 10).  The plaintiff herein
26 offhandedly remarks "that Apollo's stock option granting history
27 speaks for itself, and is 'suspicious' enough on its own."  Resp.
28 (Doc. 129) at 23:12-14.  Plaintiff does not even bother to address

1 defendants' substantive challenge to the SAC's charts. Especially
2 under these circumstances, this court agrees with the <u>Goodman</u>
3 court's astute observation that "[t]his convenient (but obvious)
4 manipulation of scale  - disguising the weakness of the
5 plaintiff['s] claims of suspicious timing – taints the plaintiff['s]
6 allegations." <u>See</u> <u>Goodman</u>, 595 F.Supp.2d at 1275 n.10.

7        The court continues to adhere to the view that "lack of a sound
8 financial analysis" is not critical or necessarily dispositive at
9 the pleading stage when backdating is a part of an alleged section
10 10(b) fraudulent scheme.   <u>See</u> <u>Apollo I</u>, 633 F.Supp.2d at 793-794.
11 From closely examining the SAC's six specifically identified grants,
12 however, it is not readily apparent that the backdating allegations
13 therein are not lacking merely due to the "lack of a sound financial
14 analysis[.]" <u>See</u> <u>id.</u>  Rather, it is a culmination of pleading
15 deficiencies which compels the conclusion that the SAC's backdating
16 allegations are not plead with the requisite particularity.  This is
17 evidenced by internal inconsistencies, ambiguities, and erroneous
18 and misleading factual allegations which do not comport with
19 Apollo's own stock chart.  Even if the SAC had adequately plead
20 backdating, nonetheless, as discussed next, it fails to plead
21 falsity with the requisite particularity.  Thus, in any event, the
22 SAC cannot withstand these motions to dismiss.

23            *C.  "Material Misrepresentations or Omissions"*[14]

24                 *1.  Pleading Standards*

25      A securities fraud plaintiff, as <u>Apollo I</u> discusses, must
26 satisfy Rule 9(b)'s particularity requirements, as well as the

27 _____

28        [14]    For the sake of brevity, hereinafter these claims shall be referred to
as "false statements."

1   PSLRA's "exacting requirements for pleading falsity." <u>Metzler</u>,

2   540 F.3d at 1070.  The court incorporates by reference that prior

3   discussion of particularity pleading standards.  <u>See</u> <u>Apollo I</u>,

4   633 F.Supp.2d at 783-784.  Several principles bear repeating and

5   expansion though.

6        Under the PSLRA's "heightened pleading standard[s][,] . . .

7   'the complaint shall specify each statement alleged to have been

8   misleading, the reason or reasons why the statement is misleading,

9   and, if an allegation regarding the statement or omission is made on

10  information and belief, the complaint shall state with particularity

11  all facts on which that belief is formed." <u>In re Cutera Secs.</u>

12  <u>Litig.</u>, 610 F.3d 1103, 1107 (9th Cir. 2010) (quoting 15 U.S.C.

13  § 78u-4(b)(1)(B)).  "Thus, a plaintiff must plead falsity with

14  particularity[.]" <u>Rubke v. Capitol Bancorp Ltd.</u>, 551 F.3d 1156, 1164

15  (9th Cir. 2009) (citation omitted).  Similarly, Rule 9(b) requires

16  that "[i]n all averments of fraud or mistake, the circumstances

17  constituting fraud or mistake shall be stated with particularity."

18  FED.R.CIV.P. 9(b).

19       The PSLRA could not be more clear: "If a plaintiff fails to

20  plead the alleged misleading statements or omissions or the

21  defendant's scienter with particularity, the complaint *must* be

22  dismissed." <u>Nursing Home Pension v. Oracle Corp.</u>, 380 F.3d 1226,

23  1231 (9th Cir. 2004) (citing 15 U.S.C. § 78u-4(b)(3)(A)).  The

24  purpose of those "heightened pleading requirements is 'to give

25  defendants notice of the particular misconduct which is alleged to

26  constitute the fraud charged so that they can defend against the

27  charge and not just deny that they have done anything wrong.'"

28  <u>Apollo I</u>, 633 F.Supp.2d at 783 (quoting <u>Neubronner v. Milken</u>,

1  6 F.3d 666, 671 (9ᵗʰ Cir. 1993) (internal quotations and citation

2  omitted)).

3      Agreeing with defendants, in Apollo I this court found that

4  plaintiff's false statements were not pled with the requisite

5  particularity in accordance with the principles just outlined.  Not

6  only was the FAC "a puzzle-like pleading which the court [could] not

7  countenance[,]" but the FAC's "cut and paste nature" was also

8  "troubling."   Apollo I, 633 F.Supp.2d at 786.  To this court

9  though, "[p]erhaps the most troubling aspect of the FAC" was "that

10 the 'vague allegations of deception' [we]re 'unaccompanied by a

11 particularized explanation stating why the defendant's alleged

12 statements or omissions are deceitful." Id. (quoting Metzler, 540

13 F.3d at 1061 (citation omitted) (emphasis added by Metzler Court).

14 Despite those glaring deficiencies, the court declined to dismiss

15 the FAC based upon its form.  Following the Ninth Circuit's

16 "recommend[ation][,]" this court instead "require[d] . . . plaintiff

17 to streamline and reorganize the [FAC][.]"   Id. (citations and

18 internal quotation marks omitted).  More specifically, the court

19 directed plaintiff to "be clear and concise in identifying the false

20 statements and articulating the factual allegations supporting an

21 inference that the statement is false or misleading." Id. at 786-

22 787 (citation and internal quotation marks omitted)).  The SAC's

23 changes in form only highlight the substantive deficiencies of the

24 SAC, though, revealing that it does not plead falsity with the

25 requisite degree of particularity.

26 . . .

27

28

- 37 -

### *2.  Overview of SAC*

Plaintiff did reorganize and arguably streamline[15] the FAC. The SAC separately numbers each allegedly false and misleading statement, whereas the FAC did not; but the SAC more than doubles the number of such statements, from 26 to 54.  Before enumerating each of those 54 statements, the SAC generally alleges:

> Apollo's stock options typically vested over a four year period.  Because Apollo was required to take a compensation charge for in-the-money options during each quarter in which such stock options vested, each of Apollo's financial statements detailed herein were false and misleading because of defendants' failure to recognize compensation associated with in-the-money stock options which vested during a given quarter, and which were granted in the four years preceding the quarter of the financial statement.

SAC (Doc. 112) at 20:9-14, ¶ 46.  The SAC goes on to group the allegedly false statements into four categories pertaining to: (1) Apollo's "earnings and financial results;"  (2) Apollo's "compliance with Accounting Principles Board (APB) 25 and IRS Code § 162(m);" (3) Apollo's "internal controls relating to stock option grants and related financial reporting;" and (4) "denials of backdating[.]" Id. at 20:18-23, at ¶ 47.  Apart from the denials of backdating, the other three types of alleged false statements were in Apollo's earnings announcements, Form 10-Ks, Form 10-Qs[16] and SOX certifications.

---

[15]  The SAC itself is 25 pages less than the FAC, but with attached exhibits, it is approximately 500 pages – almost 100 pages longer than the FAC and its exhibits.

[16]  "The primary difference between a form 10-K and a form 10-Q is the time it is filed; a 10-K is filed yearly and a 10-Q is filed quarterly.  However, both the 10-K and the 10-Q require the company to disclose information about its financial condition, operations, and the owners of its securities." U.S. v. Jenkins, 2011 WL 208357, at *11 (9th Cir. Jan. 25, 2011) (citations omitted).

1    With the exception of the fiscal year 2001 Form 10-K, for the
2  35 false statements pertaining to Apollo's "earnings and financial
3  results," the SAC follows a distinct pleading pattern.  Each such
4  allegedly false statement consists of three subparagraphs.

5    In the first, the SAC alleges that approximately one month
6  before Apollo filed its Form 10-Qs and Form 10-Ks, it would make
7  "Earnings Announcement[s]" in the form of press releases.  <u>See</u>,
8  <u>e.g.</u>, SAC (Doc. 112) at ¶¶ 50(a); 61(a); exh. 2 at 686; and exh. 24
9  at 3-4.  Thereafter, the SAC alleges that either a Form 10-Q or a
10 Form 10-K, or both, were filed with the SEC.  Those forms
11 "reaffirmed the previously announced financial results[.]"  <u>See</u>,
12 <u>e.g.</u>, <u>id.</u> at 22:21, ¶ 51(b).  The SAC identifies by name the
13 individuals who signed the Form 10-Qs and Form 10-Ks,[17] but only
14 generically alleges that Apollo issued the earnings announcements.
15 The third part of each "earnings and financial results" allegation
16 is a separate paragraph entitled "**Reasons Why the Statement Was**
17 **False and Misleading**[.]"  <u>See</u>, <u>e.g.</u>, <u>id.</u> at ¶¶ 49(b) (emphasis in
18 original).  For 17 of these 35 statements, the SAC relies
19 exclusively upon the Restatement to support its allegations as to
20 why those statements are false.  For the other 18 statements, the
21 SAC does not refer to any source in alleging why a given statement
22 was false.

23    Apollo's 10-Ks are the source of the second group of alleged
24 false statements - those pertaining to compliance with IRS Code

25

26

---

27      [17]   The Form 10-Qs were signed by two section 10(b) defendants, Gonzales
   and Nelson, and defendant Bachus.  Those 10-Ks were signed by nine of the 11
28 individuals, four of whom are section 10(b) defendants.

§ 162(m)[18] and APB 25.[19]  Insofar as compliance with section 162(m)

is concerned, the SAC alleges that in Apollo's Form 10-Ks for fiscal

years 2002 - 2005:

> Apollo stated that 'The company's policy is to
> comply with the requirements of Section 162(m)
> and maintain deductibility for all executive
> compensation, except in circumstances where we
> conclude on an informed basis that it is in the
> best interest of the Company and the shareholders
> to take actions with regard to the payment of
> executive compensation which do not qualify for
> tax deductibility.'

Id. at 32:17-21, ¶ 67(a) (quoting exh. 9 thereto at 27).  Likewise,

in Apollo's Form 10-Ks for fiscal years 2002-2005, as to compliance

with APB 25, the SAC alleges:

> 'The Company applies the recognition and
> measurement principles of [APB] Opinion No.
> 25, Accounting for Stock Issued to Employees,
> and related interpretations in accounting
> for those plans.  Stock-based employee
> compensation expense is not reflected in the
> Consolidated Statement of Operation as all options
> granted under those plans had an exercise price
> equal to the market value of the underlying common
> stock on the date of grant.'

---

[18]    Very basically, that section of the Internal Revenue Code "prohibits a federal income tax deduction to publicly held companies for compensation paid to certain executive officers, to the extent that compensation exceeds $1.0 million per covered officer in any fiscal year." Middlesex, 527 F.Supp.2d at 1174; see also SAC (Doc. 112) at 49:11-13, ¶ 96

[19]    "Accounting for employee stock options is governed by prescribed methodology and measurement standards." S.E.C. v. Pattison, 2011 WL 723588, at *5 (N.D.Cal. Feb. 22, 2011).  The SAC alleges:

> Pursuant to [APB] Opinion No. 25, Accounting for Stock Issued to Employees ("APB 25"), which was in effect through June 2005, [Apollo] was obligated to recognize this gain [from "options . . . priced below a stock's fair market value when they are awarded[]"] as compensation expense over the vesting period of the option.

SAC (Doc. 112) at 3:6-10, ¶ 6(a).

1  Id. at 34:14-19, ¶ 68(b) (quoting exh. 9 thereto at 18).[20]   The

2  Restatement is the SAC's primary basis for alleging why the

3  statements as to compliance with section 162(m) and APB 25 were

4  false.

5       The third category of false statements pertaining to "internal

6  controls relating to stock option grants and related financial

7  reporting" are in the SOX certifications for fiscal years 2002-2005,

8  signed by section 10(b) defendants Nelson and Gonzales.  Again, the

9  SAC relies upon the Restatement in alleging why those certifications

10  were false.  The fourth category of allegedly false statements

11  comprises a relatively small part of the SAC.  The SAC alleges six

12  statements wherein certain defendants denied any wrongdoing as to

13  Apollo's stock option practices.  The Restatement is not a basis for

14  alleging why these six statements are false, but the SAC continues

15  the pattern of separately pleading "why" such statements were false.

16       For analytical purposes, Apollo divides the 54 allegedly false

17  statements into two groups – "accounting statements" (Nos. 1-48) and

18  backdating denials (Nos. 49-54); so, too, will this court.

19                  *3.   "Accounting Statements"*

20       Together, Apollo and the individual defendants offer a host of

21  reasons as to why the accounting statements are not plead with the

22  necessary degree of  particularity.  The Restatement is an integral

23

24       [20]    The statement regarding compliance with APB 25 differed slightly in the
fiscal year 2001 Form 10-K:

25
              'The Company applies APB No. 25 and related
26            interpretations in accounting for its stock-based
              compensation, and has adopted the disclosure-only
27            provisions of SFAS No. 12.  Accordingly, no compensation
              cost has been recognized for these plans.'

28  SAC (Doc. 112) at 34:7-10, ¶ 68(a) (quoting exh. 1 thereto at 107).

                                    - 41 -

1  part of most of these defense arguments.  Likewise, the Restatement

2  is at the heart of plaintiff's response.  This is so even though, as

3  mentioned at the outset of this section,  not all of the accounting

4  statements rely upon the Restatement as the source for alleging

5  falsity.  Overlooking that fact, viewing the Restatement as "an

6  admission that [Apollo's] reported financial results . . . were

7  false and misleading when made[,]" plaintiff maintains that the SAC

8  "alleges falsity with particularity."  Resp. (Doc. 129) at 11:3-5

9  (citation omitted); and at 10:10 (emphasis omitted).  The defendants

10  did not directly address the issue of whether the Restatement is an

11  admission of falsity.  Instead, essentially they argue, among other

12  things, that the SAC does not allege falsity with the requisite

13  particularity due to a lack of allegations showing a sufficient

14  nexus between the Restatement and the purportedly false accounting

15  statements.

16      The court will address these Restatement arguments momentarily,

17  but first it will examine the SAC's allegedly false statements which

18  undermine rather than advance plaintiff's fraud theory herein.

19              ***a.   Fiscal Year 2004 Understatement***

20      The "crux of the fraudulent scheme[,]" according to the SAC, is

21  that "defendants *overstated* Apollo's earnings and income by failing

22  to report compensation expenses associated with granting in-the-

23  money stock options," which in turn led to "an artificial inflation

24  of [Apollo's] stock[.]"  SAC (Doc. 112) at 1:9-11; and 16, ¶ 2

25  (emphasis added).  Nonetheless, as to Apollo's fiscal year 2004 Form

26  10-K and its related "Earnings Announcement," the SAC alleges that

27  Apollo "misstated" rather than overstated its net income and

28  earnings per share and compensation expenses.  Id. at 28:13-28 -

29:1-3, ¶¶ 61(a)-(c).  Allegedly, that misstatement was "as a result
of Apollo's failure to account for compensation and tax expenses
associated with stock options priced below the fair market value of
Apollo's common stock on the date of the grant."[21]  Id. at 29:16-19,
¶ 61(c).

To be compatible with the SAC's theory of fraud quoted above,
however, the "misstatement" would necessarily have to be an
overstatement.  The SAC explicitly refers to overstatements,
understatements and misstatements, so presumably plaintiff knew the
difference and intended to distinguish among them.

Moreover, the SAC also alleges that the Restatement "admits"
that Apollo's net income was "*understated* . . . during FY04 due to
Apollo's failure to properly account for in-the-money stock option
grants."  Id. (emphasis added).  This understatement allegation
makes no sense if, as the SAC explicitly alleges, a critical aspect
of the purported "fraudulent scheme" was overstating earnings.  See
id. at ¶ 2.  Thus the court agrees with Apollo that an
understatement of net income is "incompatible" with the plaintiff's
fraud theory as the SAC defines it.  See Apollo Mot. (Doc. 122) at
16:3.

Plaintiff ignores the argument that the allegations outlined
above do not comport with plaintiff's theory of fraud set forth in
the SAC.  As to the alleged understatement of net income, plaintiff
weakly counters that such an understatement "could merely have been
caused by the cancellation of previously issued backdated stock
options."  Resp. (Doc. 129) at 16:4-5.  This is pure, unpled

_____

[21]   The other 34 accounting statements include this exact same allegation.
See, e.g., SAC (Doc. 112) at ¶¶ 49(b); and 54(c).

- 43 -

1  conjecture.  The SAC does not allege how understating net income

2  could have been part of an alleged "fraudulent scheme" to

3  "overstate[] Apollo's earnings and income by failing to report

4  compensation expenses associated with granting in-the-money stock

5  options[.]" Id. at 1:9-11, ¶ 2; cf. McCasland v. Formfactor Inc.,

6  2009 WL 2086168, at *8 (N.D.Cal. 2009) (SAC did not plead scienter

7  where it did not "advance any persuasive theory of how understating

8  gross margins and earnings could have been part of defendants'

9  fraudulent scheme[]" to "deliberate[ly] understate[] . . . the costs

10 of revenue and overstate[] . . . gross margins[]"). It defies logic

11 that Apollo would intentionally *understate* its *net income* as part of

12 a scheme to artificially *inflate* its *stock price*.  That, combined

13 with the fact that the SAC does not allege how a misstatement of net

14 income supports a fraudulent theory to overstate net income warrants

15 granting defendants' motion to dismiss insofar as it is premised

16 upon false statements No. 24 (¶ 61(a)) and No. 25 (¶ 61(b)).[22]

17 False statements 24 and 25 can be dismissed for the additional

18 reason that although they rely upon the Restatement as the sole

19 basis for alleging falsity, as discussed herein, the SAC does not

20 adequately correlate the Restatement to these allegations, among

21 others.

22               ***b.  Overstatement of Compensation Expenses***

23      The false statements discussed in the preceding section are not

24 the only allegedly false statements directly contradicting

25 plaintiff's theory of securities fraud as pled in the SAC.  The SAC

26

27      [22]      Because there is no correlation between the SAC's paragraphs and the

28 number of a given alleged false statement, for clarity's sake this decision will
        cite to both.

1    alleges that Apollo's Form 10-K for fiscal year 2005, its Form 10-Q

2    for the first quarter of fiscal year 2002, and their corresponding

3    earnings announcements, overstated *both* Apollo's net income and its

4    compensation expenses.  See id. at ¶ 65(c).[23]  Supposedly the

5    Restatement "admits" that "Apollo's net income was overstated by

6    $6.4 million, or 1.5%, during FYO5 due to Apollo's failure to

7    properly account for in-the-money stock option grants."  Id.  The

8    SAC does not allege, however, the amount of the overstatement in

9    this particular Form 10-Q.

10        Much like the alleged 2004 understatement of net income, there

11   is nothing in the SAC alleging how an overstatement of a

12   compensation expense could result in an increase in net income, and

13   the court is at a loss as to how this could be so.  "Logically, such

14   [an] overstatement [of compensation expenses] would mean that the

15   price of [Apollo] stock purchased by Plaintiff[] was deflated rather

16   than inflated."  See Kelly v. Rambus, Inc., 2008 WL 5170598, at *5

17   (N.D.Cal. Dec. 9, 2008). What is more, plaintiff's response is

18   conspicuously silent on this issue as well.  The PSLRA's stringent

19   standard for pleading falsity is not met absent "*specific* facts

20   indicating why those statements were false[.]"  See Metzler, 540

21   F.3d at 1070 (citation omitted) (emphasis added).  These bare

22

_____

23        [23]   More specifically, paragraph 65(c) alleges that the preceding
     statements were:
24
                    false and misleading because they *overstated* Apollo's
25              net income *and* earnings per share and Apollo's
                compensation expenses as a result of Apollo's failure
26              to account for the compensation and tax expenses associated
                with stock options granted at a price below the fair
27              market value of Apollo's common stock on the date of the
                grant.
28
     SAC (Doc. 112) at 31:17-20, ¶ 65(c) (emphasis added); at 22:9-12, ¶ 50(c) (same).

1  allegations as to misstatements of net income, an understatement of
2  net income in 2004, and an overstatement of compensation expenses
3  which are facially inconsistent with the SAC's fraud theory,
4  vividly show the need for "'articulating the factual allegations
5  supporting an inference that the statement is false or misleading.'"
6  See Apollo I, 633 F.Supp.2d at 786- 787 (quoting Patel v. Parnes,
7  253 F.R.D. 531, 554 (C.D.Cal. 2008) (internal quotation marks and
8  citation omitted)).

9      Statement number three pertaining to the 10-Q for the first
10  quarter of fiscal year 2002 is lacking in particularity for the
11  additional reason that it does not allege the amount of the
12  purported overstatement.  See Hansen, 527 F.Supp.2d at 1153
13  (citations omitted) (plaintiff insufficiently plead financial
14  statements were false and misleading where, inter alia, the
15  complaint did not allege "the amount by which th[ose] . . .
16  statements were misstated[]").  Accordingly, the court grants
17  defendants' motion to dismiss to the extent it is premised upon a
18  failure to plead falsity with particularity as to false statements
19  Nos. 2-3 (¶¶ 50(a)(b); and Nos. 32-33, (¶¶ 65(a)(b)).[24]

20                      *c. Misstatements*
21      The SAC also alleges that four 10-Qs, and their corresponding
22  earnings announcements, were false and misleading because they
23  "*misstated* Apollo's net income and earnings per share and Apollo's
24  compensation expenses as a result of Apollo's failure to account for
25  compensation and tax expenses associated with stock options granted
26

27      [24]    Plaintiff's reliance upon the Restatement, especially the method by
28  which it calculated the amounts of the alleged overstatement, as explained herein,
    provides another reason for dismissing false statements 32 and 33.

1   at a price below the fair market value of Apollo's common stock on

2   the date of the grant."  <u>See</u> SAC (Doc. 112), at ¶¶ 58(a)-(c);

3   ¶¶ 59(a)-(c); ¶¶ 60(a)-(c); and ¶¶ 66(a)-(c) (emphasis added).

4   Once again, because plaintiff's fraud theory is premised upon

5   Apollo's overstatement of earnings and income, on the face of it,

6   these misstatement allegations do not support that theory.  <u>See</u> <u>id.</u>

7   at ¶ 2.  What is more, the SAC also does not include the amount of

8   those purported misstatements.  As set forth above, that omission is

9   legally significant.  <u>See</u> <u>Hansen</u>, 527 F.Supp.2d at 1153.

10  For both of these reasons, the court grants defendants' motions to

11  dismiss to the extent that it is premised upon false and misleading

12  statements Nos. 18-23 (¶¶ 58(a)(b); ¶¶ 59(a)(b); ¶¶ 60(a)(b); and

13  Nos. 34-35 (¶¶ 66(a)(b)).

14                    ***d.  Restatement***

15      Paragraph 48 aside,[25] the SAC expressly relies upon the

16  _____

17      [25]     The FAC did not include any allegations as to the purported import of
    the Restatement, but the SAC does.  The SAC generally alleges:

18          Apollo's May 22, 2007 *restatement is an admission*
19          that the Company's previously filed and announced
            *financial statements* alleged herein were materially
            *false* and misleading.  A *restatement admits* that
20          *previously filed financial statements* were *materially
            false* when they were issued.  The *restatement means*
21          that facts existed and were known to [Apollo] at the
            time the financial statements were issued that rendered them false.
22
    SAC (Doc. 112) at 20-21, ¶ 48 (emphasis added).  Additionally, as discussed herein,
23  the Restatement is the sole basis for alleging falsity as to a number of the SAC's
    false statements (*i.e.*, 28).

24      Whether the Restatement is an admission is a legal conclusion, as discussed
    above.  Legal conclusions couched as factual allegations "are not entitled to the
25  assumption of truth," <u>Ashcroft v. Iqbal</u>, 556 U.S. ___, 129 S.Ct. 1937, 1950, 173
    L.Ed.2d 868 (2009), and therefore are "'insufficient to defeat a motion to dismiss
26  for failure to state a claim,'" <u>In re Cutera Sec. Litig.</u>, 610 F.3d 1103, 1108 (9th
    Cir. 2010) (citation omitted).  As such, this court is "'not bound to accept as
27  true'" those "'legal conclusion[s] couched as . . . factual allegation[s][.]'"
    <u>Iqbal</u>, 129 S.Ct. at 1950 (quoting Bell <u>Atlantic Corp. v. Twombly</u>, 550 U.S. 544,
    555, 127 S.Ct. 1955, 1965 (2007)); <u>see also</u> <u>Freedman v. Louisiana-Pac. Corp.</u>, 922
28  F.Supp. 377, 392 (D.Or. 1996) (internal quotation marks omitted) (striking

                                    - 47 -

1  Restatement to plead why slightly more than half (or 28 of 48) of

2  the accounting statements were false.  For example, the SAC alleges

3  that in Apollo's 10-Ks for fiscal years 2001-2005, and in its 10-Qs

4  for fiscal year 2005, the "restatement admits" overstating or, in

5  one instance, understating Apollo's net income.  See, e.g., SAC

6  (Doc. 112) at ¶ 49(b).  Some courts have found, as plaintiff urges,

7  "that the mere fact that financial results are restated is

8  sufficient at the pleading stage to establish that the results were

9  false when originally made."  Beaver County Retirement Bd. v. LCA-

10 Vision Inc., 2009 WL 806714, at *16 (S.D.Ohio March 25, 2009)

11 (citations omitted); see also In re Enron Corp. Sec. Litig., 2010

12 WL 5100809, at *25, n. 25 (W.D.Tex. Dec. 8, 2010) (citing, inter

13 alia, In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324

14 F.Supp.2d 474, 486-87 (S.D.N.Y. 2004) ("[a]lthough a restatement is

15 not an admission of wrongdoing, the mere fact that financial results

16 were restated is sufficient basis for pleading that those statements

17 were false when made."), citing In re Cylink Sec. Litig., 178

18 F.Supp.2d 1077, 1084 (N.D.Cal. 2001) ("existence of restated

19 financial results is sufficient to support plaintiff's belief that

20 the statements were misstated[]"); but see In re Atlas Mining Co.

21

22 paragraph alleging "a legal conclusion regarding the existence and scope of
   defendants' duty to disclose" information "that would materially affect the present
23 and true financial operating results").  Indeed, "merely alleg[ing] [those] legal
   conclusion[s]" only "confuses the issues."  See Freedman, 922 F.Supp. at 396.
24 Thus, in resolving these motions, the court will disregard paragraph 48 to the
   extent it contains legal conclusions as to the import of restatements generally or
   Apollo's Restatement in particular.

25

26      The court hastens to add that given the broad nature of paragraph 48, and the
   lack of "further factual enhancement[s][,]" Iqbal, 129 S.Ct. at 1949 (citation and
   internal quotation marks omitted), even if the court were to consider that
27 paragraph, the result would not change here.  That is because, as explained herein,
   the SAC still does not allege falsity with sufficient particularity.

28

1 <u>Sec. Litig.</u>, 670 F.Supp.2d 1128, 1133-1134 (D.Idaho 2009) (rejecting

2 plaintiffs' theory that "a restatement of audited financial

3 statements constitutes an admission of falsity and materiality[,]")

4 (citing <u>In re Metawave Communications Corp. Sec. Litig.</u>, 298

5 F.Supp.2d 1056, 1079 (W.D.Wash. 2003) ("Plaintiff's contention that

6 Metawave's restatement is an admission that Defendants issued false

7 and misleading financial reports is without merit."))

8      Even assuming *arguendo* that Apollo's Restatement is an

9 admission that certain accounting statements were false when made,

10 that assumption cannot cure the SAC's failure to plead falsity with

11 particularity.  The lack of particularity primarily arises from the

12 manner in which the SAC relies upon the Restatement.  It is not

13 enough to simply allege that a given statement is false and

14 misleading and then baldly rely upon a restatement.  Rule 9(b) and

15 the PSLRA demand more.  That is especially so here where the

16 Restatement does not always support the SAC's allegations and, on

17 its face, the correlation between the Restatement and the false

18 statements is fairly attenuated.

19      The SAC includes a nine page, single spaced, block quote from

20 the Restatement.  Only a few aspects of the Restatement factor into

21 the court's analysis at this juncture.  Quoting directly from the

22 Restatement, the SAC alleges that Apollo "determined that 57 of

23 the 100 total grants made during this time period [*i.e.*, "fiscal

24 year 1994 through September 2006"] used incorrect measurement dates

25 for accounting purposes."  SAC (Doc. 112) at 44; <u>see</u> <u>also</u> Farrell

26 Decl'n (Doc. 126), exh. 19 thereto at 3 (same).  Continuing to quote

27 directly from the Restatement, the SAC alleges that "revised

28 measurement dates were selected for many grants and resulted in

1  exercise prices that were less than the fair market value of the

2  stock on the most likely measurement dates." Id.  Consequently, as

3  the Restatement indicates and the SAC alleges, Apollo "recorded pre-

4  tax compensation expense of $52.9 million ($59.9 million after-tax)

5  in the aggregate over the fiscal years 1994 through 2005."  Id.

6       In arguing that the SAC does not plead falsity with

7  particularity, Apollo contends that it "does not allege which

8  portion of the restatement relates to allegedly backdated grants."

9  Apollo Mot. (Doc. 122) at 14:14-15.  Or, as the individual

10  defendants put it, the SAC does not "draw a nexus between the option

11  grants [it] [is] challenging in this action' and the additional

12  compensation expenses recognized in the Restatement."  Defs'. Mot.

13  (Doc. 120) at 10:5-8 (citation and internal quotation marks

14  omitted).  Nor, Apollo argues, does the SAC allege "which part [of

15  the restatement] pertained to accounting errors and conduct during

16  the class period."  Apollo Mot. (Doc. 122) at 14:20-21 (emphasis

17  omitted).  In sum, "[p]laintiff makes no effort to plead properly

18  (because it cannot) that the alleged falsehood actually arose from

19  the wrongdoing alleged in the SAC."  Defs'. Mot. (Doc. 120) at 2:18-

20  19.  Defendants thus argue that they lack "notice of the particular

21  misconduct which is alleged to constitute the fraud charged."  See

22  Apollo I, 633 F.Supp.2d at 783 (citation and internal quotation

23  marks omitted).

24       Emphasizing that it "has never claimed that the entirety of

25  Apollo's restatement was caused by" the six options which the SAC

26  identifies, plaintiff retorts that "the fact that the [SAC] only

27  identifies [those] six specific backdated grants does not make

28  defendants' statements any less false."  Resp. (Doc. 129) at 14:14-

1  15; and at 14:12-13 (citation omitted).  This is not responsive to

2  defendants' lack of particularity and lack of notice arguments.

3      As Apollo points out, and plaintiff disregards, the SAC is void

4  of any allegations regarding "how much of the $52.9 million

5  restatement resulted from allegedly backdated grants – much less the

6  six grants at issue" herein.  Apollo Mot. (Doc. 122) at 14:26-28.

7  Exacerbating that omission is, as the SAC alleges, the fact that the

8  Restatement spanned 12 years, yet plaintiff did not plead how much

9  of that "12-year adjustment pertained to accounting errors that

10 occurred ***during the class period***[,]" *i.e.,* between November 28, 2001

11 and October 18, 2006.  Id. at 15:2-3 (emphasis in original).  That

12 is a significant pleading omission because the Restatement indicates

13 that $31.8 million of the $52.9 million pre-tax adjustment  – or

14 about 60% - pertained to fiscal years 1995 through 2001, which ended

15 on August 31, 2001 – nearly three months prior to the commencement

16 of the class period.  See Farrell Decl'n (Doc. 126), exh. 19 thereto

17 at 56.  Necessarily then, by Apollo's estimation, 60% of the

18 Restatement "applies to pre-class period financials, and . . .

19 relates to options granted well before the beginning of the class

20 period."  See Apollo Mot. (Doc. 122) at 15:6-8.

21     Of course, because allegedly "Apollo's stock options typically

22 vested over a four year period[,]" SAC (Doc. 112) at 20:9, ¶ 46,

23 conceivably there could have been accounting and tax consequences

24 during the class period although the grants were made prior thereto.

25 Rather than undermining Apollo's argument, this only highlights the

26 SAC's lack of particularity in failing to correlate any backdated

27 stock options – much less the grants which the SAC identifies – to

28 Apollo's purported failure to properly account for compensation

1  expenses.  See In re PMC-Sierra, Inc., 2007 WL 2427890, at *5

2  (N.D.Cal. Aug. 22, 2007) ("the fact that PMC . . . admitted to

3  erroneously record[ing] some option grant dates d[id] not create an

4  inference that the challenged options were intentionally and

5  fraudulently backdated[]" where plaintiffs did not "draw[] [any]

6  nexus between the option grants they [we]re challenging . . . and

7  PMC's 'admission'").

8      Further, due to the four year vesting period, the largest

9  adjustment of slightly more than 28 million dollars for fiscal year

10  2001, apparently resulted from options granted prior to the class

11  period.  See RJN (Doc. 126), exh. 19 thereto at 56.  The same is

12  true, but to a much lesser extent, of the nearly 22.8 million dollar

13  adjustment for fiscal year 2002.  While the bulk of that adjustment

14  was within the class period (i.e., approximately 10 months), not all

15  of it was.

16      Without regard to the foregoing, plaintiff contends that the

17  SAC "clearly identifies why [Apollo's] financial statements were

18  false and misleading[]" in that they "overstated Apollo's net income

19  and understated Apollo's compensation expenses as a result of

20  Apollo's failure to account for compensation and tax expenses

21  associated with stock options priced below the fair market value of

22  Apollo's common stock on the date of the grant."  Resp. (Doc. 129)

23  at 11:9-13 (citations omitted).  With a few slight variations, the

24  SAC alleges that the just quoted statement is the reason "why" every

25  one of the 35 alleged earnings releases and financial filings is

26  purportedly false.  Rote repetition of that conclusory allegation

27  does not satisfy the PSLRA's particularity requirement.  See In re

28  Ferro Corp., 2007 WL 1691358, at *20 (N.D. Ohio June 11, 2007)

("because the 'substance of why' amount[ed] to little more than a repetitive series of vague, redundant, and conclusory allegations[,]" plaintiff "did not me[e]t its burden under the PSLRA of establishing that the challenged statements were false or misleading because the SAC lacks the requisite particularity as a matter of law[]").  Although the form has changed, plaintiff did not cure what this court previously found to be "[p]erhaps the most troubling aspect of the fact" – "the 'vague allegations of deception' [were] "unaccompanied by a particularized explanation stating why the defendant's alleged statements or omissions [we]re deceitful."  Apollo I, 633 F.Supp.2d at 786 (quoting Metzler, 540 F.3d at 1061 (citation omitted)).

The fact, as plaintiff mentions, that the SAC "details, wherever possible, the exact amount of net income overstated[]" does not rectify the SAC's lack of particularity.  Resp. (Doc. 129) at 11:14.  The difficulty arises because close scrutiny of the alleged "details" and the Restatement, which is the basis for those "details," shows several discrepancies and inconsistencies.

To show that the SAC provides details, plaintiff refers to paragraph 49(b) wherein it alleges that Apollo's fiscal year 2001 Form 10-K was false because as the "restatement admits, Apollo's net income was overstated by $20.5 million, or 23.6%, during FY01 due to Apollo's failure to properly account for in-the-money stock option grants."  SAC (Doc. 112) at 21:18-19, ¶ 49(b).  The SAC includes three nearly identical allegations pertaining to the 10-Ks for fiscal years 2002, 2003 and 2005, but with differing amounts.  The SAC claims that "[a]s Apollo's [R]estatement admits . . . Apollo's net income was overstated" by the following amounts: (1) $17.2

million or 12% in fiscal year 2002; (2) $11.1 million or 4.7% in
fiscal year 2003; and (3) $6.4 million or 1.5% in fiscal year 2005.
Id. at 24:7-9, ¶ 53(c); at 26:20-22, ¶ 57(c); and at 31:20-22,
¶ 65(c).

Although the SAC includes numbers, as Apollo convincingly
argues, plaintiff's method of calculating those dollar amounts and
percentages "demonstrates a failure to plead fraud with
particularity[.]"  Apollo Mot. (Doc. 122) at 17:18.  This is yet
another defense argument which, for the most part, plaintiff chose
to ignore.

Alleging that the "[R]estatement admits" that Apollo's net
income was overstated by the dollar amounts just enumerated, leaves
the impression that those amounts are actually in the Restatement.
Tellingly, though, the SAC does not cite to any specific part of the
roughly 500 page Restatement as the basis for those amounts.
"[T]he only possible source" for those amounts, as Apollo points out
and plaintiff does not dispute, is a chart in the Restatement
entitled "Summary of Impact Restatement Adjustments[.]"  See Apollo
Mot. (Doc. 122) at 17:27, n. 24.  Comparing that chart to the SAC's
allegations of net income overstatements, as Apollo did,
demonstrates that plaintiff inconsistently calculated those amounts,
resulting in a lack of particularity.

For fiscal years 2001, 2002 and 2005, plaintiff arrived at the
net income overstatement amounts by adding three line items – "Share
Based Compensation Expense[s,]" "Income Tax Provision (Benefit) –
Related to Share Based Compensation Expense" and "Tax Effect of
162(m) Limitation[.]"  See id. at 17:1-3; see also RJN (Doc. 126),
exh. 19 thereto at 56.  In calculating the net income overstatement

1  for 2003 and the understatement for 2004, however, besides those
2  three categories, plaintiff included "Bad Debt Expense[s,]" "Other
3  Adjustments[,]" and "Penalty and Interest on Exercises[.]" Id.
4  Plainly, the adjustments for bad debt expenses and the unspecified
5  "Other Adjustments" are irrelevant here.

6       Additionally, if plaintiff had used the same three factors for
7  its 2003 and 2004 calculations as it used for fiscal years 2001,
8  2002 and 2005, as Apollo asserts, it would have "yield[ed] a much
9  smaller overstatement of net income in 2003 (2.1% versus 4.7%
10 claimed in the SAC) and a much larger **understatement** of net income
11 in 2004 (2.8% versus 0.8% claimed in the SAC)." Id. at 17:20-22
12 (emphasis in original).  Thus, Apollo argues, the SAC "uses
13 inconsistent measuring standards, which exaggerate the impact of the
14 Restatement[,]" hence "demonstrat[ing] a failure to plead fraud with
15 particularity[.]" Id. at 16:7-8 (emphasis omitted); and at 17:18.

16      Plaintiff does not deny using the method Apollo suggests to
17 calculate these dollar amounts.  Included in a footnote, plaintiff
18 even "agrees that . . . bad debt expenses do not appear to be the
19 result of Apollo granting options below fair market value."  Resp.
20 (Doc. 129) at 16:26, n. 5.  Presumably then, plaintiff also agrees
21 that the SAC improperly relies upon such expenses in alleging the
22 amount by which the Restatement purportedly "admitted" to
23 understating net income in fiscal year 2004 and overstating net
24 income in 2005.  Regardless, plaintiff further remarks in passing
25 that "the inclusion of th[o]se [bad debt expense] numbers does not
26 provide a basis for dismissal." Id. at 16:26-27, n. 5 (citing
27 Maniscalco v. Brother Int'l Corp., 627 F.Supp.2d 494, 497 n. 1
28 (D.N.J. 2009)).

1    The court cannot overlook the SAC's inclusion of those bad debt
2    expenses as a means of finding particularity where none exists.
3    First, even if the court were inclined to disregard those bad debt
4    expenses, the SAC still relies upon "other adjustments" in the
5    Restatement which on the face of it are unrelated to the alleged
6    fraudulent accounting scheme.  Second, neither the court nor the
7    defendants should be expected to recalculate (or second-guess) the
8    amounts which the SAC alleges to bring those amounts into conformity
9    with the Restatement.  That would entirely defeat the "notice
10   pleading . . . theory of Rule 8(a) and of the federal rules in
11   general[.]"  See Starr v. Baca, 2011 WL 477094, at *10 (9th Cir.
12   Feb. 11, 2011).

13       Third, although plaintiff attempts to liken this case to
14   Maniscalco, there are fundamental differences between that case and
15   the present one rendering Maniscalco wholly inapposite.  There,
16   purchasers brought a putative class action against a printer
17   manufacturer alleging violations of the New Jersey Consumer Fraud
18   Act and unjust enrichment.  The Maniscalco complaint alleged one
19   purchase date, which "[p]laintiff's counsel represent[ed] . . . was
20   a "typographical error[.]"  Maniscalco, 627 F.Supp.2d at 497 n. 1.
21   Nonetheless, in moving to dismiss and refusing to consent to correct
22   the date, the defendant manufacturer insisted that the court use the
23   purchase date alleged in the complaint.  The court refused,
24   explaining that it would "adjudicate[] the claims on the merits
25   rather than on . . . mere technicalities[]" where the defendant had
26   become aware of the correct date during discovery.  Id. (citation
27   omitted).

28       Unlike Maniscalco, there has been no suggestion here (and the

1  court fails to see how there could be) that the amounts alleged in
2  the SAC were due to typographical errors.  Nor is this a situation
3  where the numbers in the SAC are a "mere technicality."  Plaintiff's
4  allegations as to the amounts by which the Restatement purportedly
5  overstated (and in 2004 understated) Apollo's net income go to the
6  very crux of the SAC's alleged fraudulent scheme, in sharp contrast
7  to Maniscalco.  Further, the heightened pleading standards of a
8  federal securities fraud action were not invoked in Maniscalco,
9  alleging violations of a state consumer fraud statute.  Plaintiff,
10 therefore, cannot rely upon Maniscalco to circumvent the clear
11 mandate of both the PSLRA and Rule 9(b) that falsity be pled with
12 particularity.

13      The SAC's broad, conclusory allegations that Apollo overstated
14 its net income and understated its compensation expenses as a result
15 of granting stock options below the fair market value of Apollo's
16 common stock on the date of the grant do not satisfy the exacting
17 pleading standards of the PSLRA and Rule 9(b).  The SAC's reliance
18 on the Restatement does not provide the necessary particularity
19 because it does not "draw a specific nexus between the allegedly
20 fraudulent statement and the facts upon which the allegation of
21 fraud is dependent[,]" *i.e.* the Restatement, "or, at least, a clear
22 statement of why and how the plaintiff has reached the conclusion
23 that a particular statement is fraudulent."  See Ferro, 2007 WL
24 1691358, at *19 (citation, internal quotation marks and emphasis
25 omitted).  Even if the SAC provided that missing link, it still
26 could not withstand these dismissal motions because in relying upon
27 the Restatement as a basis for falsity, the SAC does not always
28 comport with the Restatement.  Consequently, the court grants

1  defendants' motions to dismiss insofar as it is predicated upon

2  those false and misleading statements where the Restatement is the

3  sole basis for pleading falsity (No. 1, ¶ 49; Nos. 8-9, ¶¶ 53(a)(b);

4  Nos. 16-17, ¶¶ 57(a)(b); Nos. 24-33, ¶¶ 61(a)(b); ¶¶ 62(a)(b);

5  ¶¶ 63(a)(b); ¶¶ 64(a)(b); ¶¶ 65(a)(b); and ¶¶ 66(a)(b)).   That

6  includes the allegations pertaining to compliance with IRS Code

7  § 162(m) and APB No. 25, and the SOX certifications (Nos. 36-48,

8  ¶¶ 67(a)-(d); ¶¶ 68(a)-(e); and ¶¶ 69(a)-(d)).

9                    ***e.   Non-Restatement Based Allegations***

10         In addition to the Form 10-Qs relying upon the Restatement

11  discussed above, the SAC alleges that five others and their related

12  press releases contained false statements.   The SAC alleges the

13  exact same reason as to why those Forms and press releases were

14  false and misleading:

15                      because they overstated Apollo's net income
                        and earnings per share and understated Apollo's
16                      compensation expenses as a result of Apollo's
                        failure to account for the compensation and tax
17                      expenses associated with stock options granted
                        at a price below the fair market value of Apollo's
18                      common stock on the date of the grant.

19  SAC (Doc. 112) at ¶¶ 51(c); 52(c); 54(c); 55(c); and 56(c).   The SAC

20  further alleges that section 10(b) defendants Gonzales and Nelson,

21  and defendant Bachus signed the Form 10-Qs.   The "financial results"

22  were simply "announced" by Apollo though.   See, e.g., id. at

23  ¶¶ 51(a); and (b).   That is the total of the allegations as to these

24  particular Form 10-Qs and related earnings announcements.

25         Even in the face of those rote and conclusory allegations,

26  without any analysis, plaintiff baldly declares that "[t]hese

27  allegations of falsity are as detailed, if not far more detailed,

28  than allegations that have been upheld in comparable stock option

1  backdating cases, and cases involving restatements."  Resp. (Doc.

2  129) at 11:17-19 (citations omitted).  Careful review of plaintiff's

3  cited authority belies this assertion, and conveniently disregards

4  case law supporting the contrary point of view, *i.e.,* the foregoing

5  falsity allegations do not satisfy the PSLRA.

6       Indeed, the allegation quoted is strikingly similar to the

7  complaint in <u>Hansen</u> which alleged:

8                [A]ll of the . . . financial statements
                 and press releases issued by Hansen were
9                false and misleading when issued because
                 the Company did not reveal that it had
10               engaged in the practice of backdating option
                 grants, had understated its compensation expenses
11               and potential tax liabilities and overstated
                 its net income.

12

13 <u>Hansen</u>, 527 F.Supp.2d at 1152 (citation omitted).  The <u>Hansen</u> court

14 held that the complaint "violat[ed] . . . the [PSLRA]'s requirement

15 that a complaint must specify the reasons why *each* statement is

16 alleged to have been misleading[]" because, *inter alia*, "nowhere"

17 therein did plaintiff "explain in which of th[ose] . . . ways . . .

18 each of the 17 pages of allegedly false statements [we]re false."

19 <u>Id.</u>

20       To be sure, in contrast to <u>Hansen</u>, here the SAC does number

21 each false statement and alleges that "misleading statements were

22 false individually or by category[.]"  <u>See</u> <u>id.</u>  Those stylistic

23 differences do not render the reasoning of <u>Hansen</u> any less

24 applicable here though because the fundamental pleading shortfall is

25 the same – lack of particularity as to falsity.  The allegations as

26 to these Form 10-Qs and their related press releases lack a

27 foundation in particular facts.  <u>Cf</u>. <u>In re Daou Systems, Inc.</u>, 411

28 F.3d 1006, 1017 (9th Cir. 2005) (citation and internal quotation

marks omitted) (in pleading irregularities in revenue recognition, "[a] general allegation that the practices at issue resulted in a false report of company earnings is not a sufficiently particular claim of misrepresentation to satisfy Rule 9(b)[]"). The SAC does not include details such as the amounts of the alleged overstatements or understatements, or what compensation expenses were associated with the backdating.

Plaintiff's cited authority does nothing to dispel this court of its view that the SAC does not plead falsity with the necessary particularity as to the Form 10-Qs and press releases discussed in this section. For example, in Middlesex Retirement System v. Quest Software Inc., 527 F.Supp.2d 1164 (C.D.Cal. 2007), the court found, albeit in the context of scienter, that investors did not state with sufficient particularity the allegation that the company's financial statements failed to report $150 million as a result of backdated stock option grants where the complaint did not "state what the unreported expense was for each individual year that improperly granted options were given." Id. at 1189. Therefore, rather than supporting plaintiff's position herein, Middlesex actually supports the defense argument as to lack of particularity.

Plaintiff fares no better with its reliance upon In re Cylink Sec. Litig., 178 F.Supp.2d 1077 (N.D.Cal. 2001). The Cylink court was considering the issue of what satisfies the PSLRA's requirement that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." See 15 U.S.C. § 17u-4(b)(1). In addressing that narrow issue, the court held that "the existence of restated financial results [wa]s

1  sufficient to support plaintiffs' belief that the statements were
2  false." Id. at 1084. Significantly, however, none of the
3  allegations in the SAC are based upon information and belief.
4      This is yet another instance where the SAC contains merely
5  "[a] litany of alleged false statements *unaccompanied by* the
6  pleading of *specific facts* indicating why those statements were
7  false[.]" See Metzler, 540 F.3d at 1070 (emphasis added) (citing
8  Falkowski v. Imation Corp., 309 F.3d 1123, 1133 (9th Cir. 2002)
9  ("Although the allegations here are voluminous, they do not rise to
10 the level of specificity required under the PSLRA. The allegations
11 consist of vague claims about what statements were false or
12 misleading, how they were false, and why we can infer intent to
13 mislead. We have dismissed much more specific and compelling
14 allegations.")). The blanket assertion of falsity as to overstating
15 Apollo's net income and earnings per share and understating Apollo's
16 compensation and tax expenses associated with backdated stock
17 options, quite simply, does not meet the PSLRA's "exacting
18 requirements for pleading 'falsity.'" See id. Thus, to the extent
19 defendants are seeking dismissal of false and misleading statements
20 Nos. 4-7, ¶¶ 51(a)(b); and ¶¶ 52(a)(b); Nos. 10-15, ¶¶ 54(a)(b);
21 ¶¶ 55(a)(b); and ¶¶ 56(a)(b), they are entitled to such relief.

22                    ***f.  Earnings Announcements***

23     The individual defendants are entitled to dismissal of the 17
24 earnings announcement allegations because, critically, they are not
25 specifically identified therein, much less that they made, prepared
26 or disseminated those earnings announcements.
27     This is a significant omission for two reasons. First,
28 "[g]enerally, only those defendants who actually make a false or

1    misleading statement can be held liable under section 10(b) or Rule

2    10b-5." Downey, 2009 WL 736802, at *5 (citation omitted).  Second,

3    as the individual defendants are quick to point out, to satisfy the

4    particularity requirements for pleading falsity, among other things,

5    "'a pleader must identify the individual who made the alleged

6    representation[.]" Apollo I, 633 F.Supp.2d at 783 (quoting Hansen,

7    527 F.Supp.2d at 1151).  Defendants argue that the SAC's press

8    release allegations do not meet that standard because they do not

9    "identify any particular [individual] Defendant[s] responsible for

10   the preparation and dissemination of th[os]e statements[.]" Mot.

11   (Doc. 120) at 8:23-24.  Instead, the SAC generally alleges that

12   "*Apollo* announced financial results." Id. at 9:1 (citation and

13   internal quotation marks omitted) (emphasis added).

14       Plaintiff retorts that the SAC alleges "*who* made . . . false

15   and misleading earnings release[s][.]" Resp. (Doc. 129) at 11:6-7

16   (citing [SAC (Doc. 112) at] ¶¶ 49-66; [SAC], Exh. 1-35) (emphasis

17   added).  Citing to those same 17 paragraphs, earlier in its

18   response, plaintiff similarly declares that the SAC complies with

19   Rule 9(b) and the PSLRA in that, *inter alia*, it "alleges . . . *who*

20   made ["false and misleading . . . financial statements][.]" Id. at

21   1:20-22 (citations omitted) (emphasis added).  Plaintiff does not

22   specify where in any of the SAC's cited paragraphs, or in the 17

23   earnings announcement exhibits, totaling 177 pages, the name of a

24   single individual defendant can be found.  After closely reviewing

25   each of the paragraphs to which plaintiff cites and the

26   corresponding press releases, it is obvious why plaintiff resorted

27   to such vague declarations in its response.  The SAC is void of any

28   allegations as to exactly who made, prepared or disseminated the

1 purportedly misleading press releases.  Merely because plaintiff

2 claims that the SAC contains such allegations does not make it so.

3      Moreover, as this court previously noted, individual defendants

4 such as corporate officers like Nelson and Gonzales, "cannot . . .

5 be liable for . . . press releases, except to the extent that there

6 are specific statements attributed to them, or the press releases

7 are otherwise connected to them[.]" <u>Apollo I</u>, 633 F.Supp.2d at 808,

8 n. 13 (citation and internal quotation marks omitted).  The SAC

9 likewise is void of any allegations that the 17 press releases or

10 earnings announcements at issue contain "specific statements" which

11 may be "attributed" to any of the individual defendants.  Nor does

12 the SAC contain any other allegations "connecting" the press

13 releases to those defendants.  Finally, the general allegations that

14 "Apollo announced financial results[,]" <u>see</u>, <u>e.g.</u>, SAC (Doc. 112) at

15 ¶ 50(a), "cannot be attributed to the Individual Defendants under

16 the group pleading doctrine because, as this Court . . . previously

17 held,"[26] that "doctrine did not survive the PSLRA." <u>See Downey</u>,

18 2009 WL 736802, at *7 (footnote and citation omitted).  For these

19 reasons, the court grants the individual defendants' motion to

20 dismiss insofar as it is directed to allegedly false and misleading

21 earnings announcements, i.e., the even numbered (two through thirty-

22 four inclusive) alleged false and misleading statements.

23      Finally, because the court has found that the SAC does not

24 sufficiently plead falsity with respect to any statements which were

25 preceded by an earnings announcement, the SAC's allegations as to

26

27

28      [26]  <u>Apollo I</u>, 633 F.Supp.2d at 809 (citation and internal quotation marks omitted) ("This court [j]oin[s] the majority of other courts in this Circuit, . . . hold[ing] that group pleading is no longer viable under the PSLRA.")

1  Apollo making those announcements is not a form of actionable

2  conduct under section 10(b).  Apollo is thus entitled to dismissal

3  of these 17 earnings announcement statements referenced above.

4  ### *4.  Backdating Denials*

5       Lastly, the SAC includes six allegedly false statements wherein

6  plaintiff claims that certain defendants denied any wrongdoing as to

7  Apollo's stock option practices.  More specifically, the SAC alleges

8  that a section 10(b) defendant Norton, then Chairmen of Apollo's

9  Compensation Committee, denied backdating stock options.  See SAC

10 (Doc. 112) at ¶ 72 (No. 49).  Further, the SAC alleges that after a

11 June 8, 2006 report of a Lehman Brothers' analyst, "Apollo continued

12 to issue false statements and half-truths about the backdating at

13 the Company[]" on five different occasions.  Id. at ¶ 70; and at

14 ¶¶ 73-91 (Nos. 50-54).

15      The individual defendants offer several reasons why the court

16 should dismiss these six statements pertaining to backdating

17 denials.  First, they argue that four of these denial allegations

18 are inadequately pled because they are not attributable to any of

19 the individual section 10(b) defendants.  Second, there are no

20 allegations that any particular section 10(b) defendant was

21 instrumental in preparing or disseminating these statements.  Third,

22 the individual defendants contend that the two statements which the

23 SAC directly attributes to section 10(b) defendants are,

24 nonetheless, deficient.  One statement, "fails to plead falsity

25 adequately[,]" while the other "fails to plead the requisite

26 particulars" in that it "pleads only the date, nothing more."

27 Defs'. Mot. (Doc. 120) at 13:15 (citation omitted); and at 14:4-5.

28      Apollo makes a single, temporal argument, noting that two of

1   the six denial statements, *i.e.*, Nos. 53 (¶ 86) and 54 (¶ 54) were

2   made after the class period.  Apollo thus baldly asserts that

3   "[p]laintiff cannot predicate claims of fraud on [either of those]

4   statements[.]"  Apollo Mot. (Doc. 122) at 18:23.

5       At the risk of repetition, plaintiff did not directly respond

6   to any of these defense arguments.  It merely offers this one

7   sentence declaration: "[T]he [SAC] alleges that certain of Apollo's

8   denials of misconduct throughout the Class Period were materially

9   false and misleading because *defendants* knew or were deliberately

10  reckless in not knowing that Apollo had in fact engaged in the very

11  conduct that they were denying."  Resp. (Doc. 129) at 13:15-19

12  (citations omitted) (emphasis added).  That sweeping declaration,

13  void of any legal analysis,[27] and failing to identify *any* particular

14  defendant, or the six statements at issue, is hardly a meaningful

15  response to defendants' arguments.  Moreover, this retort does not

16  in any way elucidate plaintiff's conclusory assertion that the SAC

17  "explains why the denials of misconduct were false when made."  Id.

18  at 13:14-15 (emphasis omitted).  Thus, "because plaintiff d[id] not

19  bother to address any of th[ese] other" allegedly false statements

20  addressed by defendants, plaintiff has "failed to discharge [its]

21  burden to successfully rebut defendants' . . . arguments."  See Bare

22  Escentuals, 2010 WL 3893622, at *22.  While that is a sufficient

23  reason in and of itself to grant defendants' motions to dismiss to

24  the extent they are directed at the six backdating denial false

25  statements, as outlined below, there are additional substantive

26  _____

27      [27]    Plaintiff cites to Institutional Investors Group v. Avaya, Inc., 564
    F.3d 242, 270 (3rd Cir. 2009), which obviously is of limited precedential value
28  given that it is outside the Ninth Circuit.  Moreover, without the benefit of any
    legal analysis whatsoever from plaintiff, the relevance of the cited page is not
    apparent.

1 | reasons also warranting dismissal.

2 | ### *a. Post-Class Period Statements*

3 | Here, as the SAC alleges, the class period is between
4 | November 28, 2001 and October 18, 2006.  SAC (Doc. 112) at 1, ¶ 1.
5 | Among other things, the SAC premises section 10(b) liability
6 | expressly upon "defendants' false and misleading statements *issued*
7 | *during the class period*[.]" <u>Id.</u> at 20:3-4 (bold and capitalized
8 | emphasis omitted) (italicized emphasis added).  Despite that, the
9 | SAC includes two allegedly false statements made on November 3, 2006
10 | – roughly two and a half weeks after the class period.  <u>See id.</u> at
11 | ¶ 86 (No. 53); and ¶ 90 (No. 54).

12 | In a securities fraud action, "[t]he class period defines the
13 | time during which defendants' fraud was allegedly alive in the
14 | market[.]"  <u>In re Clearly Canadian Sec. Litig.</u>, 875 F.Supp. 1410,
15 | 1420 (N.D.Cal. 1995).  Thus, "a defendant may be held liable, . . .
16 | *only* for the statements made during the class period."  <u>In re REMEC</u>
17 | <u>Inc. Sec. Litig.</u>, 702 F.Supp. 1201, 1223 (S.D.Cal. 2010) (citations
18 | omitted) (emphasis added); <u>see also</u> <u>Hodges v. Akeena Solar, Inc.</u>,
19 | 2010 WL 3705345, at *2 (N.D.Cal. 2010) (striking "allegedly false
20 | and misleading statements . . . made prior to the start of the Class
21 | Period" because they could "not serve as a basis for liability as a
22 | matter of law"; <u>Clearly Canadian</u>, 875 F.Supp. at 1420 (striking as
23 | "irrelevant to plaintiffs' fraud claims . . . statements made . . .
24 | before or after the purported class period").  Consequently, because
25 | the class period here, November 28, 2001 through October 18, 2006,
26 | dictates the period of liability, defendants cannot be liable for
27 | the two allegedly false statements, *i.e.*, Nos. 53 and 54, made after
28 | the class period.  Perhaps plaintiff realizes this because nowhere

1   in its response does it even cite to these statements, let alone

2   argue that they can form the basis for a section 10(b) misleading

3   statement claim.   Accordingly, the court grants defendants' motion

4   to dismiss to the extent it is based upon false statements No. 53

5   (¶ 86); and No. 54 (¶ 90).

6                        ***b.   Lack of Attribution***

7        Of the four remaining backdating denial statements, the SAC

8   attributes two of them strictly to Apollo.   See id. at ¶¶ 74 (No.

9   50); and 76 (No. 51).   The SAC alleges that on June 9, 2006, "the

10  Company issued a news release denying that it had backdated stock

11  options."   Id. at 38:24-25, ¶ 74.   Further, the SAC alleges:

12              Apollo claimed that it had reviewed its
                stock option practices 'including reviewing
13              documents and interviewing employees,' and
                that Apollo's management believed that Apollo
14              had 'complied with all applicable laws . . .
                in granting options to officers and it has not
15              backdated options.'

16  Id. at 38:25-28, ¶ 74.   Likewise, the SAC alleges:

17              [Apollo] issued a press release disclosing
                that it had received a subpoena from the U.S.
18              Attorney for the Southern District of New
                York requesting documents relating to Apollo's
19              stock option grants.   Apollo again denied
                impropriety, stating that 'Apollo's board of
20              directors had hired an outside firm to review
                and confirm [the company's] initial conclusions
21              that [the Company] acted appropriately regarding
                its stock option practices.'

22

23  Id. at 39:6-11, ¶ 76.   As to these denial allegations, the SAC does

24  not include even the most basic details the identity, *i.e.,* the

25  "who" of any of the individual defendants, Blair, Gonzales, Nelson

26  or Norton.   Thus, the SAC does not adequately allege that any of

27  them made a false statement on the basis of those two press releases

28  attributable solely to Apollo.

1    Not only does the SAC fail to name any of the section 10(b)
2  individual defendants in those allegations, it also does not allege
3  that they "played any role whatsoever in the preparation or
4  dissemination of" those two press releases.  See Hansen, 527
5  F.Supp.2d at 1153.  Finally, to the extent plaintiff is attempting
6  to rely upon the group pleading doctrine, it cannot.  "[T]he general
7  allegations against [Apollo] cannot be attributed to the Individual
8  Defendants under th[at] . . . doctrine, because, as this Court . . .
9  previously held, the group pleading doctrine did not survive the
10 PSLRA."  See In re Downey Sec. Litig., 2009 WL 736802, at *7
11 (C.D.Cal. 2009) (citation and footnote omitted); Apollo I, 633
12 F.Supp.2d at 809; see also Hansen, 527 F.Supp.2d at 1153-54 ("A
13 defendant must actually make a false or misleading statement in
14 order to be held liable under Section 10(b).").  In light of the
15 foregoing, the court grants the individual defendants' motion to
16 dismiss insofar as it is based upon false statement No. 50
17 (¶ 74) and No. 51 (¶ 76).

18                    ***c.  Form 8-K***

19    The SAC does specifically identify one of the section 10(b)
20 defendants, Ms. Gonzales, as having made an allegedly false
21 statement in a Form 8-K.  "[A] Form 8-K filing is required from an
22 issuer of securities when substantial events occur[.]"  S.E.C. v.
23 Gemstar-TVGuide Intern., Inc., 401 F.3d 1031, 1059 (9th Cir. 2005)
24 (citation and internal quotation marks omitted).  The SAC alleges
25 that "[o]n June 20, 2006, Apollo filed a Form 8-K signed by
26 Gonzales[]" and two other non-section 10(b) defendants, Bachus and
27 Mueller.  SAC (Doc. 112) at 39, ¶ 77 (No. 52).  That Form repeated
28 Apollo's prior statement that its "board of directors has hired an

1  outside firm to review and confirm [Apollo's] initial conclusions
2  that [Apollo] acted appropriately regarding its stock option
3  practices.'" <u>Id.</u> at 39, ¶ 76 (No. 51).  That statement was allegedly
4  "false and misleading" because "Apollo had not 'acted appropriately
5  regarding its stock option practices[.]'" <u>Id.</u> at 39,
6  ¶ 78.

7      That allegation ignores the broader context of the
8  Form 8, however.  It is self-evident that the purpose of that Form
9  was to announce that Apollo had hired an outside firm.  Moreover,
10 the outside firm was tasked with "'review[ing] and confirm[ing]
11 [Apollo's ] *initial* conclusions that [Apollo] had acted
12 appropriately regarding its stock option practices.'" <u>Id.</u> at 39,
13 ¶ 76 (emphasis added).  As worded, this Form left open the
14 possibility that those "initial conclusions" could be changed at a
15 later date, depending upon the outcome of the outside review.  Thus,
16 on the face of it there is nothing false or misleading about
17 statement 52, and the SAC does not suggest otherwise.  This
18 allegation also lacks specific facts indicating why that Form 8 was
19 false at the time it was signed.  <u>See</u> <u>In re Vantive Corp. Sec.</u>
20 <u>Litig.</u>, 283 F.3d 1079, 1086 (9th Cir. 2002) (falsity not established
21 due to lack of particularity where "much of the complaint fail[ed]
22 to allege any facts indicat[ing] why th[e] statement would have been
23 misleading at the several points at which it was alleged to have
24 been made[]").  The foregoing provides an alternative basis for
25 granting defendants' motion to dismiss to the extent it is premised
26 upon false statement No. 52 (¶ 77).

27                    ***d. Norton's Denial of Backdating***
28     The SAC alleges that "[o]n June 7, 2006, in response to [the

1   Lehman Brothers'] report . . . question[ing] the timing of Apollo's

2   stock option grants, Norton, the Chairman of Apollo's Compensation

3   Committee[,]' and a section 10(b) defendant, "stated that 'Our

4   option policies are clean and straightforward.  We never backdated

5   options.  Never once.'" SAC (Doc. 112) at 38, ¶ 72 (No. 49).

6   Defendant Norton argues that these allegations are "insufficient[]"

7   because they do not include "the requisite particulars[.]" Defs'.

8   Mot. (Doc. 120) at 14:7 and 14:4.  It is impossible to discern from

9   the SAC whether Mr. Norton's alleged remark was publicly made and,

10  if so, under what circumstances.  Without factual allegations such

11  as the "time[], . . . , place[], . . . benefits received, and other

12  benefits of the alleged fraudulent activity[,]" this allegation does

13  not comport with either the PSLRA or Rule 9(b).  Hence, defendant

14  Norton does not have notice of the "particular misconduct . . . so

15  that []he[] can defend against the charge and not just deny that

16  []he[] has done anything wrong."  See Apollo I, 633 F.Supp.2d at 783

17  (citations and internal quotation marks omitted).   For these

18  reasons, coupled with  plaintiff's failure to counter defendant

19  Norton's argument, the court grants his motion to the extent it is

20  based upon false statement No. 49 (¶ 72)).

21      As with the SAC's backdating allegations, it is a culmination

22  of factors – not the omission of a single factor – which leaves the

23  court with the firm conviction that the SAC does not plead falsity

24  in accordance with the requisite degree of particularity.  The

25  hallmark of the SAC continues to be what was "[p]erhaps the most

26  troubling aspect of the FAC[.]" See Apollo I, 633 F.Supp.2d at 786.

27  That is, even with amendment, the SAC's false and misleading

28  statements remain nothing more than "'vague allegations of

1  deception' . . . 'unaccompanied by a particularized explanation

2  stating *why* the defendant's alleged statements or omissions are

3  deceitful." Id. (quoting Metzler, 540 F.3d at 1061 (citation

4  omitted) (emphasis added by Metzler Court). Additionally, plaintiff

5  disregarded Apollo I because the SAC, like the FAC, is not "clear

6  and concise in identifying the false statements and *articulating the*

7  *factual allegations supporting an inference* that the *statement is*

8  *false or misleading*." Id. at 786-787 (citation and internal

9  quotation marks omitted)) (emphasis added).

10      Seemingly, plaintiff has mistaken quantity for quality. Here,

11 quantity did not cure the deficits in the FAC. In fact, especially

12 with respect to the addition of the October 20, 2003 grants, if

13 anything, quantity made the weaknesses all the more appreciable. In

14 short, this prolix and discursive complaint does not satisfy the

15 PSLRA's stringent pleading standards. As the Fifth Circuit has

16 pointedly observed, a "long-winded, even prolix" style of pleading

17 "is not an uncommon mask for an absence of detail." Williams v. WMX

18 Techologies, Inc., 112 F.3d 175, 178 (5th Cir. 1997). Here, as in

19 Williams, the SAC, "although long, states little with

20 particularity." See id. Likewise, the Ninth Circuit's comment in

21 Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981 (9th Cir. 2009),

22 albeit in the scienter context, is an apt description of the SAC.

23 "The plaintiff[] . . . assume[s] that compiling a large quantity of

24 otherwise questionable allegations" will satisfy the particularity

25 pleading requirements. See id., at 1008. It does not. Succinctly

26 put, the SAC falls far short of satisfying the stringent pleading

27 standards of the PSLRA and Rule 9(b).

28      Because the court has expressly found that at least one of the

1  elements of plaintiff's section 10(b) claim is missing, *i.e.*,
2  falsity, that claim fails, and there is no need for the court to
3  consider defendants' loss causation and scienter arguments.  See
4  Cutera, 610 F.3d at 1108 n. 1; accord In re 2007 Novastar Fin., Inc.
5  Sec. Litig., 579 F.3d 878, 884 n. 5 (8th Cir. 2009) ("Because we
6  conclude that the district court properly dismissed the complaint
7  for failing to comply with the PSLRA's pleading requirements
8  concerning falsity under § 78u-4(b)(1), we need not address . . .
9  additional arguments concerning . . . compliance with the PSLRA's
10 pleading requirements concerning scienter under § 78u-4(b)(2).")

11 ***III.   Section 20A Claim***

12     The FAC alleged that all defendants violated section 20(A)'s
13 proscription against "contemporaneous" insider trading, 15 U.S.C.
14 § 78t-1(a), but now the SAC names only one defendant, John Blair, in
15 this claim.  In Apollo I, this court found that the insider trading
16 claim against defendant Blair was "lacking" because the FAC did not
17 plead such facts.  Id.

18     Defendant Blair continues to argue that the SAC "fail[s] to
19 describe [his] prior history[,]" and hence it does not state a
20 section 20A(a) claim against him.  Defs'. Mot. (Doc. 120) at
21 14:15-16.  Plaintiff disagrees that allegations of Blair's prior
22 trading history are necessary to state a section 20A(a) claim
23 against him.  Plaintiff readily concedes, though, that one can be
24 liable under section 20A "*only* where an independent violation of
25 another provisions of securities law has occurred[.]" Resp. (Doc.
26 129) at 18:22-23 (citation and internal quotation marks omitted)
27 (emphasis added).

28     That is an accurate statement of the law in this Circuit.

- 72 -

1  "Claims under Section 20A are derivative and therefore require an
2  independent violation of the Exchange Act."  In re Oracle Sec.
3  Litig., 627 F.3d 376, 394 (9th Cir. 2010) (citation and internal
4  quotation marks omitted).  Consequently, regardless of whether the
5  SAC includes allegations of defendant Blair's trading history,
6  because the court has found that plaintiff's section 10(b) claim
7  must be dismissed, that finding requires dismissal of the section
8  20A claim against defendant Blair.  See id. (plaintiffs'
9  contemporaneous trading claims "end[ed]" because they could not
10 establish a triable issue on loss causation as to their other
11 Exchange Act claims).

12 *IV.  Section 20(a) Claim*

13      After reciting section 20(a) of the Exchange Act, the Ninth
14 Circuit in Zucco Partners, reiterated that "a defendant employee of
15 a corporation who has violated the securities law will be jointly
16 and severally liable to the plaintiff, as long as the plaintiff
17 demonstrates 'a primary violation of federal securities law' *and*
18 that 'the defendant exercised actual power or control over the
19 primary violator.'" Zucco Partners, 552 F.3d at 990 (citing America
20 West, 320 F.3d at 945) (quoting Howard v. Everex Sys., Inc., 228
21 F.3d 1057, 1065 (9th Cir. 2000) (quotation marks omitted)) (other
22 citations omitted)) (emphasis added).  Put differently, "[c]ontrol
23 person liability is secondary only and cannot exist in the absence
24 of a primary violation."  In re Silicon Storage Technology, Inc.
25 Deriv. Litig., 2009 WL 1974535, at *11 (N.D.Cal. July 7, 2009)
26 (citations and internal quotation marks omitted).  So where, as
27 here, the section 10(b) claims have been dismissed, "the § 20(a)
28 claims [a]re also properly dismissed."  See Cutera, 610 F.3d at 1113

- 73 -

n. 6.

**_V.   Motion to Strike_**

Having granted defendants' motion to dismiss, there is no need to consider their request for alternative relief pursuant to FED.R.CIV.P. 12 (f).  Indeed, dismissal renders moot that alternative motion to strike.

**_VI.   Amendment_**

Lastly, plaintiff perfunctorily "requests leave to amend . . . [s]hould the Court grant any portion of defendants' motions to dismiss[.]" Resp. (Doc. 129) at 32:20-22.  Defendants did not address this one sentence "request."

In granting plaintiff's "'request' for leave [to amend][,]" in Apollo I, this court explained that "[t]he pleading deficiencies" in the FAC did not lie "in the raw content of the FAC, but in the absence of rigorously particularized allegations in accordance with the PSLRA."  Apollo I, 633 F.Supp.2d at 832 (citation and internal quotation marks omitted).  In allowing amendment, the court expressly "advised" plaintiff "that failure to cure the pleading deficiencies identified therein, _and_ failure to comply with the relevant case law in that regard, _may well lead to dismissal_ of these claims _in the future_." Id. (emphasis added).  Thereafter, plaintiff acknowledged "that it [was] '[m]indful that [Apollo I] required [it] to amend [its] Complaint to more particularly allege[] the falsity of the alleged misstatements[.]'" Apollo II, 690 F.Supp.2d at 981 (quoting Mot. (Doc. 107) at 3).  Nonetheless even after amendment, as thoroughly discussed herein, the hallmark of the SAC is, still, the "absence of rigorously particularized allegations in accordance with the PSLRA[]" and Rule 9(b).  See

- 74 -

1  Apollo I, 633 F.Supp.2d at 832 (citation and internal quotation
2  marks omitted).

3       Denial of leave to amend is subject to an abuse of discretion
4  standard of review.  See Telesaursus VPC, LLC v. Power, 623 F.3d
5  998, 1003 (9th Cir. 2010).  "[W]here the plaintiff has previously
6  been granted leave to amend and has subsequently failed to add the
7  requisite particularity to its claims, [t]he district court's
8  discretion to deny leave to amend is particularly broad.'" Zucco
9  Partners, 552 F.3d at 1007 (citations and internal quotation marks
10 omitted).  Moreover, as the Ninth Circuit has repeatedly recognized,
11 "[t]he fact that [plaintiff] failed to correct the deficiencies in
12 its [FAC] is 'a strong indication that the plaintiffs have no
13 additional facts to plead'."  See id., (quoting Vantive Corp., 283
14 F.3d at 1098).  For that reason, the Zucco Partners Court held that
15 the "district court did not err when it dismissed the SAC with
16 prejudice, since it was clear that the plaintiffs had made their
17 best case and had been found wanting."  Id. (citing Metzler, 540
18 F.3d at 1072 ("upholding a dismissal with prejudice where, inter
19 alia, the deficiencies at issue 'persisted in every prior iteration
20 of the [complaint]'").  Likewise, "[w]here the plaintiff fails to
21 set forth any additional facts that could save the complaint,
22 . . . , dismissal with prejudice is appropriate."  Finisar II, 2009
23 WL 3072882, at *15 (citing, inter alia, In re Silicon Graphics Inc.
24 Sec. Litig., 183 F.3d 970, 991 (9th Cir. 1999), abrogated on other
25 grounds, Tellabs, 551 U.S. at 322-24, 127 S.Ct. 2499, 168 L.Ed.2d
26 179)).

27      Application of those rules to the present case mandates that
28 the SAC be dismissed without prejudice to renew.  Plaintiff has been

1   given the opportunity to amend once, following a fairly

2   comprehensive analysis of the FAC's deficiencies and overall

3   weaknesses.  The SAC did not correct those deficiencies; nor has

4   plaintiff offered any additional facts in its response that could

5   be alleged in a third amended complaint, and that would save the SAC

6   from dismissal with prejudice.[28]    See In re MIPS Techs., Inc.

7   Deriv. Litig., 2008 WL 3823726, at *8 (N.D.Cal. Aug. 13, 2008)

8   (dismissing without leave to amend derivative shareholder suit where

9   plaintiff did not "set forth additional facts he could plead in

10  either his briefing or at argument[]).  Further, in contrast to

11  "many securities fraud cases," plaintiff's allegations herein are

12  not based upon "the statements of confidential witnesses and/or

13  employees and former employees[.]" See Hansen, 527 F.Supp.2d at

14  1163.  Therefore, as in Hansen, "it is difficult to imagine what

15  additional facts Plaintiff could allege to satisfy the strict

16  pleading requirements of the PSLRA and Rule 9(b)." Id.  Plaintiff,

17  represented by experienced counsel who routinely practice in the

18  area of securities class action litigation,[29] were given an adequate

19  opportunity to file an amended complaint addressing this court's

20  concerns in Apollo I, and satisfying the governing pleading

21

22      [28]     Plaintiff did not move to amend under FED.R.CIV.P. 15.  Instead, it
    simply "request[ed] leave to amend."  Resp. (Doc. 129) at 32:22.  This is a

23  somewhat telling, although not entirely dispositive, distinction.  Because
    plaintiff sought leave to amend in the form of a request, arguably it was not

24  required to attach a proposed amended complaint or otherwise comply with the
    dictates of LRCiv 15.1.  Among other things, that Rule requires that if "[a] party

25  moves for leave to amend," it "must attach a copy of the proposed amended
    pleading[,]" and it "must indicate in what respect it differs from the pleading

26  which it amends, by bracketing or striking through the text to be deleted and
    underlining the text to be added." LRCiv 15.1 (emphasis added).  Perhaps plaintiff

27  made this "request" as a means of circumventing that Local Rule and because it does
    not have any additional facts.  Otherwise, surely plaintiff would have brought them
    to the attention of the court and defendants.

28      [29]     See Salcido Decl'n (Doc. 33), exh. D thereto.

- 76 -

1   standards as developed in the applicable case law.  Plaintiff did

2   not avail itself of that opportunity.  Accordingly, the court denies

3   plaintiff's "request" for leave to amend and grants defendants'

4   motions to dismiss in their entirety with prejudice and without

5   leave to amend.

6                            ***Conclusion***[30]

7        "To be successful, a securities class-action plaintiff must

8   thread the eye of a needle made smaller and smaller over the years

9   by judicial decree and congressional action."  Alaska Elec. Pension

10  Fund v. Flowserve Corp., 572 F.3d 221, 235 (5th Cir. 2009) (*per*

11  *curiam*) (Hon. Sandra Day O'Connor, Associate Justice of the U.S.

12  Supreme Court (Ret.), sitting by designation pursuant to 28 U.S.C.

13  § 294(a)). In the present case, even with the opportunity for

14  amendment, plaintiff was unable to thread that needle.

15       For all of the reasons set forth herein, IT IS ORDERED that:

16       (1) the "Motion to Dismiss . . . Lead Plaintiff's Second

17  Amended Complaint for Violations of the Federal Securities Laws" by

18  individual defendants John G. Sperling, Todd S. Nelson, Kenda B.

19  Gonzales, Daniel E. Bachus, John Blair, John R. Norton III, Hedy

20  Govenar, Brian E. Mueller, Dino J. DeConcini, Peter Sperling, and

21  Laura Palmer Noone (Doc. 120) is GRANTED;

22       (2) the "Alternative[] [Motion] to Strike Portions of Lead

23

24 ─────────────────────────
         [30]    On March 29, 2011, plaintiff filed a Notice of Supplemental Authority
25  (Doc. 141), "appris[ing]" this court of the recent Supreme Court decision, Matrixx,
    supra, 2011 WL 977060.  Not. (Doc. 141) at 1:1.  Plaintiff asserts that Matrixx
26  "holdings regarding [the] materiality" element of a section 10(b) claims lend
    "further support" for its opposition arguments herein.  Id. at 1:13.  In their
    Reply of that same date, the individual defendants contend, and the court agrees,
27  that Matrixx has "no bearing" on the primary issue herein  – plaintiff's alleged
    "failure to meet the pleading standard for falsity under the PSLRA[.]"  See Reply
28  (Doc. 142) at 1:14-16.  The court thus finds that no supplemental briefing of
    Matrixx is necessary.

                                     - 77 -

1  Plaintiff's Second Amended Complaint for Violations of the Federal
2  Securities Laws[]" (Doc. 120) by the defendants listed in paragraph
3  (1) above is DENIED as MOOT;

4       (3) the "Motion to Dismiss by Defendant Apollo Group, Inc.
5  (Doc. 122) is GRANTED; and

6       (4) the "Motion for Judicial Notice in Support of Lead
7  Plaintiff's Omnibus Opposition to Defendants' Motion to Dismiss the
8  Second Amended Complaint for Violations of the Federal Securities
9  Laws by Plaintiff Pension Trust Fund for Operating Engineers" (Doc.
10  131) is GRANTED.

11       IT IS FURTHER ORDERED that the Second Amended Complaint (Doc.
12  112) is DISMISSED WITH PREJUDICE.  The Clerk of the Court is
13  directed to enter JUDGMENT in favor of defendants and terminate the
14  case.

15       DATED this 31st day of March, 2011.

16
17
18  _____
     Robert C. Broomfield
19  Senior United States District Judge
20
21
22
23  Copies to counsel of record
24
25
26
27
28